## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

|  |  |
|---|---|
| STEPHEN D. WOODBRIDGE and ROBERTA BROWNING, *Plaintiffs*, | |
| v. | No. 23-cv-30093-TSH |
| CITY OF GREENFIELD, *Defendant* | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
## PURSUANT TO FED. R. CIV. P 12(b)(6) FOR
## FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

NOW COMES the Defendant, City of Greenfield (the "City"), and submits the following Memorandum of Law in Support of its Motion to Dismiss pursuant to Rule 12(b)(6) of the Rules of Federal Civil Procedure on the basis that the Plaintiffs' Amended Complaint (the "Amended Complaint"), fails to state a claim upon which relief can be granted.

In further support of the Motion, the City states as follows:

## I.  FACTUAL ALLEGATIONS[1]

### The Woodbridge Property

1.  At all times relevant to this dispute, Plaintiff Stephen D. Woodbridge ("Mr. Woodbridge") was the record owner of 2 parcels of real property located at 87 Stone Ridge Lane and Stone Ridge Lane in Greenfield, Massachusetts ("Woodbridge Property"). Amended Complaint, ¶¶ 13-14.

---

[1] The facts recited herein and which form the basis for this motion are based on the facts set forth in the Amended Complaint, except where noted, as they must be. The City explicitly reserves the right to contest such allegations in the future.

2. On June 23, 2017, the City executed two Instruments of Taking on the Woodbridge Property due to unpaid real estate taxes. Amended Complaint, ¶ 14.

3. Over six months after executing the Instruments of Taking, on January 18, 2018, the City filed a Complaint to Foreclose on the Woodbridge Property with the Massachusetts Land Court (Docket No. 18-TL-000099). A copy of the docket report for this action is attached as Exhibit A hereto.

4. On June 11, 2018, a Citation issued from the Land Court relative to the Woodbridge Land Court proceeding. The Citation was successfully served on Mr. Woodbridge via certified mail on June 21, 2018. Exhibit A.

5. Due to Mr. Woodbridge not appearing or filing a responsive pleading in the matter, on February 27, 2019, the City filed a Motion for General Default, which was allowed by the Land Court on December 12, 2019. Exhibit A.

6. On December 20, 2019, the Land Court entered a Final Judgment as to Tax Taking on the Woodbridge Property. Exhibit A.

7. Over one year later, on December 24, 2020, Mr. Woodbridge filed a Motion to Vacate the Judgment. Exhibit A.

8. After hearing on Mr. Woodbridge's Motion to Vacate on January 21, 2021, the Land Court continued the matter to allow Mr. Woodbridge further time to redeem the Woodbridge Property. Exhibit A.

9. On February 18, 2021, having been unable to redeem the Woodbridge Property, the Land Court denied Mr. Woodbridge's Motion to Vacate. Exhibit A.

10. On October 20, 2021, the City sold one parcel of the Woodbridge Property to Steve Ozcelik and Nuray Ozcelik for $270,000. Amended Complaint, ¶ 17.

902211.1

11. The City has not sold the other parcel of the Woodbridge Property, which has an assessed value of $50,200. Amended Complaint, ¶ 18.

12. The City made no payments to Mr. Woodbridge representing any equity that may have existed in the Woodbridge Property. Amended Complaint, ¶ 22.

### The Browning Property

13. At all times relevant to this dispute, Plaintiff Roberta Browning ("Ms. Browning") was the record owner of real property located at 3 Vernon Street in Greenfield, Massachusetts ("Browning Property"). Amended Complaint, ¶ 23.

14. On April 25, 2016, the City executed an Instrument of Taking on the Browning Property due to unpaid real estate taxes. Amended Complaint, ¶ 24.

15. Over eight months after executing the Instruments of Taking, on January 12, 2017, the City filed a Complaint to Foreclose on the Browning Property with the Massachusetts Land Court (Docket No. 17-TL-000056). Amended Complaint, ¶ 25. A copy of the docket report for this action is attached as Exhibit B hereto.

16. On September 20, 2018, a Citation issued from the Land Court relative to the Browning Land Court proceeding. The Citation was successfully served on Ms. Browning via certified mail on September 22, 2018. Exhibit B.

17. Due to Ms. Browning not appearing or filing a responsive pleading in the matter, on June 24, 2019, the City filed a Motion for General Default, which was allowed by the Land Court on June 27, 2019. Exhibit B.

18. On July 22, 2019, the Land Court entered a Final Judgment as to Tax Taking on the Browning Property. Exhibit B.

19. On October 16, 2020, the City sold the Browning Property to Lindsey M. Doolen for $34,000. Amended Complaint, ¶ 27.

20. The City made no payments to Ms. Browning representing any equity that may have existed in the Browning Property. Amended Complaint, ¶ 31

## II.   STANDARD OF REVIEW

It is well-established that the Court, in evaluating a motion to dismiss, asks "whether the complaint 'state[s] a claim to relief that is plausible on its face,' accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." *Maloy v. Ballori–Lage*, 744 F.3d 250, 252 (1st Cir. 2014), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To cross the plausibility threshold, the plaintiff must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. *Nollet v. Justices of Trial Court of Mass.*, 83 F.Supp.2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000). See also, *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (noting "exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."). Taking judicial notice of pleadings from a state court action does not require the Court to convert a motion to dismiss into one for summary judgment. *Gabovitch v. Shear*, 70 F.3d 1252, FN 2 (1st Cir. 1995), citing *Edwards v. John Hancock Mutual Life Ins. Co.*, 973 F.2d 1027, 1030 n. 1 (1st Cir. 1992).

902211.1

While the Court must accept factual allegations of the Complaint as true, it should not

accept any legal conclusions in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    ARGUMENT

### a.    The Amended Complaint Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted Because The City Has Taken No Independent Action To Deprive The Plaintiffs Of Any Property Interest.

Plaintiffs' Amended Complaint attempts to hold the City liable for its compliance with

the laws of the Commonwealth prescribing the process and procedure for tax takings. While the

Amended Complaint alleges no actions by specific City officials or employees (and names no

individuals as defendants), it attempts to paint the City's ongoing compliance with state law –

and a public statement issued by the Mayor over 18 months after the most recent sale of the

Plaintiffs' property – as an existing "policy" that would make the City liable under Federal law.

This strategy reeks of an attempt to circumvent the sovereign immunity of the Commonwealth

by seeking to cast the City as the responsible party for merely acting as a component of a state

statutory scheme. See, e.g., *Santiago v. Keyes*, 839 F. Supp. 2d 421, 427 (D. Mass. 2012)(

Eleventh Amendment bars actions by private individuals against a state).

#### i.    The purported "policy" relied upon by the Plaintiffs in the Amended Complaint is merely a recitation of state law and the City's ongoing intent to comply with the same.

Under federal law, "[l]ocal governments (and local officials sued in their official

capacities) can be sued under § 1983 'for monetary, declaratory, or injunctive relief where ... the

action that is alleged to be unconstitutional implements or executes a policy statement,

ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"

*Martin v. Gross*, 340 F. Supp. 3d 87, 98–99 (D. Mass. 2018), quoting *Monell v. Dep't of Soc.*

*Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

Other than a conclusory statement that "the City maintained an official policy of retaining the value of property taken from individuals that was in excess of the amounts that those individuals owed to the City in taxes and other costs related to the property," the Amended Complaint provides no factual allegations of any policy, formal or informal, that was in place when the Plaintiffs' property was taken. Amended Complaint, ¶ 32. As set forth herein, the "policy" described in the Amended Complaint merely recites the current state of the law governing tax foreclosure process in Massachusetts.

To buttress its vague and conclusory suggestion of an official City policy, the Amended Complaint highlights a public statement made by the Mayor of Greenfield titled "Protecting Equity for Homeowners Facing Foreclosure" that was released on July 13, 2023 ("Mayor's 2023 Statement"). Other than reiterating continued compliance with state law, the Mayor's 2023 Statement sets forth certain processes and procedures the City will employ going forward to ensure that "foreclosing on residents' real property by the city is a rare occasion and only used as a last resort." Amended Complaint, Exhibit 13. The steps outlined in the Mayor's 2023 Statement are prospective in nature. *Id*. ("To that end, I outline the following steps the city shall take, as a matter of policy, when homeowners are late paying their tax bills…").

As set forth above, the City obtained a Final Judgment relative to the Browning Property on July 22, 2019. Exhibit B. Final Judgment entered with respect to the Woodbridge Property on December 20, 2019. Exhibit A. The Mayor's 2023 Statement was released on July 13, 2023, over three years after the most recent Final Judgment entered with respect to either of the Plaintiffs' property. Amended Complaint, Exhibit 13. In fact, the Mayor's 2023 Statement was released over 18 months after the most recent parcel of Plaintiffs' property was sold. Amended Complaint, ¶¶ 17, 27 & Exhibit 13.

6

902211.1

The Mayor's 2023 Statement, then, can have no bearing as a purported "policy" governing the handling of either of the Plaintiffs' tax liens or the foreclosures or sales of their respective parcels of real property. The Amended Complaint offers no allegations regarding any policy actually in place at the time applicable to their claims and even the conclusory statement relied upon therein merely reflects that the City complied with state law with respect to tax foreclosure proceedings.

Crucially for the Court's analysis here, courts have long held that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). As set forth below, the City, like every other municipality in Massachusetts, had no alternatives for how to handle the foreclosure of the Plaintiffs' property.

1.  The Foreclosure Process, Generally, in Massachusetts

In Massachusetts, state law governs the collection of taxes and sets forth the process and procedure for municipalities handling a taxpayers' refusal or inability to pay such taxes. See, generally, G.L. c. 60. While this complicated process[2] is, admittedly, "archaic and arcane," the

---

[2] While the Supreme Judicial Court has provided an invaluable appendix to its decision in *Tallage Lincoln, LLC v. Williams*, 485 Mass. 449 (2020), the Appeals Court has provided the following "simplified" explanation of the process in its decision in *Ithaca Fin., LLC v. Leger*, 99 Mass. App. Ct. 368, 369–70 (2021), *review denied*, 487 Mass. 1108 (2021):

> When a taxpayer fails to pay his or her real estate taxes, a municipality or its assignee (as occurred here) may conduct a tax taking. See G. L. c. 60, §§ 2C, 53. Once the assigned party provides the requisite notice of taking, it obtains tax title, i.e., legal ownership, to the property subject to the taxpayer's right of redemption, at the time and place designated in the notice. See G. L. c. 60, § 53. After the taking, the assigned party records an instrument of taking in the registry of deeds, which notifies prospective purchasers that the property is being taken. See G. L. c. 60, § 54; *Franklin v. Metcalfe*, 307 Mass. 386, 389-390, 30 N.E.2d 262 (1940). The taxpayer then has six months to "redeem" the property by paying the balance of overdue taxes, fees, costs, and interest. See G. L. c. 60, §§ 61, 65. If the taxpayer does not redeem the property, the assigned party "may bring a petition in the [L]and [C]ourt for the foreclosure of all rights of redemption." G. L. c. 60, § 65.

> Once a petition for foreclosure is filed, the taxpayer is notified of the obligation to appear and answer the petition. G. L. c. 60, §§ 65, 66. The taxpayer's failure to respond or redeem permits the assigned party to move to foreclose the taxpayer's right of redemption. G. L. c. 60, § 67. If the court renders a judgment of

902211.1

dispute in question centers around the final entry of judgment in the Land Court on the parcels in

question and the effects thereof. *Tallage Lincoln, LLC v. Williams*, 485 Mass. 449, 450 (2020).

By operation of law, once a judgment of foreclosure enters, "'strict foreclosure' results

and the assigned party takes absolute title to the property free and clear from any and all

encumbrances thereon." *Ithaca Fin., LLC v. Leger*, 99 Mass. App. Ct. 368, 370 (2021), *review*

*denied*, 487 Mass. 1108 (2021) (citations omitted). Indeed, the state statutory scheme specifically

and emphatically provides that "[i]f a default is entered under section sixty-seven, or if

redemption is not made within the time and upon the terms fixed by the court under the

preceding section, or if at the time fixed for the hearing the person claiming the right to redeem

does not appear to urge his claim, or if upon hearing the court determines that the facts shown do

not entitle him to redeem, a decree shall be entered which shall forever bar all rights of

redemption." G.L. c. 60, § 69 (emphasis added).

Unlike a foreclosure by power of sale in a home mortgage foreclosure, "there is no sale in

a strict foreclosure; the foreclosure judgment extinguishes the taxpayer's remaining interest in

the property -- the right of redemption -- and converts the municipality's or third party's tax title

into absolute title." *Williams*, *supra*, 485 Mass. at 469, citing G. L. c. 60, § 64. The municipality

then can choose whether to retain the property for public use or to sell the property. *Id*. See also,

*Sandwich v. Quirk*, 409 Mass. 380, 384, *cert. denied*, 502 U.S. 814 (1991). Notably, at this point

---

foreclosure, "strict foreclosure" results and the assigned party takes absolute title to the property free and clear from any and all encumbrances thereon. *Williams*, 485 Mass. at 452, 151 N.E.3d 344. See G. L. c. 60, §§ 64, 69.

Pursuant to G. L. c. 60, § 69A, however, the foreclosure judgment may be vacated if the taxpayer pays the entire redemption amount, plus interest, within one year. Beyond one year, the judgment may be vacated upon a showing that the taxpayer's due process rights were denied. See *Williams*, 485 Mass. at 453, 151 N.E.3d 344; *Ithaca Fin., LLC v. Lopez*, 95 Mass. App. Ct. 241, 243, 137 N.E.3d 398 (2019) ("Absent a showing of a due process violation, strict adherence to this one-year period is mandatory").

902211.1

in the process, "the taxpayer loses any equity that he or she had in the property, no matter how small the amount of taxes owed." *Williams, supra,* 485 Mass. at 469, citing *Tallage LLC v. Meaney,* Mass. Land Ct. No. 11 TL 143094 (June 26, 2015).

2.  Treatment of Sale Proceeds or Equity in Property Once a
    Municipality Takes Title

In this case, the Browning Property and one of the two parcels comprising the Woodbridge Property were sold by the City. Amended Complaint, ¶¶17, 18, 27. The second Woodbridge parcel was retained by the City. Amended Complaint, ¶ 18. Plaintiffs suggest in the Amended Complaint that they are entitled to the proceeds from the sale of these parcels in excess of the tax liabilities and related costs and expenses (or the value of the retained parcel in excess thereof), the so-called "excess value of the taken property." Amended Complaint, ¶ 39, 43.

The proceeds of the sales (or the value of the retained parcel), however, are public funds (or public assets) by operation of law under the state statutory scheme that grants a municipality absolute title in the Woodbridge Property and the Browning Property. G. L. c. 60, § 64. Once the right to redeem has been extinguished, the municipality is the sole owner of the property and any proceeds from the sale of such property become public funds. As a result, the City is restricted in how it can distribute or expend those funds under state law.

A municipality's authority to spend public funds in Massachusetts starts from the premise that it may "appropriate money for the exercise of any of its corporate powers; provided, however, that a [municipality] shall not appropriate or expend money for any purpose, on any terms, or under any conditions inconsistent with any applicable provision of any general or special law." G.L. c. 40, § 5.[3] As subsequent case law has long held in Massachusetts, any

---

[3] While G.L. c. 40, § 5 references "towns" in its body, G.L. c. 40, § 1 makes clear that "all laws relative to towns shall apply to cities."

9

expenditure of funds by a municipality "shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object." *Lowell v. Boston*, 111 Mass. 454, 460–61 (1873).

Massachusetts courts have long acknowledged that municipal expenditures must be evaluated "with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare." *Allydonn Realty Corp. v. Holyoke Hous. Auth.*, 304 Mass. 288, 292–93 (1939). Where an expenditure could arguably benefit both public and private purposes, the primary beneficiary of the expenditure is outcome determinative in the analysis. *Id.* "At any rate it is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public." *Id.* (citations omitted).[4]

Above all, the expenditure must be primarily for public benefit, regardless of how meritorious the objective or how sympathetic the recipient of the public funds may be. See, e.g., *Lowell, supra*, 111 Mass. at 472 (use of public funds to rebuild private property destroyed by fire in Boston in 1872 was impermissible); *Fowler v. Selectmen of Danvers*, 90 Mass. 80, 85 (1864)(expenditures to reward residents who enlisted as soldiers were an "illegal and unauthorized expenditure of money"); *Mead v. Inhabitants of Acton*, 139 Mass. 341, 343–44 (1885)(bounties paid to civil war soldiers for service was improper use of public funds);

---

[4] "The paramount test should be whether the expenditure confers a <u>direct public benefit</u> of a reasonably general character, that is to say, <u>to a significant part of the public, as distinguished from a remote and theoretical benefit</u>, and whether the aspects of private advantage are reasonably incidental to carrying out a public purpose in a way which is within the discretion of the Legislature to choose." *Opinion of the Justices to the House of Representatives*, 368 Mass. 880, 885 (1975)(internal quotations and citations omitted)(Emphasis added).

*Whittaker v. Salem*, 216 Mass. 483, 484–85 (1914)(grant of one-year leave of absence with payment of half his salary to a high school principal was an illegal emolument rather than a payment for a public use). In short, a municipality has "no authority to appropriate money for gratuities to persons whose situation may appeal to public sympathy." *Matthews v. Inhabitants of Westborough*, 131 Mass. 521, 522 (1881). In those instances, even when there may be a secondary public benefit to the expenditure, they are illegal because "[t]he direct primary object is to benefit individuals and not the public." *Mead, supra*, 139 Mass. at 344. Such a conclusion is required, regardless of how "meritorious the project may appear in its practical, ethical, or sentimental aspects…" *Whitaker, supra*, 216 Mass. 484. See also, *Lowell, supra*, 111 Mass. at 460-461.[5]

Moreover, the use of public funds to primarily benefit an individual does not become permissible simply by being couched as a legal claim for compensation. *Jones v. Inhabitants of Natick*, 267 Mass. 567, 570 (1929)(despite the efforts to describe a payment to an individual as settlement of a potential claim, the doubtfulness of the claim itself rendered the expenditure illegal and "was in substance and effect a mere gratuity")(citations omitted).

Consistent with this analysis, when the Town of Acton sought to use public funds to compensate soldiers who had served in the Civil War, the Court noted the lack of any obligation of the municipality to make such payments:

> In the case at bar it seems to us clear that the object for which the town of Acton has raised this money is private and not public. The town had made no promise to these soldiers, and is not under any obligation to pay them any bounties. The purpose is not to repay any

---

[5] "The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary."

902211.1

> sums advanced them as an inducement to enlist. The bounty to be paid cannot be regarded in the light of compensation for services rendered; for their services as soldiers were not rendered to the town, and the town had nothing to do with their compensation. The war has been over for many years, and the payment of the bounties cannot encourage enlistment, or in any way affect the public service or promote the public welfare. The direct primary object is to benefit individuals and not the public.

*Mead, supra*, 139 Mass. at 343-344.

As a result, regardless of the sympathy or merit of the recipient, the expenditure of public funds is only permissible if "the aspects of private advantage…are reasonably incidental to carrying out a public purpose." *Court St. Parking Co. v. Boston*, 336 Mass. 224, 231 (1957).

Here, Plaintiffs suggest that the City should have used public funds to pay them for the "excess value of the taken property." There can be no doubt that such expenditure would benefit private individuals – namely, the Plaintiffs here. While that fact alone is not dispositive, *Allydonn Realty Corp., supra*, 304 Mass. at 293, the Plaintiffs have failed to articulate <u>any public purpose whatsoever</u> in utilizing these public funds in the manner they propose. In any event, any <u>public</u> benefit would clearly be secondary to the <u>private</u> benefit to the Plaintiffs, rendering the payments illegal. *Whittaker, supra*, 216 Mass. at 484–85; *Opinion of the Justices to the House of Representatives, supra*, 368 Mass. at 885.

The City, then, by virtue of state law, had <u>no alternative course of action</u> in how to ultimately proceed with respect to the Plaintiffs' property. The state has created a statutory structure for municipalities to pursue unpaid taxes – which the City followed. The state has also determined, by law, that the property in question immediately becomes public property upon the foreclosure of the Plaintiffs' right to redemption. By virtue of that transformation, the City was then prohibited from using public funds (or property) to compensate the Plaintiffs for any theoretical "excess value in the taken property." There has been no action taken by the City that

can in any way be described as a policy sufficient to create liability under *Monell* or its progeny, as the City had no alternative course of action to take at any point along the way. See, *Tuttle, supra,* 471 U.S. at 823.

The Supreme Court has held that "to establish the constitutional violation in *Monell* no evidence [is] needed other than a statement of the policy by the municipal corporation, and its exercise," as well as a causal relation between the policy and the alleged constitutional violation. *Tuttle, supra,* 471 U.S. 808, 822–23. See also, *McCabe v. Life-Line Ambulance Serv., Inc.,* 77 F.3d 540, 544 (1st Cir. 1996)("a municipal liability claim under § 1983 requires proof that the municipality maintained a policy or custom which caused, or was the moving force behind, a deprivation of constitutional rights"), citing *Tuttle, supra,* 471 U.S. at 819; *Monell, supra,* 436 U.S. at 694; *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.), *cert. denied,* 493 U.S. 820, (1989). Failure to adequately allege such a policy is grounds for dismissal. *Malachowski v. Keene,* 787 F.2d 704, 711 (1st Cir. 1986).

While it may be plain to see why the Plaintiffs are unsatisfied with the current system and how it has impacted them, their grievance is with the Commonwealth of Massachusetts (through the legislative process), rather than the City.

Based on the forgoing, the Plaintiffs' Amended Complaint should be dismissed.

**b.   The Amended Complaint Should Be Dismissed Because The Principles Of Res Judicata And Claim Preclusion Dictate That The Claims In The Amended Complaint Are Not Claims Upon Which Relief Can Be Granted By Virtue Of The Final Judgment Entered In The Land Court Proceeding Involving These Parties.**

Despite the presence of Federal claims, Massachusetts law governs the application of res judicata or claim preclusion in this action. *Cruz v. Melecio,* 204 F.3d 14, 18 (1st Cir. 2000)("state

law, with all its wrinkles, applies in deciding the res judicata effect of a state court judgment in a federal court").

"'Res judicata' is a generic term for various doctrines by which a judgment in one action has a binding effect in another." *Heacock v. Heacock*, 402 Mass. 21, 23 n. 2 (1988). The term includes both issue preclusion and claim preclusion. *Id*. "The doctrine of claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action." *Id*. at 23. The affirmative defense of res judicata can be dealt with through a motion to dismiss in some instances. *Woofenden v. Merriam*, 1985 Mass. App. Div. 21, 22 (1985)(defense of res judicata "can be dealt with as a Motion to Dismiss under M.R.C.P 12 (b) (6) where all of the materials are official records available to the judge and not in dispute"). A copy of this decision is attached as Exhibit C hereto. See also, *Dwight v. Dwight*, 371 Mass. 424, 426 (1976)(dismissal granted on the basis of claim preclusion after the Court took judicial notice of court records).

Claim preclusion applies even if the plaintiff in the subsequent action is prepared to present "evidence, grounds, or theories of the case not presented in the first action or to seek remedies or forms of relief not demanded in the first action." *Massaro v. Walsh*, 71 Mass. App. Ct. 562, 565 (2008), citing *Boyd v. Jamaica Plain Co-op. Bank*, 7 Mass. App. Ct. 153, 163 (1999). The principle also applies to so-called claim splitting, which is similarly prohibited where the subsequent claim arises from the same transaction or occurrence as the previous claim. *Woofenden, supra*, 1985 Mass. App. Div. at 34.

In the case at bar, both Plaintiffs were properly served and made party to the respective Land Court proceedings. See Exhibits A & B. While Ms. Browing did not appear in the underlying litigation, Mr. Woodbridge filed a Motion to Vacate the Judgment and raised

arguments before the Court. Exhibit A. In either event, both Ms. Browning and Mr. Woodbridge had the opportunity to raise the very claims they are raising here in the Land Court.

The fact that Ms. Browning did not appear and a default entered has no bearing on the issue of claim preclusion. *Smith v. Am. Int'l Coll., Inc.*, 84 Mass. App. Ct. 1129 (2014). A copy of this decision is attached as Exhibit D hereto. See also, *Genentech, Inc. v. Arendal Mgt., Inc.*, 92 Mass. App. Ct. 1108 (2017)("Under the doctrine of claim preclusion, parties and their privies are barred from relitigating the same claims, including those adjudicated by a default judgment"). A copy of this decision is attached as Exhibit E hereto.  It is similarly irrelevant that the arguments that the Plaintiffs raise here would have been brought as defenses (rather than initial claims) in the Land Court action. *U.S. Nat. Ass'n v. McDermott*, 87 Mass. App. Ct. 1103, *1 (2015). A copy of this decision is attached as Exhibit F hereto.

In evaluating the prior litigation to determine the application of claim preclusion, it is not relevant if "the claims and defenses do not overlap precisely" and the "cause of action need not be a clone of the earlier cause of action." *Fed. Home Loan Mortgage Corp. v. Alvarez*, 87 Mass. App. Ct. 1125, *2 (2015), citing *Korn v. Paul Revere Life Ins. Co.*, 83 Mass. App. Ct. 432, 437 n. 3 (2013), quoting from *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn.*, 142 F.3d 26, 38 (1st Cir. 1998). A copy of this decision is attached as Exhibit G hereto.

Here, the Land Court action was the proper venue to evaluate the sufficiency of the City's claim for taxes owed and finally adjudicate the parties' respective rights in the real property at issue. *Streeter v. Worcester*, 336 Mass. 469, 471 (1957). It was the appropriate forum for the Plaintiffs to have raised any Constitutional challenges to the process or to the handling of any "excess value" in the property. Indeed, Mr. Woodbridge appeared and filed a Motion to Vacate that was heard by the Court. These legal claims should have been raised by the Plaintiffs in the

902211.1

underlying actions in the Land Court. *Montague v. Golrick*, 91 Mass. App. Ct. 1109 (2017)(constitutional issues must be raised via petition in the Land Court to vacate the judgment). A copy of this decision is attached as Exhibit H hereto.

As both Plaintiffs elected not to raise these defenses at that time, they are foreclosed from bringing the current suit to raise those issues now. This principle – claim preclusion – "is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and private peace,' which should be cordially regarded and enforced by the courts....". *Rhode Island Hosp. Tr. Nat. Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 82 (1st Cir. 1986), quoting *Federated Department Stores v. Moitie,* 452 U.S. 394, 401 (1981).

> ### i. The Recent Decision By The United States Supreme Court Has Not Altered This Analysis Or Provided An Excuse For Plaintiffs' Failure To Raise These Constitutional Issues In The Land Court Proceeding.

To the extent that the Plaintiffs have implied that the recent Supreme Court decision, *Tyler v. Hennepin County*, 598 U.S. 631 (2023), has given rise to their claims here, that argument is disingenuous and ineffective.

First, the ruling in *Tyler* does not implicate the Massachusetts statutory structure for tax takings. While the unanimous Court in *Tyler* determined that the Minnesota statutory scheme at issue was unconstitutional for failing to provide any opportunity for a taxpayer to retain their equity in their property, the Court went to great lengths to reaffirm the statutory structure implemented in New York City, which allowed for a limited avenue for taxpayers to recover surplus proceeds from a judicial sale through the legal process. *Tyler*, *supra*, 598 U.S. 644. The Court distinguished the New York City statutory scheme from Minnesota by holding that, "[b]ecause the New York City ordinance did not 'absolutely preclud[e] an owner from obtaining

16

the surplus proceeds of a judicial sale,' but instead simply defined the process through which the owner could claim the surplus, we found no Takings Clause violation." *Id.*, quoting *Nelson v. City of New York*, 352 U.S. 103, 110 (1956). The Court noted that "Minnesota's scheme provides no opportunity for the taxpayer to recover excess value." *Id.* (Emphasis added). For that reason alone, the statutory system was held to be unconstitutional.

In Massachusetts, Land Court judges have the authority to order a judicial sale and reserve the surplus equity for the taxpayer. See, e.g., *Town of Arlington v. Holman*, Mass. Land. Ct., No. 14 TL 148023 (Nov. 30, 2016) (Long, J.). As Judge Long articulated in *Holman*, a copy of which is attached as Exhibit I hereto, existing Masschusetts law empowers a Land Court judge to order a judicial sale of the property in question and reserve the equity therein for the taxpayer. *Id.*, citing G. L. c. 60, § 68. Any taxpayer facing a tax foreclosure, including the Plaintiffs, could request this relief from the Land Court and, if granted, preserve their equity in the property in question.

The Supreme Court in *Tyler* is clear that any opportunity for a taxpayer to recover the excess value of their property is sufficient to find no Constitutional violations. *Tyler*, *supra*, 598 U.S. at 644. Like the New York City system that was explicitly preserved by the Supreme Court in *Tyler*, the Massachusetts system includes a pathway for protection of a taxpayer's equity in their property. As a result, the decision in *Tyler* confirms that the Massachusetts system is Constitutional by virtue of the judicial authority to grant the relief at issue here.

Notwithstanding this legal argument, there is nothing that would have prevented the Plaintiffs here from raising their Constitutional concerns regarding the Massachusetts tax taking system before the Land Court in their respective underlying proceedings. Parties regularly raise constitutional concerns with the Massachusetts tax taking process in Land Court. *Ithaca Fin.,*

17

902211.1

*LLC v. Lopez*, 95 Mass. App. Ct. 241, 246 (2019). See also, e.g., *Tallage LLC vs. Meaney*, Mass. Land Ct., No. 11 TL 143094, *3 n. 8 (June 26, 2015)(a copy of this decision is attached as Exhibit J hereto.); *Russell vs. Barlow*, Mass. Land Ct., No. 03 TL 130055, *13 (RBF) (July 13, 2016)(a copy of this decision is attached as Exhibit K hereto). The fact that the decision in *Tyler* was novel and upended the tax taking system in numerous states across the country does not mean that the Plaintiffs could not have raised the same claims in the Land Court – as, indeed, Ms. Tyler did in raising the then-untested legal argument in her own proceedings.

## IV.    CONCLUSION

For the foregoing reasons, the City respectfully requests that the Plaintiffs' Amended Complaint be dismissed with prejudice.

Dated: October 10, 2023

RESPECTFULLY SUBMITTED,
DEFENDANT CITY OF GREENFIELD,
BY ITS ATTORNEY,

/s/ Jesse W. Belcher-Timme
Jesse W. Belcher-Timme, Esq. (BBO No. 660343)
Doherty, Wallace, Pillsbury & Murphy, P.C.
One Monarch Place, Suite 1900
Springfield, MA 01144-1900
Tel.: (413) 233-9570
Fax: (413) 734-3910
Email: jtimme@dwpm.com

18

902211.1

**CERTIFICATE OF SERVICE**

I, Jesse W. Belcher-Timme, hereby certify that this document has been filed through the

ECF system and sent electronically to the registered participants as identified on the Notice of

Electronic Filing (NEF) on October 10, 2023.


Dated: October 10, 2023                         /s/ Jesse W. Belcher-Timme
                                                Jesse W. Belcher-Timme, Esq.

902211.1

# EXHIBIT A

## 18 TL 000099 Town of Greenfield v. Woodbridge, Stephen D.



- Case Type:
- Tax Lien
- Case Status:
- Closed
- File Date
- 01/18/2018
- DCM Track:

- Initiating Action:
- Tax Lien - two tax takings
- Status Date:
- 12/20/2019
- Case Judge:
- Patterson, Deborah J.
- Next Event:

### Property Information

Stone Ridge Lane
Greenfield
RECORD

| All Information | Party | Event | Docket | Financial | Checks | Receipt | Disposition |

### Party Information

**Town of Greenfield**
- Plaintiff

**Party Attorney**
- Attorney
- Bloom, Esq., Dawn E
- Bar Code
- 659839
- Address
- 43039 Boardwalk Loop
- Punta Gorda, FL 33982
- Phone Number
- (413)529-9936
- Attorney
- Leahy, Esq., Iris Ann
- Bar Code
- 697783
- Address
- Law Office of Iris A. Leahy
  4 Open Square Way
  Suite 217
  Holyoke, MA 01040
- Phone Number
- (413)322-8318

_More Party Information_

**Woodbridge, Stephen D.**
- Defendant

**Party Attorney**
- Attorney
- Pro Se
- Bar Code
- PROPER
- Address
- Phone Number

_More Party Information_

### Events

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 01/21/2021 10:00 AM | Tax Session | Courtroom 403 - Fourth Floor | Motion to Vacate Judgment | Patterson, Deborah J. | Held via video |
| 02/18/2021 10:00 AM | Tax Session | Courtroom 403 - Fourth Floor | Motion to Vacate Judgment | Patterson, Deborah J. | Held via video |

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|

## Docket Information

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|-------------|-------------|-------------|--------------|
| 01/18/2018 | Complaint filed. | | Image |
| 01/18/2018 | Case assigned to the Tax Track per Land Court Standing Order 1:04. | | |
| 01/18/2018 | Land Court filing complaint tax Receipt: 379923 Date: 01/18/2018 | $200.00 | |
| 01/18/2018 | Land Court initial deposit tax Receipt: 379923 Date: 01/18/2018 | $300.00 | |
| 01/18/2018 | Land Court surcharge Receipt: 379923 Date: 01/18/2018 | $15.00 | |
| 01/18/2018 | Tax taking 1 additional parcel Receipt: 379923 Date: 01/18/2018 | $150.00 | |
| 01/19/2018 | Joseph W. Topor, Jr., Esq. appointed as Title Examiner. | | |
| 02/15/2018 | Report filed by Joseph W. Topor, Jr., Esq.. | | Image |
| 02/20/2018 | Land Court examiner costs | $300.00 | |
| 06/11/2018 | Citation issued as to the land described as: Parcel 1 Property: Land & Building Containing: 6.39 AC (more or less) Location: 87 Stone Ridge Ln Parcel ID: R03-10-0 Registry: 6058-112 Land Court: Recorded at: Franklin County Registry of Deeds, Parcel 2 Property: Land Containing: 13.00 AC (more or less) Location: Stone Ridge Ln Parcel ID: R03-2-0 Registry: 6058-112 Lnad Court: Recorded at: Franklin County Registry of Deeds. Returnable 08/06/2018. | | |
| 06/11/2018 | Land Court notices mailing - Certified Mail<br>Issue Date: 06/11/2018<br>Service: Service<br>Method: Certified Mail<br>Cost Per: 11.67<br><br>Stephen D. Woodbridge<br>Mailing Address<br>87 Stone Ridge Ln.<br>Greenfield, MA 01301<br>Tracking Number: 71901706197000807540 Receipt: 387174 Date: 06/11/2018 | $11.67 | |
| 06/29/2018 | Successful Service<br>  Method  : Certified Mail<br>  Issued  : 06/11/2018<br>  Service  : Service<br>  Served  : 06/21/2018<br>  Return  : 06/26/2018<br>  On    : Woodbridge, Stephen D.<br>  Signed By  :<br>  Reason  : Successful<br>  Comment  :<br>  Tracking #: 71901706197000807540 | | |
| 02/27/2019 | Affidavit as to Military Service filed. | | |
| 02/27/2019 | Motion for General Default filed. | | |
| 02/28/2019 | Checklist sent. | | |
| 08/15/2019 | Plaintiff Town of Greenfield Motion to Amend Complaint Filed and Allowed | | Image |
| 12/12/2019 | Checklist completed. | | |
| 12/12/2019 | Motion for General Default allowed. (Patterson, Rec.)<br><br>Judge: Patterson, Deborah J. | | |
| 12/20/2019 | Final Judgment entered as to tax-taking(s): Parcel 1 Property: Land & Building Containing: 6.20 AC (more or less) Location: 87 Stone Ridge Ln Parcel ID: R03-10-0 Registry: 6058-112 Land Court: Recorded at: Franklin County Registry of Deeds, Parcel 2 Property: Land Containing: 12.956 AC (more or less) Location: Stone Ridge Ln Parcel ID: R03-2-0 Registry: 6058-112 Lnad Court: Recorded at: Franklin County Registry of Deeds.<br><br>Judge: Patterson, Deborah J. | | |
| 12/27/2019 | Land Court overpayment refund disbursement<br>Notice of disposition sent to: Berenson & Bloom | $138.33 | |
| 12/24/2020 | Land Court cost- vacation of judgment tax lien<br>Judge: Patterson, Deborah J. Receipt: 420048 Date: 12/29/2020 | $11.00 | |
| 12/24/2020 | Motion to Vacate Judgment filed. | | |
| 12/31/2020 | Scheduled<br>Judge: Patterson, Deborah J.<br>Event: Motion to Vacate Judgment<br>Date: 01/21/2021 Time: 10:00 AM | | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 01/19/2021 | Appearance of Iris Ann Leahy, Esq. for Town of Greenfield, filed | | |
| 01/21/2021 | Event Resulted: Motion to Vacate Judgment scheduled on: 01/21/2021 10:00 AM Has been: Held via video Comments: Continued to February 18, 2021 at 10:00 A.M. Deborah J. Patterson, Presiding | | |
| 01/21/2021 | Scheduled Judge: Patterson, Deborah J. Event: Motion to Vacate Judgment Date: 02/18/2021  Time: 10:00 AM | | |
| 02/18/2021 | Event Resulted: Motion to Vacate Judgment scheduled on: 02/18/2021 10:00 AM Has been: Held Comments: Motion to vacate judgment DENIED. Deborah J. Patterson, Presiding | | |

### Financial Summary

| Cost Type | Amount Owed | Amount Paid | Amount Dismissed | Amount Outstanding |
|---|---|---|---|---|
| Cost | $237.67 | $237.67 | $0.00 | $0.00 |
| | $237.67 | $237.67 | $0.00 | $0.00 |

### Money on Deposit

| Account | Applied Amount |
|---|---|
| Land Court Deposit Holding | $11.67 |
| | $11.67 |

### Money Distributed by Court

| Payment Type | Amount |
|---|---|
| Disbursement | $438.33 |
| | $438.33 |

### Check Information

| Created | Payee Name | Description | Account | Check | Amount |
|---|---|---|---|---|---|
| 02/20/2018 | Joseph W. Topor, Jr. | Case: 18 TL 000099 Land Court examiner costs | LCD | 20369 | $300.00 |
| 12/27/2019 | Town of Greenfield | Case: 18 TL 000099 Land Court overpayment refund d | LCD | 32434 | $138.33 |

### Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 379923 | 01/18/2018 | Town of Greenfield | $665.00 |
| 387174 | 06/11/2018 | Bloom, Esq., Dawn E | $11.67 |
| 420048 | 12/29/2020 | Stephen D. Woodbridge | $11.00 |
| | | | $687.67 |

### Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Judgment Entered | 12/20/2019 | Patterson, Deborah J. |

For Land Court only: Name search is currently unavailable. Case type and case number searches are available. For a Land Court name search, contact the Land Court Recorder's Office at 617-788-7470. We apologize for the inconvenience.

# EXHIBIT B

## 17 TL 000056 Town of Greenfield v. Moore, Sybil R. , et al.

Case Type:
Tax Lien

Case Status:
Closed

File Date
01/12/2017

DCM Track:

Initiating Action:
Tax Lien - one tax taking

Status Date:
07/22/2019

Case Judge:

Next Event:

### Property Information

Vernon Street
Greenfield
RECORD

---

| All Information | Party | Docket | Financial | Checks | Receipt | Disposition |

### Party Information

**Town of Greenfield**
- Plaintiff

**Party Attorney**
Attorney
Bloom, Esq., Dawn E
Bar Code
659839
Address
43039 Boardwalk Loop
Punta Gorda, FL  33982
Phone Number
(413)529-9936

More Party Information

**Moore, Sybil R.**
- Defendant

Party Attorney

More Party Information

**Browning, Roberta R.**
- Defendant

Party Attorney

More Party Information

**Internal Revenue Service**
- Defendant

Party Attorney

More Party Information

**US Attorney**
- Defendant

Party Attorney

More Party Information

**USA Attorney General**
- Defendant

Party Attorney

More Party Information

## Docket Information

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 01/12/2017 | Complaint filed. | | Image |
| 01/12/2017 | Case assigned to the Tax Track per Land Court Standing Order 1:04. | | |
| 01/12/2017 | Land Court filing complaint tax Receipt: 360828 Date: 01/12/2017 | $200.00 | |
| 01/12/2017 | Land Court initial deposit tax Receipt: 360828 Date: 01/12/2017 | $300.00 | |
| 01/12/2017 | Land Court surcharge Receipt: 360828 Date: 01/12/2017 | $15.00 | |
| 01/23/2017 | Keith A Campbell, Esq. appointed as Title Examiner. | | |
| 01/27/2017 | Report filed by Keith A Campbell, Esq.. | | Image |
| 01/30/2017 | Land Court examiner costs | $150.00 | |
| 05/22/2017 | Checklist sent. | | |
| 06/12/2017 | Plaintiff Town of Greenfield Motion to Amend Complaint to Strike Sybil R. Moore, filed and allowed. | | Image |
| 07/12/2017 | Checklist completed. | | |
| 12/06/2017 | Checklist sent. | | |
| 09/19/2018 | Checklist completed. | | |
| 09/20/2018 | Citation issued as to the land described as: Property Address: 3 Vernon St Description of Parcel: A parcel of land with any buildings thereon, containing about 6,011.28 sf being described as parcel 89 21 in the office of the Assessors, Greenfield identified in book and page 4038-317, Franklin Registry of Deeds.. Returnable 11/12/2018. | | |
| 09/20/2018 | Land Court notices mailing - Certified Mail  Issue Date: 09/20/2018  Service: Service  Method: Certified Mail  Cost Per: 11,67  USA Attorney General  Mailing Address  Department of Justice  950 Pennsylvania Ave., NW  Room 4545  Washington, DC  20530  Tracking Number: 71901706197000837080  Roberta R. Browning  Mailing Address  13 Elm Terr.  Apt. B  Greenfield, MA  01301  Tracking Number: 71901706197000837097  Roberta R. Browning  Mailing Address  3 Vernon Street  Greenfield, MA  01301  Tracking Number: 71901706197000837103  Internal Revenue Service  Mailing Address  PO Box 9112 STOP 20800  J. F. K. Post Office  Boston, MA  02203  Tracking Number: 71901706197000837110  US Attorney  Mailing Address  U.S. Courthouse, Suite 9200  1 Courthouse Way  Boston, MA  02210  Tracking Number: 71901706197000837127  Internal Revenue Service  Mailing Address  SBISE Headquarters  5000 Ellin Rd.  Lanham, MD  20706  Tracking Number: 71901706197000837134 Receipt: 392919 Date: 09/20/2018 | $70.02 | |
| 09/24/2018 | Successful Service  Method   : Certified Mail  Issued   : 09/20/2018  Service   : Service | | Image |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| | Served   : 09/22/2018<br>Return   : 09/24/2018<br>On       : Browning, Roberta R.<br>Signed By :<br>Reason   : Successful<br>Comment  :<br>Tracking #: 71901706197000837097 | | |
| 09/25/2018 | Unsuccessful Service.<br>Method   : Certified Mail<br>Issued   : 09/20/2018<br>Service  : Service<br>Served   : 09/23/2018<br>Return   : 09/25/2018<br>On       : Browning, Roberta R.<br>Signed By :<br>Reason   : Unsuccessful<br>Comment  : unable to forward<br>Tracking #: 71901706197000837103 | | Image |
| 09/25/2018 | Successful Service<br>Method   : Certified Mail<br>Issued   : 09/20/2018<br>Service  : Service<br>Served   : 09/24/2018<br>Return   : 09/25/2018<br>On       : US Attorney<br>Signed By :<br>Reason   : Successful<br>Comment  :<br>Tracking #: 71901706197000837127 | | Image |
| 10/02/2018 | Successful Service<br>Method   : Certified Mail<br>Issued   : 09/20/2018<br>Service  : Service<br>Served   : 09/26/2018<br>Return   : 10/01/2018<br>On       : Internal Revenue Service<br>Signed By :<br>Reason   : Successful<br>Comment  :<br>Tracking #: 71901706197000837134 | | Image |
| 10/02/2018 | Successful Service<br>Method   : Certified Mail<br>Issued   : 09/20/2018<br>Service  : Service<br>Served   : 09/26/2018<br>Return   : 10/01/2018<br>On       : USA Attorney General<br>Signed By :<br>Reason   : Successful<br>Comment  :<br>Tracking #: 71901706197000837080 | | Image |
| 10/09/2018 | Successful Service<br>Method   : Certified Mail<br>Issued   : 09/20/2018<br>Service  : Service<br>Served   : 09/24/2018<br>Return   : 10/09/2018<br>On       : Internal Revenue Service<br>Signed By :<br>Reason   : Successful<br>Comment  :<br>Tracking #: 71901706197000837110 | | Image |
| 06/24/2019 | Affidavit as to Military Service filed. | | |
| 06/24/2019 | Motion for General Default filed. | | |
| 06/27/2019 | Motion for General Default allowed.  (Patterson, Rec.)<br><br>Judge: Patterson, Deborah J. | | |
| 07/22/2019 | Final Judgment entered as to tax-taking(s): Property Address: 3 Vernon St Description of Parcel: A parcel of land with any buildings thereon, containing about 6,011.28 sf being described as parcel 89 21 in the office of the Assessors, Greenfield identified in book and page 4038-317, Franklin Registry of Deeds..<br><br>Judge: Patterson, Deborah J. | | |
| 07/29/2019 | Land Court overpayment refund disbursement | $79.98 | |

## Financial Summary

| Cost Type | Amount Owed | Amount Paid | Amount Dismissed | Amount Outstanding |
|---|---|---|---|---|
| Cost | $285.02 | $285.02 | $0.00 | $0.00 |
| | $285.02 | $285.02 | $0.00 | $0.00 |

## Money on Deposit

| Account | Applied Amount |
|---|---|
| Land Court Deposit Holding | $70.02 |
| | $70.02 |

## Money Distributed by Court

| Payment Type | Amount |
|---|---|
| Disbursement | $229.98 |
| | $229.98 |

## Check Information

| Created | Payee Name | Description | Account | Check | Amount |
|---|---|---|---|---|---|
| 01/30/2017 | Keith A. Campbell, Esq. | Case: 17 TL 000056 Land Court examiner costs | LCD | 16511 | $150.00 |
| 07/29/2019 | Town of Greenfield | Case: 17 TL 000056 Land Court overpayment refund d | LCD | 31598 | $79.98 |

## Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 360828 | 01/12/2017 | Town of Greenfield | $515.00 |
| 392919 | 09/20/2018 | Bloom, Esq., Dawn E | $70.02 |
| | | | $585.02 |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Judgment Entered | 07/22/2019 | |

For Land Court only: Name search is currently unavailable. Case type and case number searches are available. For a Land Court name search, contact the Land Court Recorder's Office at 617-788-7470. We apologize for the inconvenience.

# EXHIBIT C

Woofenden v. Merriam, Not Reported in N.E.2d (1985)

1985 Mass.App.Div. 21

1985 Mass.App.Div. 21
Massachusetts Appellate Division,
District Court Department, Division.

Ross WOOFENDEN Carol Woofenden

v.

Lyman R. MERRIAM

No. 415.
|
Jan. 17, 1985.

**Attorneys and Law Firms**

Patrick J. Melnik, Northampton, Massachusetts, for Plaintiff.

OPINION:

DOHONEY, J.

*DECISION AND ORDER*

**\*1** This cause came on to and was heard in the Appellate Division for the Western District sitting at Holyoke upon a Report from the Northampton Division.

IT IS HEREBY ORDERED:

That the Clerk of the Northampton Division make the following entry in said case on the Docket of said Court, to wit, REPORT DISMISSED.

Opinion filed herewith

*In Northampton Division:*
*Justice: Richard F. Connon*

*Date of Finding or Decision Appealed: February 28, 1984*

*Docket No.: 8701*

*Date of Entry in Appellate Division: June 21, 1984*

*In Appellate Division:*
*Justices: Bernard Lenhoff, Allan McGuane, Ja* mes *P.*
Dohoney

*Sitting at: Holyoke*

*Date of Hearing: September 19, 1984*

*Date Opinion Certified: January 17, 1985*

This action involves a Complaint wherein the Plaintiffs Ross Woofenden and Carol Woofenden (hereinafter Woofenden) allege that the Defendant Lyman R. Merriam (hereafter Merriam) agreed "To install and deliver a wood burning and oil burning furnace "at their home for a price of $2,500. This price did not include the installation of the baseboard heating units. Woofenden alleges 1. that the unit was never completely installed (Paragraph 5 of their Complaint); 2. that the unit malfunctioned requiring repairs (Paragraph 7 of their Complaint); 3. that the system was inadequate to heat their home (Paragraph 8 of their Complaint); 4. that "too little" radiation units had been supplied (Paragraph 8 of their Complaint), and 5. that the unit had been installed in violation of the State Building and Fire Codes (Paragraph 9 of their Complaint). Merriam filed an Answer which, among other allegations, asserted that the case has been previously litigated. Merriam further filed a Motion for Summary Judgment asserting that the matter had been previously litigated. A hearing on the Motion for Summary Judgment was heard. The Trial Justice made certain findings and acted on Woofenden's Requests for Rulings of Law. Woofenden filed a Motion to Alter and Amend Judgment. This Motion was denied. Woofenden claims to be aggrieved by the denial of their Motion to Alter or Amend Judgment. The ultimate issue presented to us is whether the present claims of Woofenden are barred by the judgment in the prior Small Claims action.

The Report contains evidence tending to show allegations that there was a transaction between the parties concerning the sale and partial installation of a heating system by Merriam for Woofenden. This transaction first resulted in litigation by Merriam in the Small Claims session of the Hampshire Division wherein he alleged $806.78 was due and stated as his claim:

> Completed installation of an oil burner and wood boiler May 15, 1982. I have not been paid the remaining balance for labor and material.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    1

Woofenden v. Merriam, Not Reported in N.E.2d (1985)

1985 Mass.App.Div. 21

Woofenden filed an Answer in which they stated:

> Improper and hazardous installation of heating system. Not installed by code. Situation resulting in lack of heat during winter and most recently no hot water. Sum of money is for necessary work to allow system to be brought to code, to pay for service call by Whiting Oil, and for compensation for endangering my house and family and inconvenience of no heat or hot water.

**\*2** The Report contains evidence that a hearing was held on both the original claim and the Counterclaim. The Trial Justice in the Small Claim action found for Merriam on the balance due and for Merriam for amounts alleged to be due for the improper installation of the heating system.

Woofenden thereafter filed the Complaint in this action and argues that the present Complaint addresses the allegation that the system is inadequate to heat the home and that this was not known by the parties or litigated at the time of the Small Claim actions. The Trial Justice held a hearing and allowed Merriam's Motion for Summary Judgment and stated that the "facts alleged in the Complaint are identical to the facts that were stated in Woofenden's Counterclaim and their Answer to Merriam's claim in the Small Claims Court action."

The Motion to Alter or Amend Judgment or for a New Trial brings into issue whether there was any error of law in the allowance of Merriam's Motion for Summary Judgment.

STANDARDS FOR MOTION FOR MOTION FOR SUMMARY JUDGMENT: Mass. Rule Civ. Prac. 56(c) provides that a motion for summary judgment should be granted

> "if the pleadings, dispositions, answers to interogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."

A motion for summary judgment is a device for prompt disposition of controversies if, in essence, there is no real dispute as to the salient facts or if only an issue of law is involved. *Community National Bank v. Dawes,* 369 Mass. 550 (1976). However, in acting on a motion for summary judgment a court should not pass upon the credibility of the witnesses or on the weight of the evidence or make its own decision on the facts and the inferences must be drawn in the lights most favorable to the party opposing the motion. *Attorney General v. Bailey,* 386 Mass. 367 (1982). While generally the matter of res judication is an affirmative defense and should be raised and dealt with by answer as provided in Mass. Rule Civ. Proc. (8c), it can be dealt with as a Motion to Dismiss under Mass. Rule Civ. Proc. 12(b( (6) where all of the materials are official records available to the judge and not in dispute. See *Boyd v Jamaica Plain Cooperative Bank,* 7 Mass.App.Ct. 153(1979) further app. rev. den'd 377 Mass. 920 (1979). Therefore, it can also be dealt with as a motion for summary judgment if only a question of law is presented.

*RES JUDICATA:* The issue thus presented to us is whether res judicata prevents the maintenance of this present action as a matter of law.

The traditional view of the doctrine of res judicata was expressed by the Supreme Judicial Court in *Almeida v. Travelers Ins. Co.,* 383 Mass. 226, 229 (1981) as follows:

> The essential elements necessary to preclude relitigation of an issue are "identity of cause of action and issues, the same parties, and judgment on the merits by a court of competent jurisdiction." *Franklin v. North Weymouth Coop. Bank,* 283 Mass. 275, 280, 186 N.E. 641 (1933).

**\*3** By applying these principals we are able to resolve several of the present Woofenden claims. There is no doubt that the parties are the same in the present action as in the Small Claim action. Likewise, the Small Claims section of the Hampshire Division of the District Court Department had jurisdiction to hear the matter and render judgment and has the same status as an action at law. *Bougiorikas v. Moore,* 58 Mass.App. Dec. 74 (1976)*Bougiorikas v. Moore,* 58 Mass.App. Dec. 74 (1976). While it was not complusory on Woofenden to file a counterclaim (Dist. Mun. Supplemental Rule of Civ. Proc. No. 174), they elected to do so and must therefore be bound by the result. Therefore we must resolve

Woofenden v. Merriam, Not Reported in N.E.2d (1985)

1985 Mass.App.Div. 21

whether there was identity of cause of action and issues. A review of the pleadings in each case is determinative of several of Woofenden's present claims.

Woofenden presently claims 1. that the unit was never completely installed (Paragraph 5 of their Complaint). However, Merriam claimed in his Small Claim action that he "completed installation of the oil and gas burner" and Woofenden stated in their answer that "Job as never finished ...". Thus it seems clear that the issue of Merriam's obligations relative to completion were before the Small Claims judge and cannot again be litigated.

Likewise, with respect to Woofenden's second claim that the unit malfunctioned and necessitated repairs (Paragraph 7 of their Complaint). Their counterclaim in the Small Claim in the Small Claim action requested compensation for a service call.

Similarly, with respect to Woofenden's claim that the unit had been installed in violation of the State Building Codes (Paragraph 9 of their Complaint). The answer in the small claim action specifically set up a defense that job was not "done to code" and counterclaim specifically says "Not installed by Code". Woofenden is not therefore entitled to have these matters relitigated.

As to Woofenden's claim that "too little" radiation units had been supplied, it is clear that the thrust of Merriam's Small Claim action was that he had completed all of his obligations. The thrust of Woofenden's defense was that he had not. This is evident by Merriam's claim that he had "not been paid the remaining balance for labor and material" and Woofenden's assertion that the "job was never finished". It therefore appears that his claim was previously litigated.

*CLAIM SPLITTING: A* more complex issue is presented as to Woofenden's claim that the system was inadequate to heat their house (Paragraph 8 of their Complaint. Woofenden argues (although they do not allege this in their complaint) that they relied on the expertise of Merriam to sell them the proper sized unit, that he did not do so, and that this was not discovered until completion of the installation.
Since this action is before us on a Motion to Alter or Amend Judgment or for a New Trial and since judgment was entered on a Motion for Summary Judgment, we must assume that the alleged inadequacy of the heating system was not known at the time of the small claims trial and was not litigated in that action. We must make this assumption because the affidavit submitted by Woofenden states that "subsequent to the resolution of that claim we continued to have problems with the heating system and in 1983 I had the Kimball and Cary Fuel Corporation come in and inspect the system. At the time they made the inspection they determined that the system that had been installed by Mr. Merriam was completly inadequate to heat our house and water during the cold weather season and that no amount of money or procedures that could be used to make this system operate properly would cure the fact that the system was completely insufficient to heat our home. This fact was not known to me prior to the fall of 1983 and this fact was never raised or litigated in the original Small Claim action in this matter." We must also keep in mind that the present action is brought pursuant to General Laws, Chapter 93A and thus a totally separate cause of action.

See *Slaney v. Westwood Auto, Inc.,* 366 Mass.688 (1975).

**\*4**  The issue is thus presented as to whether the present Chapter 93A claim is barred even though certain of the facts supporting it were unknown to Woofenden at the time of Small Claim hearing, and that the Chapter 93A claim was not litigated in the Small Claim action.

This brings us to the doctrine of "claim splitting" so-called.

The clearest statement of this principal is stated in *Boyd v Jamaica Plain Cooperative Bank,* 7 Mass.App.Ct. 153, 163 (1979) further app. rev. dev. 377 Mass. 920 (1979) as follows:

> This is the principle prohibiting claim splitting which states that the entry of "valid and final judgment extinguishes ... all rights of a plaintiff to remedies against the defendant with respect to all or part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 61(1) (Tent. Draft No. 5, 1978. This principle will be applied to extinguish a claim even though the plaintiff is prepared in the second action to present evidence, grounds, or theories of the case not presented in the first action or to seek remedies or forms of relief not demanded in the first action. This policy promotes judicial economy and has been applied by our courts to bar successive actions ..........

In *Boyd,* the court was concerned the issue of the handling of tax escrow accounts and any profits derived from them. Boyd had previously been associated with a case involving a different plaintiff and a different defendant bank which was litigated on theories of escrow and fiduciary relationship. Boyd then sought a claim in the instant case based on unjust enrichment. The Court relied on the procedural background

Woofenden v. Merriam, Not Reported in N.E.2d (1985)

1985 Mass.App.Div. 21

of the controversy and found that Boyd should be barred.

The Court cited with approval the language in *Fassas v. First Bank and Trust Co.,* 353 Mass. 628 (1968) that "The statement of a different form liability is not a different cause of action, provided it grows out of the same transaction, act, or agreement and seeks redress for the same wrong."

This doctrine was further illustrated in *Fluhr v Allstate Insurance Company,* 15 Mass.App.Ct. 983, 984-5 (1983). There the plaintiffs brought an action for breach of a written contract of insurance and lost due to a late filing. They then brought a second action alleging breach of an oral agreement to pay the claim. After a jury verdict for the plaintiff, the judge entered judgment for the defendant notwithstanding the verdict Although the plaintiff contended that the two actions were based upon separate contracts (one oral and one written) the Court stated

"A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim." Restatement (Second) of Judgments § 19 (1982). The claims barred include all rights of the plaintiff to remedies against the defendant with respect to a series of connected transactions out of which the action arose. Restatement (Second) of Judgments § 24(1). This rule applies to bar a second action even though the plaintiff may be prepared in the second action "(1) To presesnt evidence or grounds or theories of the case not presented in the first action." Id. at § 25(1).

**\*5** The Court then specifically addressed the issue of "claim-splitting" and stated

There is an additonal basis on which the trial judge ruling may be sustained. It is not disputed that the alleged breach of the oral contract to settle the insurance claim occured prior to the filing of the action for breach of the written insurance contract. Thus the theory advanced by the plaintiffs in the second action could have been raised in their first action because the events underlying that theory (and the alleged cause of action) occured two and one-half years before the filing of the first suit.

Therefore, even if we were to assume that the claim based on the oral contract was new, we would still be obliged to "find that the rules against claim splitting prohibit further litigation" (*Boyd v. Jamaica Plain Co-op. Bank,* 7 Mass.App.Ct. 153, 167 (1979), because it has not been made to appear that the plaintiffs fall within the exceptions

to that rule which are set out in Restatement (Second) of Judgments § 26.

So also in *Morganville v Building Inspector of Canton,* 7 Mass.App.Ct. 475, 480 (1979) the Court was concerned with whether a prior action between other parties was binding on the present action. One of the issues was whether Section VII and/or Section VIII of the by-law was involved in the prior proceeding. The Court stated

Moreover, the claim raised by the Plaintiffs in this action is the same claim which was raised in Morley, namely that the zoning by-law of Canton precludes a building on Lot 28. Even if the front setback requirements had not been before the court, the Morely case cannot be viewed as an action to determine whether § VII of the Canton by-law precluded a building on Lot 28, and this action as one to determine whether § VIII precludes a building on such lot. It is rudimentary, whatever the definition of "claim," or of the older term "cause of action," that all the defenses to the issuance of a building permit for Lot 28 based on the Canton zoning by-law had to be raised in the prior action. The first action would be a bar even if, as is not the case here, only one section of the by-law had been put in issue. Trustees of Stigmantine Fathers, Inc. v Secretary of Admn. & Fin., 369 Mass. at 564-567. See Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, 1973 at § 61(2) (Tent.No.5, 1978).

It is therefore clear that our courts have relied on the Restatements and that it has provided a basis for recent decisions. The Restatement (Second) of Judgments, Section 24, provides as follows:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18,19), the claim extinguished

1985 Mass.App.Div. 21

includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such consideration as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties expectations or business understanding or usage.

**\*6** This view represents an expanding view of the doctrine. This is recognized in the *Comment* to Section 24

a. Rationale of a transactional view of claim. In defining claim to embrace all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction (or series of connected transactions), this Section responds to modern procedural ideas which have found expression in the Federal Rules of Civil Procedure and other procedural systems.

"Claim," in the context of res judicata, has never been broader than the transaction to which it related.

The present trend is to see claim in factual terms and to make it coterminous whith the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split ...

The law of res judication now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.

However, there are some reservations. In *Mongeau v. Bontelle,* 10 Mass.App.Ct. 246 (1980) the Court refused to apply the doctrine in a case where a land purchaser originally sued the seller for common law fraud. Thereafter the purchaser sued the broker for fraud and a violation of Chapter 93A. The defendant broker contended that there was privity between himself and the seller and thus the prior action was a bar. The Court felt otherwise and relied in part upon the propostision that the Chapter 93A claim could not have been

lodged against the seller because he was not engaged in trade or commerce.

So also in *Bradford v. Richards,* 11 Mass.App.Ct. 595 (1981) the plaintiff sought in the Probate Court to establish a holographic will wherein he was the devisee of certain real estate. While this action was pending, plaintiff filed an action in the Superior Court for the value of services rendered to the decedent. Plaintiff lost the Probate action and the defendant administrator then sought to dismiss the claim for services by alleging the plaintiff had impermissibly split his claim. The court felt otherwise and stated

> .......... we do not think that a person can be charged with claim splitting where the fundamental facts established in connection are substantially dissimilar from the facts to be established in the second ..........

See also *McSorley v. Town of Hancock,* 11 Mass.App.Ct. 563 (1981).

In applying the principles just established it appears that Woofenden has split his claim. The purchase and installation of the boiler was one transaction. This is clearly within the language of the Restatement that "The transaction is the basis of the litigative unit or entity that may not be split". The different theories of relief or the different evidence is not the determinative factor.

**\*7** The Restatement also provides exceptions to the general rule against claim splitting. Restatement (Second) Judgments § 26 provides several exceptions as follows

(1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:

a. The parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein; or

b. The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or

c. The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief; or

d. The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme, or it is the sense of the scheme that the plaintiff should be permitted to split his claim; or

e. For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course; or

f. It is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason, such as the apparent invalidity of a continuing restraint or condition having a vital relation to personal liberty or the failure of the prior litigation to yield a coherent disposition of the controversy.

2. In any case described in (f) of Subsection (1), the plaintiff is required to follow the procedure set forth in §§ 78-82.

It is obvious that none of these exceptions applies.

It is contended by Woofenden that they were not aware of the inadequacy of the installed heating system until a time subsequent to the small claims disposition, including the counterclaim therein. Their failure to possess knowledge thereof when they counterclaimed is argued to be the basis of a subsequent, separate action. However, had they properly marshalled evidence to establish their position in counterclaim, they would have discovered all their legal arrows to place in their quiver. To litigate with some legal weapons does not enable one to litigate anew another day with other weapons that full and complete preparation could have placed in his possession. Splitting their legal arsenal precludes them from benefitting from their own oversight or piecemeal preparation and presentation. The Restatement does not recognize such an exception and judicial economy prevents such an exception.

**\*8** Having found no error, the report is hereby dismissed.

**All Citations**

Not Reported in N.E.2d, 1985 Mass.App.Div. 21, 1985 WL 541711

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Smith v. American Intern. College, Inc., 84 Mass.App.Ct. 1129 (2014)

2 N.E.3d 199

84 Mass.App.Ct. 1129
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
Appeals Court of Massachusetts.

Bernadine SMITH

v.

AMERICAN INTERNATIONAL COLLEGE, INC.

No. 12–P–1925.
|
January 17, 2014.

By the Court (KAFKER, VUONO & CARHART, JJ.).

*MEMORANDUM AND ORDER
PURSUANT TO RULE 1:28*

**\*1** The plaintiff, Bernadine Smith, appeals from a judgment dismissing her claims against the defendant, American International College, Inc. (AIC). For the reasons that follow, we affirm the dismissal.

Smith was a student at AIC. Her original complaint, which asserted various causes of action as a result of having received two low grades, was filed in the Superior Court in 2009. That complaint was dismissed on January 8, 2010, under Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974). In 2010, Smith filed a complaint in the United States District Court claiming discrimination based on the same alleged facts. That case was dismissed on May 19, 2010, on the ground that it was "patently frivolous and fails to state a claim upon which relief may be granted." The dismissal was affirmed by the United States Court of Appeals for the First Circuit. Thereafter, in January, 2011, Smith filed another complaint in the Superior Court. That complaint, which is the subject of this appeal, essentially asserted the same claims as Smith's previous complaints. According to the affidavit of an AIC vice-president, the complaint, which had been served on or about February 15, 2011, was subsequently misplaced. As a result, a default was entered in April, 2011. The default was removed on June 6, 2011, upon AIC's motion, and AIC moved for a judgment on the pleadings under Mass.R.Civ.P. 12(c),

365 Mass. 754 (1974), on the basis of claim preclusion, which was granted in December, 2011.

On appeal, Smith claims that the default entered in April of 2011 should not have been removed. We disagree. On the record before us, we cannot conclude that the motion judge abused his discretion by removing AIC's default. See *Cicchese v. Tape Time Corp.,* 28 Mass.App.Ct. 72, 74 (1989). The record indicates that AIC moved expeditiously to remedy the error once it became known and that all material factors that ordinarily call for relief from default were shown to exist, particularly insofar as AIC showed a colorable, indeed an absolute, defense. See *Berube v. McKesson Wine & Spirits Co.,* 7 Mass.App.Ct. 426, 430–431 (1979). In short, we perceive no prejudice to the plaintiff as a result of restoring the case to a triable status.

Smith next argues that AIC's rule 12(c) motion was erroneously allowed. This assertion is likewise without merit. The 2009 complaint was dismissed on the merits. See Mass.R.Civ.P. 41(b)(3), as amended, 454 Mass. 1403 (2009). The allegations and claims for relief sought in the 2011 complaint were the same (or based on the same occurrences) as those set forth in the 2009 complaint (and in the Federal complaint). Smith is therefore barred from relitigating her claims under the doctrine of claim preclusion. "The doctrine of claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action." *Heacock v. Heacock,* 402 Mass. 21, 23 (1988). "Three elements are essential for invocation of claim preclusion: (1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits." *DaLuz v. Department of Correction,* 434 Mass. 40, 45 (2001). All three elements are satisfied here. Thus, the judge did not err in dismissing the complaint.

**\*2** *Judgment affirmed.*

**All Citations**

84 Mass.App.Ct. 1129, 2 N.E.3d 199 (Table), 2014 WL 183913

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.          1

# EXHIBIT E

92 Mass.App.Ct. 1108
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
NOTICE: Summary decisions issued by the Appeals
Court pursuant to its rule 1:28, as amended by 73 Mass.
App. Ct. 1001 (2009), are primarily directed to the
parties and, therefore, may not fully address the facts of
the case or the panel's decisional rationale. Moreover,
such decisions are not circulated to the entire court
and, therefore, represent only the views of the panel
that decided the case. A summary decision pursuant to
rule 1:28 issued after February 25, 2008, may be cited
for its persuasive value but, because of the limitations
noted above, not as binding precedent. See Chace
v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).
Appeals Court of Massachusetts.

GENENTECH, INC.
v.
ARENDAL MANAGEMENT, INC. & others. [1]

16–P–1335
|
Entered: October 10, 2017.

By the Court (Vuono, Wolohojian & Lemire, JJ. [2])

MEMORANDUM AND ORDER
PURSUANT TO RULE 1:28

**\*1** This dispute arose out of a breach of a promise to
use grant funds advanced by Genentech, Inc. (Genentech) to
produce a medical educational conference. In a prior action
filed in California, Genentech obtained a substantial default
judgment against two defunct corporations, Physician's
Academy for Clinical and Management Excellence, Inc. (PA)
and World Conference Holding Company, Inc. (WCH). In
this action, Genentech sought to hold Vidar Jorgensen, a
number of his companies, and a family trust liable for that
judgment. After a lengthy bench trial, a judge of the Superior
Court declined to apply the corporate disregard doctrine
in favor of Genentech and rejected most of Genentech's
claims. Judgment subsequently entered (1) domesticating
the California judgment against PA and WCH; and (2) enforcing
the California judgment against Arendal Management, Inc.

(AMI), which the judge found to be the successor corporation
to WCH. See G. L. c. 235, § 23A.

On appeal, Genentech argues that reversal is required because
(1) the trial judge made several clearly erroneous findings of
fact and misapplied the corporate disregard doctrine; (2) the
judge improperly concluded that WC Research, Inc. (WCR)
was not a mere continuation of AMI; and (3) the judge abused
his discretion by excluding certain proposed exhibits. [3]

In their cross appeal, the defendants argue that the judge erred
by enforcing the California judgment against PA, WCH, and
AMI (as successor to WCH). Specifically, they maintain that
because the California court lacked personal jurisdiction over
PA and WCH, the judgment was void, and to enforce it against
AMI, a nonparty, would violate principles of due process. We
affirm the judgment in all material respects.

1. Background. Mindful of the deferential standard of review,
we recite the relevant facts drawn from the judge's findings,
supplementing them in part with undisputed facts.

a. Jorgensen corporations. A successful businessman and
investor, Vidar Jorgensen founded or cofounded over thirty
companies in the course of his long career. Six are relevant
to this appeal. Created in 1996 by Jorgensen, WCH, a
central services and cash management company, conducted
operations primarily out of its Woburn, Massachusetts,
office. [4]  WCH provided services for a fee to a number
of affiliated companies, including PA, WRG Research, Inc.
(WRG), WCR, and the Center for Business Intelligence,
Inc. (CBI) (hereinafter "affiliated companies"). [5]  WCH was
designed not to make a profit, but to break even through a
pro rata allocation of its expenses to the affiliated companies.
When WCH encountered periodic cash flow problems,
Jorgensen and his wife provided loans and cash infusions
to keep the business going; and WCH paid Jorgensen and
his wife a "salary" in order to repay some of these loans.
Operations were suspended in 2009 due to lack of money.

**\*2** Incorporated in 2006 for the purpose of obtaining grants
to host medical conferences, PA conducted business out of a
New York City office until shortly before it was closed in
July, 2009. Jorgensen owned ninety percent of PA through
the Staubo Trust III, a family trust found by the judge to be
his alter ego. Lawrence Sherman, a recognized leader in the
continuing medical education field, owned the remaining ten

Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)

94 N.E.3d 436

percent and served as PA's chief executive officer (CEO). Jorgensen was the president, treasurer, and a director of PA. [6]

During its three years of active operations, PA produced many medical conferences, including two for Genentech. From the very beginning, PA operated at a loss. PA only survived for as long as it did because of the cash management system, see infra at 5–6, delaying payment to creditors until intercompany loans from Jorgensen and affiliated companies (or CBI sales proceeds) were provided. Despite its lack of profitability, PA, through WCH, made intercompany transfers to other affiliated companies.

Jorgensen created AMI shortly before closing WCH in 2009. AMI took over WCH's offices and equipment. In addition, several WCH employees transferred to AMI where they continued to use the same accounting software to provide the same central services to affiliated conference companies (WRG and WCR) that WCH had provided to PA. There was evidence establishing that AMI assumed WCH's debts and responsibilities and that WCH's vendors were informed that effective January 1, 2010, WCH would be "changing its name" to AMI or would be operating under AMI. Jorgensen, the sole shareholder, closed AMI in 2012 because it was only servicing one company.

WRG and WCR were formed in 2000, shared CEOs (first Dharshan Wanasundera and then Jonathan Stock), and were also wholly owned by Jorgensen. [7] Although WRG and WCR were conference companies like PA, their financial model differed: company revenue was generated not through grants, but through fees charged to conference attendees, exhibitors, and sponsors. In 2012, Stock closed WRG, which was performing substantially the same services as WCR, and folded its operations into WCR. At the time of the trial, WCR, a profitable corporation, employed fifty individuals, including Jorgensen.

b. Business operations. At all times, the affiliated companies were operated under a shared services and centralized cash management manner of doing business. By sharing services, including human resources, information technology, accounting, payroll, and bill paying, the companies lowered their overall costs and overhead.

Pursuant to the cash management system, the unused cash reserves of one company were transferred to fund another's operations. As cash came in to a particular company, the money would be lent, through WCH, to other

companies on an as-needed basis with the expectation of full repayment. The borrowed money covered costs necessary to keep the company running. The advantages of the system included the avoidance of bank fees, convenience, and short-term financing that would otherwise be unavailable. WCH managed all intercompany transfers and recorded all of them on each company's general ledger as "due to" and "due from." Made frequently, the loans were not memorialized in contracts and did not pay interest at relevant times. Both expert witnesses agreed that there was nothing inherently wrong or unusual about this method of conducting business. [8]

**\*3** Each affiliated company had its own articles of incorporation, by-laws, bank account, books, and corporate records maintained primarily through WCH; and each company obtained independent auditors' reports, and filed its own tax returns and mandatory annual reports with the Massachusetts Secretary of State. However, no official director or shareholder meetings were held.

c. Genentech's grant. In December, 2008, PA requested funds to produce a continuing medical education conference on macular degeneration. Jorgensen was not involved in any way in PA's grant applications. Following approval by the grant committee, in early January 2009, Genentech sent PA a check in the amount of $633,223. The parties' letter agreement restricted the use of the funds to "general business operations" and the payment of conference vendors. Soon after deposit, the funds were loaned to other affiliated companies. In 2009, while PA was insolvent, approximately $900,000 was transferred to WCH, WRG, and WCR. At Jorgensen's direction, PA was closed in the summer of 2009 for lack of money. The medical conference was never held.

Other facts will be discussed as they relate to the issues raised on appeal.

2. Standard of review. In reviewing the judge's decision, this court is "bound by [his] findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence." Cavadi v. DeYeso, 458 Mass. 615, 624 (2011), quoting from Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420 (2005). Review of those findings is for clear error. See Kitras v. Aquinnah, 474 Mass. 132, 138 (2016). Accord Lily Transp. Corp. v. Royal Institutional Servs., Inc., 64 Mass. App. Ct. 179, 187–189 & nn.15 and 16 (2005)

Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)

94 N.E.3d 436

(concluding that the trial judge's piercing of the corporate veil was unwarranted as matter of law and on the facts of the case). The judge's rulings of law are reviewed de novo and his ultimate decision to deny equitable relief is reviewed for abuse of discretion. See Cavadi v. DeYeso, supra at 624.

Where, as here, the jurisdictional facts were undisputed, the susceptibility of the nonresident defendants (PA and WCH) to the jurisdiction of the California courts was a question of law subject to de novo review. See ViaView, Inc. v. Retzlaff, 1 Cal. App. 5th 198, 210 (2016).

3. Discussion. a. Corporate veil piercing. In order to succeed on its main claim of error, Genentech must convince us that this is one of those rare cases in which the trial judge was required to grant equitable relief "for the defeat of fraud or wrong, or the remedying of injustice." Scott v. NG US 1, Inc., 450 Mass. 760, 767 (2008), quoting from Hanson v. Bradley, 298 Mass. 371, 381 (1937). We are not persuaded.

General disfavor of the doctrine in this type of business dispute poses the first roadblock to Genentech's appeal. As the trial judge noted, our courts are less likely to apply the corporate disregard doctrine in contract cases. See OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. 561, 567–568 (2012); Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996) (Court of Appeals for First Circuit noted that the Supreme Judicial Court [SJC] had not applied the doctrine in a contract case). Moreover, Massachusetts has been somewhat stricter than other jurisdictions in maintaining the settled expectations about corporate separation.[9] See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619–620 (1968) (My Bread Baking).

*4 At trial, Genentech proceeded solely under the first prong of My Bread Baking, supra at 619, the governing legal standard in corporate disregard cases. See Scott v. NG US 1, Inc., 450 Mass. at 768. To meet its burden of proof, Genentech was required to show that "there [wa]s active and direct participation by the representatives of one corporation [Jorgensen], apparently exercising some form of pervasive control, in the activities of another [here allegedly PA and WCH] and there is some fraudulent or injurious consequence from the intercorporate relationship." My Bread Baking Co., supra at 619. In Massachusetts, twelve factors are assessed in deciding whether this standard was satisfied.[10] See Evans

v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 733 (1991) (Evans factors).

Here, as detailed in the judge's extensive findings, while some factors supported veil piercing, many did not. The judge carefully analyzed the Evans factors, acknowledging that some, including the observance of corporate formalities, had evidence going both ways. As the fact finder, the judge was entitled to conclude that the evidence weighed in favor of the defendants on these factors. Given the My Bread Baking theory under which Genentech proceeded, the judge was also entitled to give greater weight to the issue of pervasive control. See Evans v. Multicon Constr. Corp., supra at 736 (in analyzing the twelve factors, the "exercise is, of course, not one in counting").

Our review establishes that none of the judge's findings pertaining to the Evans factors was clearly erroneous.

To the extent that Genentech claims that the judge committed reversible error by ignoring two of the twelve Evans factors (the siphoning away of corporate assets by the dominant shareholders and thin capitalization), My Bread Baking sets the governing standard. No Massachusetts court has held that a judge must make factual findings on each Evans factor. Even assuming that all Evans factors should be addressed, see Lipsitt v. Plaud, 466 Mass. 240, 253 (2013), the judge's decision demonstrates that he met this standard.

First, the judge correctly recognized that his role was to "analyze [the] twelve factors" (emphasis added). His subsidiary findings demonstrate that he considered and implicitly found no improper siphoning of PA's assets by Jorgensen or the affiliated companies. For example, the judge found that as soon as Genentech's check cleared, the funds were loaned to other affiliated companies; and that notwithstanding its lack of profitability, PA did make a number of transfers through WCH to the other affiliated companies. However, as the judge found, WCH frequently made intercompany loans and transfers to pay bills as they became due. As Genentech itself noted, in 2009, all the affiliated companies were struggling and in need of money to pay their bills. The transfer of the grant proceeds out of PA was consistent with the usual course of WCH's business operations. In fact, PA had relied on the same cash management system (and loans from Jorgensen and other affiliated companies, and CBI proceeds) for its financial survival from the beginning.

Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)

94 N.E.3d 436

The judge found, consistent with the evidence, no misuse of the corporations for personal reasons, see infra at 13–14. Jorgensen put a substantial amount of his own money into the unsuccessful affiliated companies to keep them operating and lost a net of approximately $2.2 million in PA. WCH paid Jorgensen and his wife a "salary" in order to pay back some of these loans. These were not the type of facts and inferences that would support a finding of asset depletion for the benefit of Jorgensen or the affiliated companies. See 🏴 Birbara v. Locke, 99 F.3d at 1241 n.8 (rejecting siphoning claim based on lack of evidence of "subterfuge or channeling excessive payments" or evidence that the benefits paid to the defendants were not part of a legitimate benefits plan).

*5 The judge did not "ignore" the evidence of thin capitalization, but rather found that "PA operated at a loss from the very beginning, and was only able to pay its creditors by delaying payment until it could receive inter-company loans from other affiliated companies and Jorgensen, and when it received some of the proceeds from the sale of CBI." The judge's findings appear to show that he credited the testimony of Genentech's expert witness on this matter. [11] The finding on this one factor, standing alone or in combination with other Evans factors, did not require the judge to disregard PA's corporate form.

Genentech has not shown that the finding in favor of the defendants on the eleventh Evans factor was clearly erroneous. After weighing the evidence, the judge found that with two minor exceptions, the corporations were not misused for the "numerous" transactions of the dominant shareholder. [12] Jorgensen did use one of the bank accounts managed by WCH to make wire transfers for personal reasons as well as for business reasons. Jorgensen testified that all transfers were properly recorded and charged to him personally. The judge ultimately concluded that "there was no evidence that the transactions were anything but repayment for business expenses, repayment for loans to the various companies or reclassification of debt to equity ...." The judge's finding that these transactions served no illegitimate purposes (or that Genentech had failed to prove otherwise) was warranted by the evidence.

The judge did not misapply the law governing pervasive control. See My Bread Baking Co., supra at 619. The test of pervasive control focuses on the transaction at issue, and requires a showing that the allegedly controlled corporation lacked "no separate mind, will or existence of its own."

⚠️Scott v. NG US 1, Inc., 450 Mass. at 770–771, quoting from Fletcher, Cyclopedia of Corporations § 41.10, at 143–144 (rev. ed. 2006).

Here, the judge considered appropriate factors, focusing on Jorgensen's activities and involvement in the companies, particularly as they related to the injurious consequences that befell Genentech. See My Bread Baking Co., supra at 618. He found, with support in the evidence, that although Jorgensen was the dominant shareholder and an officer of most of his companies, "the overwhelming evidence showed that he had little to do with the day to day management of the companies"; the CEOs and other officers of his companies made most of the regular decisions; and the decisions and the strong suggestions in 2008 and 2009 that he made were the exception to the norm and fell within his authority as the director or primary shareholder. [13]

*6 The evidence did show that Jorgensen, a director, became more involved in WCH out of necessity as well as in the affairs of PA when its continued existence was in doubt. However, given the limited extent of Jorgensen's participation, the judge was warranted in finding no compelling evidence of pervasive control over WCH and PA.

To the extent that Genentech claims that the judge's focus was improper in light of Jorgensen's "complete control over and misuse of corporate finances," the judge saw the facts differently. Jorgensen was rarely involved in WCH's mundane bill paying, which was handled at the controller level. Pointing out evidence in the record that was rejected by the judge is an ineffective way to satisfy the clearly erroneous standard. See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 637 (2010). The same principle holds true with respect to Genentech's challenge to the judge's finding that WCH and PA had fully functioning officers. Ibid.

The judge found, with evidentiary support, that "[t]here was some intermingling of funds taking the form of numerous intercompany loans facilitated by WCH, but—though it could have been done more carefully—the general ledgers kept track of all of the funds moving between companies." [14] There was nothing unusual or inherently wrong about WCH's centralized cash management services used by PA. The judge was not required to find that the "confused intermingling" of assets factor favored Genentech.

**Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)**

94 N.E.3d 436

A significant amount of documentary and testimonial evidence was presented regarding the paper trail of money. Although the judge found that the accounting was not impeccable and the records could have been more clear, he chose not to draw an inference that the companies were "established or operated so as to misrepresent or divert assets." Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736. This finding that the corporate forms had not been used to perpetrate fraud was amply supported by the evidence.

The judge did not misapply the corporate disregard doctrine. Genentech was seeking a type of equitable remedy from the court that is rarely granted. Ultimately, Genentech was required to prove that the defendants used the corporate form to accomplish an improper purpose such as fraud. See Berger v. H.P. Hood, Inc., 416 Mass. 652, 657 (1993), quoting from Gordon Chem. Co. v. Aetna Cas. & Sur. Co., 358 Mass. 632, 638 (1971) ("It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded"); Scott v. NG US 1, Inc., 450 Mass. at 768, quoting from Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736 ("There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance [and] finagling ..."); Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736 (twelve factors should be examined "to form an opinion whether the over-all structure and operation misleads"). Accord Kraft Power Corp. v. Merrill, 464 Mass. 145, 152 n.11 (2013). The judge was warranted in finding Genentech's evidence insufficient to make this showing.

**\*7** The balancing of the equities did not so clearly favor Genentech as to require the use of the court's equitable powers. Genentech set the parameters by which it agreed to provide the grant funds, opting for a simple letter agreement between itself and PA. As the judge found, consistent with the evidence, the affiliated companies were open about their business and connections to each other. Financial statements, if requested by Genentech, would have established that PA operated at a loss from inception. [15] Before sending out the three checks to PA totaling over $1 million, however, Genentech, a sophisticated multi-billion dollar corporation, conducted no due diligence. [16] Flush with cash, it neither required program producers like PA to provide security nor required its grant funds to be escrowed. [17] These facts weighed against a finding of gross inequity to Genentech

from the maintenance of the separate corporate forms of PA and WCH. See Greenery Rehabilitation Group, Inc. v. Antaramian, 36 Mass. App. Ct. 73, 79 (1994); OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. at 570.

In sum, the judge made appropriate findings of fact supported by the evidence and applied the correct legal standard to those facts. We discern no error or abuse of discretion in the judge's decision to not grant Genentech equitable relief.

b. Successor liability. Genentech argues that the judge erred by failing to continue the chain of corporate succession from WCH to AMI through to WCR. We disagree.

Generally, the debts and liabilities of a predecessor corporation are not imposed on a successor corporation that acquires its assets. See Guzman v. MRM/Elgin, 409 Mass. 563, 566 (1991). Four exceptions to the general rule of nonliability are recognized in Massachusetts. [18] Ibid. Creditors seeking to come within one of these exceptions must show a transfer of all or substantially all of the predecessor corporation's assets to the successor corporation. See Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 475 (2013).

Here, the judge seemed to conclude that Genentech had failed to make this threshold showing, finding that "there [wa]s no evidence that any of A[MI]'s assets were ever transferred to either WRG or WCR such that they could be considered A[MI]'s successors." We agree with Genentech that there was indeed undisputed evidence of some asset transfer (such as the computer software). However, the judge's ultimate finding—that Genentech had failed to prove its claim by a preponderance of the evidence—was well supported by the evidence.

First, the record was devoid of evidence regarding the status of AMI's assets at the time it was shut down. Absent such evidence, the judge was unable to weigh the substantiality, if any, of the asset transfer. Even if this essential prerequisite was satisfied, the "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 557 (2008), quoting from McCarthy v. Litton Indus., Inc., 410 Mass. 15, 21–22 (1991). In analyzing "mere continuation" claims, courts should focus "on whether one company has become

Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)

94 N.E.3d 436

another for the purpose of eliminating its corporate debt. Milliken & Co. v. Duro Textiles, LLC, supra at 556.

**\*8** Here, in applying this standard, the judge could properly have concluded that Genentech did not meet its burden of proof. AMI, like its predecessor WCH, was an administrative, central services and cash management corporation. In contrast, WCR was a healthcare conference company. WCR did not carry on the operations of AMI under a new hat. See ⌐ McCarthy v. Litton Indus., Inc., 410 Mass. at 22 ("[T]he imposition of liability on the [successor] is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the [predecessor] corporation").

The judge could properly have rejected Genentech's contention that the defendants shuttered AMI for an improper purpose (i.e., the avoidance of liabilities). As the judge found consistent with the evidence, AMI was closed in 2012 around the same time as WRG because it was servicing one company and "the costs became too much for so few services." With only one corporation in business (WCR), there was no longer a need for a separate central services company. Although WCR acquired some of AMI's assets and five of its employees, in light of the other findings, the judge was not required to find that WCR was AMI's successor.

c. Evidentiary issue. We discern no abuse of discretion in the allowance of the defendants' motion in limine precluding the admission of certain privileged documents.[19] See N.E. Physical Therapy Plus, Inc. v. Liberty Mut. Ins. Co., 466 Mass. 358, 363 (2013). The order requiring the defendants to produce these documents as a discovery sanction did not extend to their admissibility at trial. In the context of a subsequent ruling, the motion judge confirmed the limited nature of the privilege waiver. Even if the motion judge had deemed any and all privileges waived for all purposes, the trial judge had the authority to reconsider the ruling. See ⌐ Riley v. Presnell, 409 Mass. 239, 242 (1991).

Moreover, as Genentech acknowledged below, irrespective of the privilege issue, it was also required to show that the statements of the defendants' former attorney appearing in these documents were relevant and admissible under the vicarious admissions exception to the hearsay rule.[20] See ⌐ Ruszcyk v. Secretary of Pub. Safety, 401 Mass. 418, 420–423 (1988) (adopting Proposed Mass.R.Evid. 801[d][2][D]

and 403, and requiring the satisfaction of a two-step inquiry for qualification). These issues were argued extensively to the trial judge at the oral argument on the motion in limine. In light of Genentech's failure to address any of the substantive evidentiary issues on the merits, we need go no further. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").

Were we to reach the merits and even assuming the document was improperly excluded, we fail to see how the memorandum would have changed the result of the trial.

**\*9** 4. Cross appeal. In their cross appeal, the defendants challenge the enforcement of the California default judgment against PA, WCH, and AMI as the successor to WCH. Unless the defendants can demonstrate that the judgment of the California court was invalid, the judgment was entitled to full recognition and enforcement in the Commonwealth. See United States Constitution, art. IV, § 1; Bishins v. Richard B. Mateer, P.A., 61 Mass. App. Ct. 423, 428 (2004). Here, the defendants contend that the California judgment was void because the court lacked personal jurisdiction over PA and WCH.[21]

Applying the minimum contacts test, we conclude that PA's activity in California was of a sufficient quality and nature as to fairly and reasonably have required it to defend itself from Genentech's claims in a California court. See ⌐ Epic Communications, Inc. v. Richwave Technology, Inc., 179 Cal. App. 4th 314, 327 (2009).

The facts advanced by Genentech satisfied the first two requirements of specific jurisdiction (purposeful availment and forum relatedness).[22] Ibid. The defendants in turn did not meet their burden of presenting a compelling case as to why, based on other factors, the assumption of jurisdiction would be unjustified. See ⌐ id. at 336. PA could reasonably have anticipated that if failed to produce a medical conference as promised, it might be haled into a California court.

Although WCH was not a party to the grant contract, in light of its relationship to PA and independent minimum contacts with California, we reach the same conclusion.[23]

**\*10** There was no due process concern in extending the California default judgment to AMI. Under the doctrine of claim preclusion, parties and their privies are barred from

Genentech, Inc. v. Arendal Management, Inc., 92 Mass.App.Ct. 1108 (2017)

94 N.E.3d 436

relitigating the same claims, including those adjudicated by a default judgment. See ⬜North Atl. Distrib., Inc. v. Teamsters Local Union No. 430, 497 F. Supp. 2d 315, 320 (D. R.I. 2007). The defendants do not challenge the judge's factual finding, amply supported by the evidence, that AMI was a mere continuation of WCH under a different name. See ⬜Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 557–558 (2008). The enforcement of the judgment against AMI, as the successor corporation to WCH, did not offend due process principles. See ⬜Wolf Metals Inc. v. Rand Pac. Sales Inc., 4 Cal. App. 5th 698, 704–705 (2016).

AMI was held liable here as a successor corporation, not as an alter ego or on a veil piercing theory. Thus, cases refusing to hold nonparty alter egos liable for previous default judgments have no application.

Judgment affirmed.

**All Citations**

92 Mass.App.Ct. 1108, 94 N.E.3d 436 (Table), 2017 WL 4507538

---

### Footnotes

1    Physician's Academy for Clinical and Management Excellence, Inc.; World Conference Holding Company, Inc.; Vidar Jorgensen; WRG Research, Inc.; WC Research, Inc.; Center for Business Intelligence, LLC; World Congress, LLC; and Frank Jorgensen as trustee of the Staubo Trust III.

2    The panelists are listed in order of seniority.

3    Genentech waived all other claims as well as its appeal from the denial of its postjudgment motion to reconsider, alter, or amend the judgment.

4    Jorgensen was the president, treasurer, secretary, and a director of WCH, and its sole shareholder.

5    In 2008, Jorgensen sold CBI, the profitable flagship company, for $30 million. The judge found that instead of keeping his share of the millions of dollars generated by the sale, Jorgensen used the proceeds to pay many of the affiliated companies' debts (including those of PA).

6    Jennifer Morales, a human resources specialist for the affiliated companies, served as the secretary and a director of PA.

7    Jorgensen was the president, secretary, treasurer, and director of both WRG and WCR.

8    On this point, the judge found that "[t]hroughout the life of these companies, Harold Newburg acted as auditor and financial consultant. He and Genentech's expert, Keith Lowey, testified regarding the general state of the various companies' finances, the completeness and accuracy of the general ledger[s], the accounting practices, the intercompany loans, the repeated cash infusions from Jorgensen and later from the sale of CBI, and generally demonstrated to the Court where much of the money was coming from, where it was going and why." The judge found that "while the companies attempted to accurately record each transaction, their accounting was often confused and incomplete."

9    To prove that Jorgensen was the alter ego of PA and WCH, Genentech was required to come within one of the limited exceptions to bedrock corporate law principles. See ⬜My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968) (corporations are generally regarded as separate from their stockholders);

⚠Scott v. NG US 1, Inc., 450 Mass. at 766 ("[C]orporations—notwithstanding relationships between or among them—ordinarily are regarded as separate and distinct entities").

10    Originating in 🏳Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14–16 (1st Cir. 1985), the Evans factors were first recognized by the SJC in 🏳Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 & n.19 (2000). See 🏳Lipsitt v. Plaud, 466 Mass. 240, 252–253 (2013).

11    Asked about his opinion of PA's initial capitalization, Keith Lowey, a certified public accountant, testified that PA had significant losses "from the very beginning"; and the initial money put in ($900,000) clearly was not sufficient to cover them.

12    The judge found that the "only evidence" regarding the "salary" of Mrs. Jorgensen, a nonemployee, was that it constituted repayment for a loan to WCH. That finding was clearly erroneous to the extent that it covered her "salary" after repayment of her loan in full in 2008. According to Jorgensen, one-half of his own "salary" was attributed to his wife for purposes of tax sheltering. Jorgensen had no knowledge of the credit card issued to one of his sons, and there was no further evidence introduced on the issue. In all events, given the totality of the evidence and the burden of proof, neither Mrs. Jorgensen's "salary" nor the undeveloped facts about the credit card required a finding in Genentech's favor on this Evans factor.

13    The judge's subsidiary findings and the undisputed facts supported his ultimate finding regarding the absence of pervasive control. He found that WCH had two different CEOs (Dharshan Wanasundera and Jon Stock) who were responsible for day-to-day operations and three chief financial officers (CFOs), Jay Sun, Joseph Canty, and Tim Hockey; and that Jorgensen was often in contact with his CEO and CFO about WCH's operations. Jorgensen, who was involved in around ten companies and traveled frequently, testified that he was not involved in the "very routine administrative business" of WCH. Regarding PA, the judge found that "there was testimony that he had very little to do with PA"; Jorgensen's involvement included participation in conference calls with PA's management team; making "strong suggestions and recommendations" about cutting costs designed to save PA (some implemented, and some not); directing, after Wanasundera left WCH (in August, 2009), which PA invoices to pay out of necessity and asking Sherman and Wanasundera to attempt to sell PA. The evidence established that PA's CEO, Lawrence Sherman, and PA vice president Mary Deering, were responsible for PA's personnel decisions, the setting of salaries and policies, the creation of budgets, financial projections, and business development. In contrast, Jorgensen, who lives and works in Woburn, testified that he was not familiar with the particular business of PA and, as corroborated by the testimony of Jennifer Morales and controller Joseph Canty, that he was not involved in its day-to-day operations. While Genentech focused its veil piercing arguments against WCH and PA, the evidence also established that Stock, the CEO of WCR, was responsible for all its operational matters, and made substantial personal loans to it.

14    This finding established that the judge considered the issue of confused intermingling as part of his analysis of the Evans factors. See ⚠Scott v. NG US 1, Inc., 450 Mass. at 768. The judge properly noted that Genentech had waived any claim under the second prong of My Bread Baking.

15    The timing of Genentech's grant could not have been any worse. During the same week that the funds were provided, Sherman announced layoffs and across the board pay cuts. Jorgensen questioned Sherman's decision to go on a family vacation when he was starting 2009 "materially behind in his projections" and "the very existence of PA was in doubt."

16    Genentech did not require the disclosure of basic financial information about PA, did not visit its offices, did not request references, and did not perform any credit checks.

17    Genentech provided $40 to $50 million in grant funding annually.

18    Genentech proceeded solely under a mere continuation theory of liability.

19    The trial judge excluded Genentech's proposed exhibits 4, 11, 21, 61, 86, and 186–189. In its brief, running up against the maximum page limit, Genentech confined its argument to the allegedly improper exclusion of exhibit 61. We deem any claims of error relating to the other exhibits waived. See Abate v. Fremont Inv. & Loan, 470 Mass. 821, 833–834 (2015).

20    The judge interpreted the previous orders, as we do, to render the privileged documents "admissible for purposes of discovery but not for purposes of the trial." He summarily concluded that the documents "would not be admissible." Genentech's attorney did not request further explanation for the ruling.

21    PA and WCH were defaulted for failing to appear in this action. Genentech claims that the defendants may not raise jurisdictional arguments belonging to PA and WCH, two companies it claimed were not predecessor corporations to AMI and WCR. In any event, AMI, alleged and found to be WCH's successor, had standing to challenge the personal jurisdiction of the California courts over WCH.

22    For example, PA solicited eight grant requests from Genentech, which maintains business offices in California and processed all grant requests through those offices. PA successfully obtained grants from Genentech on three of these occasions. PA executives, Lawrence Sherman and Daniel Wray, flew out to California in order to discuss PA with Genentech's medical education department. Sherman and Wray also communicated with Genentech's medical education department in California about the grant in issue in this case by telephone and emails. PA developed a marketing plan to promote the program to California residents. The contract breached by PA that gave rise to the causes of action against PA and WCH was to be performed in part at two California locations. Finally, PA retained a local California doctor to serve as a faculty member at the Los Angeles site.

23    WCH conducted no outside for-profit operations, but rather served as the de facto central services and cash management division of the affiliated companies. In that capacity, WCH was directly involved in the events giving rise to this dispute, implementing all of the intercompany transfers out of PA challenged by Genentech. Additionally, WCH was registered to do business in California. Although the defendants contend that WCH forfeited its registration status on May 15, 2008 (before Genentech and PA entered into the letter agreement), their contention is not supported by the exhibit purporting to establish this fact. Jorgensen, as the president of WCH, "irrevocably" consented to service of process on WCH in the State of California through a designated agent. WCH filed corporate tax returns and employed California residents.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

U.S. Nat. Ass'n v. McDermott, 87 Mass.App.Ct. 1103 (2015)

24 N.E.3d 1061

87 Mass.App.Ct. 1103
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
Appeals Court of Massachusetts.

U.S. NATIONAL ASSOCIATION [1]
v.
William M. McDERMOTT.

No. 13–P–1902.
|
January 30, 2015.

By the Court (GRAHAM, BROWN & SULLIVAN, JJ. [3] ).

*MEMORANDUM AND ORDER*
*PURSUANT TO RULE 1:28*

**\*1** The defendant, William M. McDermott, appeals from summary judgment in favor of the plaintiff, U.S. National Association, as indenture trustee on behalf of the Noteholders of Aegis Asset backed Securities Trust 2005–3 Mortgage–Backed Notes (U.S.National), in U.S. National's summary process action. The Housing Court judge ruled that McDermott's challenge to U.S. National's foreclosure by entry was barred by the three-year redemption period provided in G.L. c. 244, §§ 1 & 2, and by principles of claim preclusion. We affirm.

For the procedural history and undisputed facts, we refer to U.S. National's brief at pages 3 to 9.

The judge correctly determined that McDermott waited too long to challenge alleged deficiencies in the foreclosure by entry. Under G.L. c. 244, §§ 1 & 2, McDermott's right of redemption was extinguished three years following U.S. National's entry and recording of the memorandum or certificate of entry. According to the record, entry occurred on September 17, 2008, and recording of the certificate of entry on October 20, 2008. [2] U.S. National served McDermott with a summary process summons and complaint on May 8, 2012, and McDermott filed his answer on May 31, 2012. In *Singh v. 207–211 Main St., LLC,* 78 Mass.App.Ct. 901, 902 (2010), we stated that, "[i]f a mortgagor wants to challenge a foreclosure by entry, it is incumbent on him to do so before the three-

year period has elapsed." We therefore reject McDermott's argument that c. 244, §§ 1 & 2, does not operate to bar his claims.

The judge also correctly ruled that McDermott's defenses in the summary process action were barred by principles of claim preclusion. "A claim is the same for [claim preclusion] purposes if it is derived from the same transaction or series of connected transactions." *TLT Constr. Corp. v. A. Anthony Tappe & Assocs., Inc.,* 48 Mass.App.Ct. 1, 8 (1999), quoting from *Saint Louis v. Baystate Med. Center, Inc.,* 30 Mass.App.Ct. 393, 399 (1991). In defending against the summary process action, McDermott asserted that U.S. National did not have proper title to the property and that it failed to demonstrate strict compliance with the statutory foreclosure procedure. As relevant here, McDermott claimed in particular that U.S. National failed to conduct a peaceable entry onto the property, since McDermott had refused to permit the U.S. National's agent to enter the condominium building, and the foreclosure was conducted on the sidewalk.

There is no dispute, however, that the foreclosure by entry took place while McDermott's first action, seeking rescission of the mortgage, was pending. Indeed, McDermott amended his complaint in the first action and specifically added the fact that the foreclosure had occurred. Plainly, the facts that form the basis of his defense in the summary process action were known to him while the first action was ongoing. See, e.g., *Fassas v. First Bank & Trust Co. of Chelmsford,* 353 Mass. 628, 629 (1968) (res judicata applied where all facts relating to validity of foreclosures were known to plaintiffs during their prior action alleging fraud and duress in issuance of note and mortgages). Yet McDermott failed to raise his claim concerning alleged defects in the foreclosure until U.S. National filed the instant summary process action seeking possession.

**\*2** Claim preclusion "bars further litigation of all matters that were or should have been adjudicated" in the earlier action. *Bagley v. Moxley,* 407 Mass. 633, 637–638 (1990) (gravamen of plaintiffs' complaint in both actions was claimed ownership of disputed land). A judgment in the first action "extinguishes ... all rights of a plaintiff to remedies against the defendant with respect to all or any part of the transactions ... out of which the action arose." *Massaro v. Walsh,* 71 Mass.App.Ct. 562, 565 (2008), quoting from Restatement (Second) of Judgments § 61(1) (Tent. Draft No. 5, 1978). McDermott's claims in both actions involved the parties'

U.S. Nat. Ass'n v. McDermott, 87 Mass.App.Ct. 1103 (2015)

24 N.E.3d 1061

respective rights and obligations under the mortgage. As such, we view them as transactionally related, and the present claim attacking the foreclosure should have been brought during the pendency of the earlier litigation. See, e.g., *Kucharski v. Tribeca Lending Corp.,* 620 F.Supp.2d 147, 150–151 (D.Mass.2009) (suit challenging foreclosure and subsequent suit challenging refinancing disclosures arose from same loan transaction and implicated parties' rights in relation to loan and mortgaged premises).

McDermott counters that U.S. National, for its part, could have brought its summary process claim as a counterclaim in the first action, and that if McDermott's claim is now precluded, so too is U.S. National's claim. There is no indication in the record that McDermott raised that argument in the summary judgment proceedings, nor does he provide authority for the proposition, and we do not consider it. See, e.g., *Department of Rev. v. Estate of Shea,* 71 Mass.App.Ct. 696, 701 (2008) (argument not raised in opposing summary

judgment cannot be raised on appeal for first time). See also Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); 🚩*Morgan v. Laboratory Corp. of America,* 65 Mass.App.Ct. 816, 821 n. 6 (2006) ("[M]ere assertion of a proposition without citation does not constitute appellate argument"). We find his reliance on the doctrine of judicial estoppel similarly unavailing.

Based on the foregoing, the judge properly entered summary judgment in U.S. National's favor.

*Judgment affirmed.*

**All Citations**

87 Mass.App.Ct. 1103, 24 N.E.3d 1061 (Table), 2015 WL 539311

## Footnotes

1       As indentured trustee on behalf of the Noteholders of Aegis Asset Backed Securities Trust 2005–3 Mortgage–Backed Notes.

2       Section 1 of G.L. c. 244, as amended through St.1991, c. 157, § 2, provides: "A mortgagee may, after breach of condition of a mortgage of land, recover possession of the land mortgaged by an open and peaceable entry thereon, if not opposed by the mortgagor or other person claiming it, or by action under this chapter; and possession so obtained, if continued peaceably for three years from the date of recording of the memorandum or certificate as provided in section two, shall forever foreclose the right of redemption."

3       The panelists are listed in order of seniority.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

Federal Home Loan Mortg. Corp. v. Alvarez, 87 Mass.App.Ct. 1125 (2015)

31 N.E.3d 79

87 Mass.App.Ct. 1125
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
Appeals Court of Massachusetts.

FEDERAL HOME LOAN
MORTGAGE CORPORATION
v.
Juan D. ALVAREZ & others.[1]

No. 14–P–611.
|
May 29, 2015.

By the Court (FECTEAU, AGNES & SULLIVAN, JJ.[2]).

*MEMORANDUM AND ORDER
PURSUANT TO RULE 1:28*

**\*1** The plaintiff, Federal Home Loan Mortgage Corporation (FHLMC) initiated a postforeclosure summary process action against the defendants, Juan D. Alvarez (Alvarez), Maria Alvarez, and their adult children, in the Worcester Housing Court. On cross motions for summary judgment, the motion judge granted summary judgment in favor of FHLMC. We affirm.

*Discussion.* "From the same record viewed by the motion judge, we review a grant of summary judgment de novo." *Miller v. Cotter,* 448 Mass. 671, 676 (2007). In an appeal resulting from cross motions, the court examines the record in the light most favorable to the losing party. See, e.g., *DiLiddo v. Oxford St. Realty, Inc.,* 450 Mass. 66, 70 (2007); *McLaughlin v. Berkshire Life Ins. Co. of America,* 82 Mass.App.Ct. 351, 353–354 (2012)." *Kewley v. Department of Elementary & Secondary* Educ., 86 Mass.App.Ct. 154, 158 (2014).

1. *Jurisdiction.* Alvarez contends that the Housing Court lacked jurisdiction to hear the summary process action because the underlying foreclosure was invalid. "[T]he Housing Court has jurisdiction over summary process actions pursuant to G.L. c. 239[, including those actions] brought by those who acquire ownership of property via foreclosure by sale. See  G.L. c. 185C, § 3."  *Bank of N.Y. v.*

*Bailey,* 460 Mass. 327, 331 (2011). The Housing Court also had jurisdiction to consider Alvarez's defense challenging the title of FHLMC postforeclosure.  *Bank of America, N.A. v. Rosa,* 466 Mass. 613, 614–615 (2013). Alvarez's jurisdictional argument therefore has no merit. His argument that the foreclosure was invalid is better characterized as a challenge to the merits of the underlying foreclosure. However, as we shall discuss, he has already had one opportunity to litigate the merits of his claim, and he is not entitled to two such opportunities.

2. *Claim preclusion.* Alvarez previously brought suit against FHLMC[3] and another party[4] in the Worcester Superior Court, alleging violations of G.L. c. 93A and the Truth in Lending Act,  15 U.S.C. §§ 1601–1667f (2012), breach of the implied covenant of good faith and fair dealing, unlawful foreclosure, fraudulent misrepresentation, improper foreclosure procedures, and intentional infliction of emotional distress. FHLMC removed the case to the Federal District Court. In a memorandum and order analyzing each of the claims, the District Court judge allowed FHLMC's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Alvarez v. U.S. Bank N.A.,* U.S. Dist. Ct., No. 11–12324–FDS (D. Mass. June 22, 2012). Examining that action and decision, the Housing Court judge determined that res judicata applied to Alvarez's claimed defenses in the summary process action and granted summary judgment to FHLMC.

To determine the preclusive effect of the Federal District Court's judgment, we look to the Federal law of res judicata.  *Anderson v. Phoenix Inv. Counsel of Boston, Inc.,* 387 Mass. 444, 449 (1982).  *Korn v. Paul Revere Life Ins. Co.,* 83 Mass.App.Ct. 432, 435 (2013). "Under Federal law, the three elements of claim preclusion are '(1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two actions.' "  *Id.* at 436–437, quoting from  *Hatch v. Trail King Indus., Inc.,* 699 F.3d 38, 45 (1st Cir.2012).

**\*2** With regard to the first element, a dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is an adjudication on the merits.  *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n. 3 (1981). Next, there is sufficient identicality between the causes of action asserted in the earlier District Court litigation and the defenses asserted by Alvarez in

Federal Home Loan Mortg. Corp. v. Alvarez, 87 Mass.App.Ct. 1125 (2015)

31 N.E.3d 79

the summary process action. In both proceedings, Alvarez challenged the underlying foreclosure action as invalid. While the claims and defenses do not overlap precisely, "[t]o bring claim preclusion into play, a cause of action need not be a clone of the earlier cause of action." ⚑Korn, 83 Mass.App.Ct. at 437 n. 3, quoting from ⚑*Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn.*, 142 F.3d 26, 38 (1st Cir.1998). Lastly, Juan D. and Maria Alvarez were parties to the Federal District Court proceeding. For purposes of comparing the two cases, it does not matter that the Alvarez children were added as parties to the summary process action.

In sum, Alvarez had an obligation to raise any issues concerning the propriety of the foreclosure process in the earlier Federal District Court proceeding. Alvarez is now precluded from asserting issues that were previously raised or should have been raised in that prior proceeding. See *Korn, supra* at 436–437.

*Judgment affirmed.*

*Order denying motion for relief from judgment affirmed.*

**All Citations**

87 Mass.App.Ct. 1125, 31 N.E.3d 79 (Table), 2015 WL 3421320

## Footnotes

1   Maria Alvarez, Jean DeJesus Alvarez, and Juan Jose Alvarez. Only Juan D. Alvarez, appearing pro se, has appealed.

2   The panelists are listed in order of seniority.

3   According to FHLMC, the complaint mistakenly named the Federal Home Mortgage Association as a defendant, rather than FHLMC.

4   U.S. Bank N.A.

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

Town of Montague v. Golrick, 91 Mass.App.Ct. 1109 (2017)
81 N.E.3d 822

91 Mass.App.Ct. 1109
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
NOTICE: Summary decisions issued by the Appeals Court pursuant to its rule 1:28, as amended by 73 Mass. App. Ct. 1001 (2009), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).
Appeals Court of Massachusetts.

TOWN OF MONTAGUE
v.
Jeanne GOLRICK.

16-P-681
|
Entered: March 2, 2017.

By the Court (Vuono, Milkey & Henry, JJ. [1])

MEMORANDUM AND ORDER
PURSUANT TO RULE 1:28

**\*1** The defendant, Jeanne Golrick, appeals from a judgment entered against her in this tax lien case. Her primary argument is that because she was not served notice of the petition seeking foreclosure as contemplated by G. L. c. 60, § 66, the judgment must be set aside. We disagree. As we understand the record, Golrick acknowledges that the town of Montague (town) properly recorded both the instrument of tax taking and the petition seeking foreclosure long before she obtained her purported title. Golrick thus had at least constructive notice of the pending petition. Cf. Frost Coal Co. v. Boston, 259 Mass. 354, 357-358 (1927); Devine

v. Nantucket, 449 Mass. 499, 507 (2007). More importantly, Golrick concedes she had actual notice of the petition and, in fact, she actively participated in the process by filing a formal appearance, filing opposition papers, and by appearing in person and arguing at all hearings. Lastly, Golrick does not argue she suffered any prejudice occasioned by the lack of formal § 66 notice. Neither due process nor § 66 requires more than what occurred here. See Vincent Realty Corp. v. Boston, 375 Mass. 775, 779-780 (1978). Cf. Adoption of Pearl, 34 Mass. App. Ct. 308, 312 n.5 (1993) (actual notice satisfied due process requirements).

We need only briefly address Golrick's remaining arguments. The Land Court judge properly exercised subject matter jurisdiction. See G. L. c. 185, § 1(b); G. L. c. 60, § 64. The Land Court recorder had authority to issue the judgment at issue. See G. L. c. 185, § 6, final sentence. Had Golrick wished to have the questions presented considered by a Land Court judge she could have done so via a petition in the Land Court to vacate the judgment. See G. L. c. 60, §§ 69, 69A. Although Massachusetts does not appear to recognize allodial theory as applied to real property, [2] those few non-Massachusetts jurisdictions addressing it suggest that real property so held does not exempt that property either from court process or local taxation. See Stevens v. Salisbury, 240 Md. 556, 562-563 (Md. 1965). [3] Golrick has failed to bring to our attention any authority suggesting the contrary. From all that appears of record the town's counsel is admitted to practice before the Massachusetts Bar and properly appeared on the town's behalf. Golrick has brought to our attention nothing suggesting the contrary. To the extent we have not commented explicitly on Golrick's remaining arguments, we have considered and found them to be without merit.

**\*2** Judgment affirmed.

All Citations

91 Mass.App.Ct. 1109, 81 N.E.3d 822 (Table), 2017 WL 829777

Town of Montague v. Golrick, 91 Mass.App.Ct. 1109 (2017)
81 N.E.3d 822

## Footnotes

1    The panelists are listed in order of seniority.

2    The term does not appear in any reported Massachusetts decisions, the General Laws, the Massachusetts Constitution, or in any regulatory enactment.

3    "After the close of the Revolutionary War, the ownership of property in this country has frequently been referred to as 'allodial' in nature or that the property is held by 'allodial tenure.' In its strict sense, 'allodium' means land owned absolutely, and not subject to any rent, service, or other tenurial right of an overlord; however, it has been, and is, uniformly recognized throughout this country that the ownership of property is subject to the rights of government to tax the property, to regulate reasonably its use and enjoyment under the police power of the States, and to take the same, upon payment of the values thereof, when needed for a public purpose." Stevens v. Salisbury, supra.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

Land Court

*County:* **MIDDLESEX, ss.**
*Case No.:* **CASE NO. 14 TL 148023**
*Parties:* **TOWN OF ARLINGTON, Plaintiff, v. SUSAN HOLMAN and LINDA MALOOF,[1]**
**Defendants.**
*Date:* **November 30, 2016**
*Judge:* **/s/ (Long, J.)**
*Decision Type:* **MEMORANDUM AND ORDER DIRECTING THE SALE OF 89 ROBBINS ROAD,**
**ARLINGTON**

Introduction

On June 23, 2009, the Town of Arlington took the single family home at 89 Robbins Road for non-payment of its 2009 taxes. According to the instrument of taking, the amount owed was $2,290.77, to which the town added $130.06 in interest, costs and expenses, for a total of $2,420.83. At that time, the assessed value of the home was $425,300. It is currently assessed at a fair market value of $475,600. The house has no mortgage, and, so far as the record shows, no liens other than its unpaid taxes and recent water bills.

By law, the town became the owner of the home when it filed its instrument of taking at the Registry, subject to its former owner's right of redemption by paying the taxes owed. See G.L. c. 60, §53; G.L. c. 60, §68. Neither the 2009 nor subsequent taxes were paid, and the town filed this action to foreclose the right of redemption on January 31, 2014. See G.L. c. 60, §65.

----------------------------

[1]     Lee Holman, the originally-named defendant in this proceeding, has been dropped from the caption because he is deceased and, by operation of law, all of this rights in the property at issue passed to his heirs, defendants Susan Holman and Linda Maloof.
-1-

The reasons why the taxes then, and the taxes since, have not been paid have now become apparent from the hearings in these proceedings.

The late Lee Holman was the equity owner of the home, subject to his mother, Phyllis Holman's, life estate. Phyllis died on November 9, 2006. Mr. Holman died intestate nine days later (November 18, 2006), leaving his widow, defendant Susan Holman, and his sister, defendant Linda Maloof, as his only heirs.[2] See G.L. c. 190, §1 et seq. as in effect on that date.[3] Lee's estate has never been probated.

Neither Lee nor Susan ever lived in the 89 Robbins Road home. Instead, in accordance with her life estate, it was occupied by Phyllis, and also by Phyllis' caregiver, Ann MacGibbon. Lee and Susan lived at 86 Richfield Road, Arlington — a separate property owned by Phyllis — under an agreement whose terms are not part of the record in these proceedings. Susan — who is presently not mentally competent and is represented in these proceedings by a Guardian ad litem — was unaware that her husband Lee owned the remainder interest in the 89 Robbins Road home, and instead (erroneously) believed that he owned 86 Richfield Road. Thus, she did not move from 86 Richfield Road to 89 Robbins Road after Phyllis' death and, if any of the 89 Robbins Road bills were ever forwarded to her (there is nothing currently in the record that indicates any forwarding occurred), this is likely why she assumed they had nothing to do with her. Ms. MacGibbon has continued to live in the 89 Robbins Road house, and lives there still, without ever paying any rent, any of its property taxes, or its more recent water bills. She claims she has not paid them because Linda advised her not to do so. Linda has not yet testified in response, and I will make no finding on that issue until

© 2018, Social Law Library. All Rights Reserved.

Land Court

she has had an opportunity to do so.

------------------------------

[2]  For ease of reference, because they share the same last name, I
     refer to the     Holmans (Lee, Phyllis and Susan) by their first
     names, and to Ms. Maloof as "Linda" for consistency of reference.

[3]  Under the intestacy laws then in effect, Susan Holman (spouse)
     inherited the first     $200,000 of his estate and one-half of the
     remaining real estate and personal property. Mr. Holman's sister,
     defendant Linda Maloof (his only sibling), inherited the rest.
                    -2-

   In June 2015, Susan was evicted from the 86 Richfield Road property in a
summary process action brought against her by Linda as the personal
representative of Phyllis' estate. Maloof v. Holman, Cambridge District
Court, Summary Process Action No. 1552-SU-000230 (eviction order entered May
28, 2015, with execution issued June 17, 2015). She has been homeless ever
since, living in the Albany Street Shelter in Cambridge, with her sole
source of income the social security checks she receives as Lee's widow.
Linda sold the 86 Richfield Road property for $412,500 on July 31, 2015, and
has retained Susan's share (some $93,000) in an escrow account ever since,
pending the probate of Lee's estate from which Susan's share derives.
   As noted above, no probate proceeding has yet been commenced for Lee's
estate, and Linda has declined to bring it because of her conflict of
interest. Susan herself is not mentally competent to bring the probate
action and, until informed in these proceedings of the $93,000 in escrowed
funds, may not even have known that the escrowed funds exist. She was
certainly unaware that she had an ownership interest in the 89 Robbins Road
property (the one at issue in these proceedings) until the guardian
appointed by this court so informed her.[4] For that matter, because of her
misunderstanding of the applicable intestacy law, Linda was also unaware
that she had an ownership interest in the property until she learned so
during the course of a hearing in this case.
   At present, the total amount of taxes, interest, costs, attorneys' fees,
and other expenses claimed by the town is somewhere in the neighborhood of
$70,000.[5] There is thus hundreds of

------------------------------

[4]     Susan's need for a guardian ad litem was brought to this court's
        attention by counsel for the town, whose efforts, professionalism,
        and cooperation in all aspects of this case is greatly appreciated
        by the court. The efforts by Susan's guardian in this case, attorney
        Maura Egan, have similarly been of the highest quality throughout
        these proceedings and, again, are greatly appreciated by the court.

[5]     See Docket Entry (Aug. 25, 2016). The amount may presently be
        more than that but, other than for the fees and expenses to be paid
        Susan's guardian, likely not significantly.
                    -3-

thousands of dollars in equity in the house even if the entire amount
claimed is found to be due. Susan does not have the money to pay the taxes
owed, cannot realistically borrow it (she is jobless and homeless), and will
not have access to any of the $93,000 escrow until Lee's estate is probated,
which will certainly not occur in the near term.[6]

Discussion

© 2018, Social Law Library. All Rights Reserved.

Land Court

I am not aware of any prior tax lien proceeding in which the court has directed the sale of a property in order to pay its taxes, but that does not mean it cannot be done. Indeed, the law fully supports the authority of the court to do so.

I begin with the fundamental principle underlying all tax lien proceedings. "[T]he only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of taxes due on the property, together with other costs and interest. When an owner of property taken for the nonpayment of real estate taxes comes forward with sufficient funds to redeem the property, the purpose of the statute has been fulfilled." Lynnfield v. Owners Unknown, 397 Mass. 470, 474 (1986). See also Boston v. James, 26 Mass. App. Ct. 625, 630 (1988) (quoting Lynnfield, 397 Mass. at 474). "In keeping with the respect with which our society regards the private ownership of property, the long standing policy in this Commonwealth favors allowing an owner to redeem property taken for the nonpayment of taxes." Lynnfield, 397 Mass. at 473-474. These principles are particularly apt here, where the rights of a non-competent person are at stake. See art. 1 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 106 of the

---------------------------

[6]      As previously noted, for reasons the court fully understands, Linda will not initiate the probate proceeding. The only other heir, Susan, cannot bring it because she is not mentally competent to do so. It would thus need to be brought by a conservator for Susan, who would first need to be appointed in a separate Probate and Family Court proceeding. The conservatorship proceeding will require not only filing fees and an attorney to bring and prosecute them, but also a medical certificate of Susan's incompetence. All this takes more money than she has. The only near-term reachable asset of any significant size is the 89 Robbins Road property, whose sale would generate more than sufficient funds to pay for these other proceedings. Speed is essential because interest on the principal amount of the taxes facially accrues at a 16% rate, see G.L. c. 60, §62, and any potential modification of that interest would require further proceedings in this court and, most likely, a report of the question to the Appeals Court, which will take time.

-4-

Amendments to the Massachusetts Constitution (right to acquire, possess and protect property), art. 10 of the Declaration of Rights of the Massachusetts Constitution (right to acquire, possess and protect (protections against taking), and art. 114 of the Amendments to the Massachusetts Constitution (protections for handicapped persons).

Here, the only way Susan can redeem the property and retain its equity is by having it sold. Otherwise, all of its equity will be lost to the town in the foreclosure. See G.L. c. 60, §64; Buk Lhu v. Dignotti, 431 Mass. 292, 296 (2000). This court has statutory authority to order the sale. See G.L. c. 60, §68, which allows redemption "upon such terms as may be fixed by the court" so long as the appropriate taxes are paid, and allows the court to "impose such other terms as justice and the circumstances warrant"; the sale of the property would be within such "terms"). It has authority to order the sale under its inherent judicial powers — here, the authority to fashion appropriate remedies to carry out its judgments (in this case, the redemption). See First Justice of Bristol Div. of Juvenile Court Dept. v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dept., 438 Mass. 387, 396-398 (2003) (inherent judicial powers, derived from Articles 11 and 29 of the Mass. Declaration of Rights, are those "necessary to the court's ability to perform its core judicial functions" and "whose exercise is essential to

© 2018, Social Law Library. All Rights Reserved.

Land Court

the function of the judicial department, to the maintenance of its authority, and to its capacity to decide cases"); Swann v. Charlotte-Mecklenburg Bd. of Ed, 402 U.S. 1, 29-31 (1971) (recognizing and affirming a court's power to provide equitable relief in implementation of its decrees so long as the remedy is reasonable, feasible, workable, and in accordance with "basic fairness"). The Massachusetts Rules of Civil Procedure reflect the court's ability to order sales of property in implementation of its judgments, and provide an express mechanism for doing so. See Mass. R. Civ. P. 70 (judgment divesting title and conveying it to others). There may also be

-5-

a constitutional obligation on this court to order such a sale in the circumstances of this case. See art. 1 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 106 of the Amendments to the Massachusetts Constitution (right to acquire, possess and protect property), art. 10 of the Declaration of Rights of the Massachusetts Constitution (protections against taking), and art. 114 of the Amendments to the Massachusetts Constitution (protections for handicapped persons), as previously cited above. Moreover, the Town does not object to such a sale as a means to pay the taxes it is owed.

No license from the Lee Holman estate to sell the property is necessary. Its title has been the town's, not Lee's, since the registration of the instrument of taking, subject only to the right of redemption (see G.L. c. 60, §§53 and 68), and the property is thus within the jurisdiction of this court. See G.L c. 185, §1 (b); G.L. c. 60, §68. It is no longer part of Lee Holman's estate — only its right of redemption — and that, by law, has now passed to his heirs: his widow Susan and his sister Linda. See Russo v. Inzirillo, 360 Mass. 862, 863 (1971) ("The rule in Massachusetts is that title to realty of a deceased intestate vests immediately in the heirs and no distribution is required."); McCarthy v. Landry, 42 Mass. App. Ct. 488, 490-491 (1997) ("Under Massachusetts law, real property passes directly to the heirs upon the decedent's death.")

Conclusion

Accordingly, it is hereby ORDERED:

1.  Subject to the review and supervision of this court, attorney Maura Egan, Esq., Susan's guardian ad litem and, by this Order, now an officer of this court for the following purposes, is hereby authorized to market and sell the 89 Robbins Road property in "as is" condition, and then hold its net sale proceeds in an escrow account for later distribution by this court. Her authority includes, but is not limited to, the discretion to select and

    -6-

    employ a real estate broker of her choice, on the usual terms, who shall recommend a listing price for the property and an appropriate sales strategy (which Ms. Egan may adopt or modify as she deems appropriate), and then transmit all offers to Ms. Egan for evaluation.[7] Those offers shall then be brought before the court which, after due proceedings, shall determine which shall be chosen and then direct the conveyance accordingly. Ms. Egan shall also seek whatever additional interim orders she deems necessary to market and sell the property, including (if, as, and when appropriate) an order directing its current occupant, Ms. MacGibbon, to vacate the property.

2.  Since the net sale proceeds will be more than sufficient to cover

© 2018, Social Law Library. All Rights Reserved.

Land Court

even the maximum of the town's claims, the property shall be sold, by Order of this court, free and clear of those claims, with Ms. Egan holding the net sale proceeds in an escrow account. The court will then hold appropriate proceedings to determine the appropriate amount to be paid the town in satisfaction of the property's tax and other municipal liabilities, and to determine the proper allocation of the remaining funds.

SO ORDERED.

By the court
/s/ (Long, J.)
November 30, 2016

Deborah J. Patterson
Recorder

_____

[7]     Ms. Egan's authority also includes the power to authorize inspections and showings of the property at any times she deems appropriate, to hire cleaners, stagers, and persons to address minor repair needs, to insure the property and, as necessary, to interact with the occupant, Ms. MacGibbon, to accomplish all these tasks.

# EXHIBIT J

2015 WL 4207424
Only the Westlaw citation is currently available.
Massachusetts Land Court.

TALLAGE LLC, Plaintiff,
v.
Paul MEANEY, Michele Meaney
and Sovereign Bank, Defendants.

No. 11 TL 143094.
|
June 26, 2015.

### FINDINGS, RULINGS AND ORDER ON DEFENDANTS' MOTION TO VACATE JUDGMENT FORECLOSING RIGHT TO REDEEM TAX TITLE

By the court (Long, J.)

*Introduction*

**\*1** This case is a tax lien foreclosure proceeding on the property at 28 Caro Street in Worcester—a three family dwelling, presently used as apartments for rental to students at the nearby College of the Holy Cross—brought by plaintiff Tallage LLC, a private company which purchases municipal tax liens, against the property's owners, defendants Paul and Michele Meaney, for failure to pay a fiscal year 2010 $224.58 water bill and $267.93 sewer charge. Defendant Sovereign Bank (now Santander Bank) is the holder of a $230,500 mortgage on the property, granted by the Meaneys in connection with a 2005 refinancing.

Water and sewer services are city-provided in Worcester, so their unpaid bills are considered "taxpayer receivables" and can thus result in property tax liens. *See* G.L. c.60, § 43 (definition of "taxes"). Tax liens are unique. When mortgage foreclosures occur, or when sheriff's auctions take place on judgment liens, any surplus remaining after the obligation is paid is returned to the property owner. In stark contrast, when the right of redemption on a property tax lien is foreclosed, the holder of the lien acquires "absolute title" to the property, eliminating all of the owner's equity and all interests that derived from the owner (the owner's mortgage, for example),[1] regardless of the amount owed on the lien. G.L. c.60, § 64. None of the surplus over and above what

the holder of the tax lien is owed is returned to the taxpayer or any of his creditors; once foreclosure is final, the tax lienholder keeps it all. *Id.*

Since May 2008, Worcester has auctioned its tax receivables to private entities, which bid on them individually (the receivables go to their respective highest bidder) and can thus pick and choose the ones they want. *See* G.L. c.60, § 43.[2] Private entities are interested in tax receivables for two reasons.

*First,* as tax liens, they accrue interest at 14% from the time they are due until the collector's sale or tax taking occurs, G .L. c.59, § 57, and then at 16% thereafter, G.L. c.60, § 62—a rate of return not easily obtained from other investments. Moreover, once a tax lien foreclosure proceeding is filed, the foreclosing party can also be awarded its counsel fees and costs. *See* G.L. c.60, §§ 65 & 68. A small bill can thus rapidly become much larger.

*Second,* as noted above, once a judgment enters foreclosing the taxpayer's right of redemption, the foreclosing party has "absolute title" to the property, regardless of the amount at issue in the foreclosure. G.L. c.60, § 64. A small investment—a few hundred dollars for a water or sewer lien, say—can thus potentially result in the acquisition of the entire title to the property, free and clear of all mortgages and owner equity claims, and thus an astronomical return.

Private entities thus seek out and bid on properties with considerable "upside"—the spread between the purchase price and the property's fair market value—and, as discussed more fully below, such was the case here. For a net investment of only $1052.84,[3] Tallage acquired tax title to the 28 Caro Street property—an income-producing rental property in a prime location—with a fair market value in excess of $270,000.

**\*2** Tallage then perfected the tax lien by recording the collector's deed, filed this case, received a default judgment foreclosing the Meaneys' right of redemption and then, less than three weeks after securing that judgment and well within the one year period in which this court has discretion to vacate the judgment (*see* G.L. c.60, § 69A), sold its interest in the property to a third party, HIGCO Corp., for $150,000. The Meaneys' offer to redeem the property, made shortly after the HIGCO transaction, was rejected by Tallage, and both the

Meaneys and Sovereign then moved to vacate the judgment and allow them to redeem. This court has explicit statutory authority to allow such motions "after careful consideration and in instances where it is required to accomplish justice," so long as they are filed within a year after judgment entered. *See Sharon v. Kafka,* 18 Mass.App.Ct. 541, 542 (1984). *See also Glusgol v. Ortiz,* Land Court Tax Lien Case No. 10 T.L. 141689, Order Granting Motion to Vacate Judgment (Dec. 20, 2011) (Patterson, Recorder) [4] (hereafter, *Glusgol* ) (granting motion to vacate, filed within the year, even though property had been conveyed to a third-party in the interim).

Put briefly, and as more fully discussed below, the parties' contentions were these.

At the time these events occurred (2010 and 2011), the Meaneys were overwhelmed with health and other issues and either did not see or, as I find more probable, were distracted from the water and sewer bill at issue, [5] the notice sent by the city that those charges would be auctioned, and the subsequent notices regarding these court proceedings, and thus left them unattended and unaddressed. They certainly never appreciated, and none of the notices they received ever stated, that they could lose their entire equity in the property, while remaining personally liable for the now-unsecured mortgage debt, as the result of a judgment in this case. They are not rich, and this property, along with the income it produces, is an important part of their family's livelihood and savings, and to be obligated on the mortgage debt without any corresponding property to meet that obligation will be crippling. Finally, they point to the fact that only Tallage has refused their offer of redemption. Their three other properties, caught up in the same events but with a different purchaser of the tax liens, have all been redeemed with that purchaser's assent.

Tallage, in response, points to the many notices that were sent to the Meaneys and argues that they should have been more attentive, with no one but themselves to blame for their loss. Tallage also makes the further argument that, as a matter of law, its sale of the property to a third party prior to the Meaneys' offer to redeem cuts off the one-year period within which this court may vacate the foreclosure judgment—a legal argument the Land Court has previously considered and rejected in *Glusgol, supra.*

**\*3** An evidentiary hearing was held on the motion to vacate and, for the reasons stated on the record at the conclusion of

that hearing, the motion to vacate was allowed and the parties were directed to implement the redemption with these written findings and rulings, confirming that direction, to follow.

### Tax Lien Foreclosure Proceedings

Before discussing the matters presently before the court, an explanation of tax lien foreclosure proceedings generally, followed one on how private companies can come to possess a citizen's municipal tax obligation, may be helpful. I thus begin with a summary of the law regarding the assessment and collection of property taxes in Massachusetts, and a broad overview of the issues raised by the "privatization" of such collection.

Municipalities assess taxes on real property, *see* G.L. c.59, and a detailed statutory framework exists for their collection when they go unpaid, *see* G.L. c.60. Such taxes are not limited to the property assessments alone. Unpaid municipal water and sewer charges can also be added to the tax account. *See* G.L. c.60, § 43 (definition of "taxes").

In the usual case, collection enforcement proceeds as follows. An instrument of taking is recorded at the Registry of Deeds and, if against the proper party(ies) and in compliance with the statutory prerequisites, places title in the municipality subject to the property owner's right of redemption. Generally speaking, the municipality then proceeds against the property owner itself. Some municipalities, however, will sell some or all of their tax titles to private investors, leaving it to them to pursue. If, as here, the municipality has sold the tax *receivable* to a private investor, a collector's deed (rather than an instrument of taking) is recorded, putting title in the private investor, once again subject to the taxpayer's redemption right. Unless previously resolved by agreement, an action is then filed in the Land Court to foreclose the right of redemption. [6] One of two alternatives then occurs: (1) the municipality or investor enter into an agreement with the property owner on a redemption figure and payment plan and, upon satisfaction, the case is dismissed, or (2) in the absence of such voluntary agreement, after due proceedings, the court makes a "finding" of the amount necessary to redeem and the date by which redemption must take place, often involving a payment schedule. If the taxpayer fails to comply with the finding, the right of redemption is foreclosed and judgment enters accordingly. As previously noted, that judgment may be vacated within one year if the court, "after careful consideration and in instances where it is required to

accomplish justice," so allows. *See* Sharon v. Kafka, 18 Mass.App.Ct., 541, 542 (1984). Once past the year, it may be vacated only if a "due process" violation occurred, e.g. the failure adequately to notify the record owners or mortgagees of the foreclosure proceeding. [7] *See* Christian v. Mooney, 400 Mass. 753, 760–761 (1987). [8]

**\*4** As noted above, tax foreclosure cases are unlike any other in certain important respects. Interest accrues at 14% from the time taxes are due until the collector's sale or tax taking occurs, G.L. c.59, § 57, and at 16% thereafter, G.L. c.60, § 62. A small tax bill can thus rapidly become much larger. Also, unlike mortgage foreclosures or executions on money judgments in ordinary civil cases, the tax-foreclosing party keeps all surplus. Once the right of redemption has been foreclosed, tax title is "absolute" and neither the property owner nor any party claiming through the owner (such as mortgagees, lienors, or attaching creditors) has any claim, then or later, to the property or any part of its value. G.L. c.60, § 64; *Buk Lhu v. Dignotti,* 431 Mass. 292, 296 (2000).

Property owners should pay their taxes, but a Procrustean application of 14%/16% interest rates and a complete loss of equity once redemption rights are foreclosed can arguably lead to inequitable results. Those who make these arguments are often the elderly or widowed who, once behind in their payments, find it difficult to "catch up"; those whose employment has been interrupted and have the same issue; heirs who have difficulty co-ordinating amongst themselves after a parent or relative's death; or those, as here, who have had severe health issues that disrupted their lives. The Legislature has thus enacted three safeguards. *First,* the municipality may reduce the interest owed and enter into payment plans with the property owner. G.L. c.60, § 62A. *Second,* the municipality may apply to the Commissioner of the Department of Revenue for a reduction in the principal owed. G.L. c .58, § 8. *Third,* the Land Court has been given discretion to "make a finding allowing the [property owner] to redeem, within a time fixed by the court ..." and to "impose such other terms as justice and the circumstances warrant." G.L. c.60, § 68. This last allows the court "to determine whether the party seeking to redeem can meet the financial burdens imposed by statute, and if he can, on what terms payment to the town should be made." *Lynnfield v. Owners Unknown,* 397 Mass. 470, 475 (1974). The Land Court may also exercise other potential powers to address inequities, either inherent or conferred by statute, expressly

or by implication. *See, e.g.,* G.L. c.60, § 75; G.L. c.220, § 2; G.L. c.185, § 25, and G.L. c.185, § 25A. [9] These include the explicit power at issue here: the court's discretion under G.L. c.60, § 69A, "after careful consideration and in instances where it is required to accomplish justice," to vacate a judgment foreclosing redemption if the motion is brought within a year after that judgment entered.

With the exception of payment plans, the scope of the court's powers to address inequities has rarely been explored in the context of tax foreclosure cases. One reason may be that, until recently, actions to foreclose a property owner's right of redemption have generally been brought and pursued by the municipalities themselves. They have thus been conducted within the political process and, much like a District Attorney's office, with a large measure of discretion, cognizant of special circumstances.

**\*5** Tax foreclosure proceedings brought and pursued by private entities are outside the political process. Such entities are responsible to their investors, not the citizens of a city or town, and their goals and incentives are not the same. Maximizing return on investment may not include accommodation to individual circumstance to the same extent a municipality, acting for itself, might otherwise deem warranted. [10] Constitutional problems arising from such privatization are thus raised and, to avoid them, the court has appropriate discretion to address circumstances that a municipality would likely have accommodated, but a private entity has not. *See* McCulloch v. Maryland, 17 U.S. 316, 407, 431 (1819) (identifying the "great powers" of government as "to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies" and observing, "the power to tax involves the power to destroy").

### Facts

Based on the sworn testimony of the witnesses, my assessment of the witnesses' credibility, the admitted exhibits, the records of the Land Court of which I may take judicial notice, and the inferences I draw from the entirety of the evidence, these are the facts as I find them after trial.

Defendant Paul Meaney is a financial advisor with Integrated Financial Partners in Waltham. He and his wife, defendant Michele Meaney, have two small children—Jack, who was

seven at the time of trial, and Kate, who was five. Michele has stayed home with the children, taking time from her career while they are young. They currently live in Natick.

The Meaneys are not rich. To supplement Mr. Meaney's earnings and to save for their children's educations and their ultimate retirement, the Meaneys have purchased four three-family homes on Caro Street in Worcester near Mr. Meaney's *alma mater,* the College of Holy Cross. The four are: (1) 21 Caro Street, (2) 23 Caro Street, (3) 25 Caro Street, and (4) 28 Caro Street. Each is used for apartments for rental to Holy Cross students. The one at issue in this case is 28 Caro Street, purchased by the Meaneys in January 2003 for $270,000, and refinanced by them in September 2005 with a mortgage to defendant Sovereign Bank in the principal amount of $230,500. [11] Sovereign is also the mortgagee on 21, 23 and 25 Caro Street.

Mr. Meaney manages the properties himself. He contracts with a property maintenance company to handle building maintenance and repairs, but he is the one who finds and interacts with tenants, collects rents, and pays building-related expenses. The monthly mortgage payments include a property tax escrow, and Sovereign employs a company named CoreLogic which monitors the City's tax records to learn the taxes owed and then pay them from the tax escrow funds. CoreLogic, however, does not monitor water and sewer bills. These are sent to the Meaneys who, in the ordinary course, pay the City directly.

**\*6** Worcester's water and sewer charges are mailed quarterly. If a quarter's bill is unpaid, it is added to the next quarter if within the same tax year. No bill goes beyond the tax year, however. If unpaid at fiscal year's end, [12] it is added to the taxpayer's tax account for that fiscal year where it can become a tax lien. Water and sewer bills in the next fiscal year do not reflect unpaid charges from previous years.

The Meaneys have failed to pay water and sewer bills on one or more of their Worcester properties on occasion in the past. CoreLogic learned of this on those occasions, and arranged for their payment from the Meaneys' tax escrow. The tax escrow obligation was then adjusted upwards to cover the shortfall, and these readjustments (reflected on subsequent monthly mortgage bills) alerted Mr. Meaney to the fact that he had missed the payments. His conclusion from this—wrong, as it turned out—was that CoreLogic would *always* catch unpaid water and sewer bills added to the tax title account, arrange for their payment, and then readjust his

escrow payments. Such was not the case with the water and sewer bill at issue in this proceeding. CoreLogic learned of the unpaid bill in January 2011 after it had been added to the Meaneys' tax account [13] but, for reasons neither it nor Sovereign could explain at trial, never paid it. Most likely, it was never brought to the proper person's attention—one more in the series of unfortunate events that occurred in this case. *See* discussion below.

The City mailed water and sewer bills on all four Caro Street properties on December 31, 2009. Mr. Meaney paid all of them in timely fashion. All previous water and sewer bills had likewise been paid. The ones that were missed were the next ones, mailed on April 1, 2010—four separate bills, one each for each of the four buildings. The charges that led to the lien foreclosed in this proceeding (28 Caro Street) were $224.58 for water and $267.93 for sewer.

The Meaneys claim that they never saw the April 1, 2010 bill for 28 Caro Street or any of the April 1 bills for the other three properties, all of which were mailed by the City to their residential address at that time: 357 Commercial Street, Apartment 725, Boston MA 02109. These bills were mailed when the Meaneys were moving from that address to their new home at 17 Davis Brook Drive in Natick. I am not convinced that none of these bills were seen. One bill may have gone astray, but it is difficult to believe that none of the four arrived, and seeing a bill for even one of the buildings would have alerted the Meaneys that bills for the three others had also been sent. More likely, the bills were received, put in moving boxes, and then overlooked after the move was completed in the expectation that any unpaid charges would simply appear on the next bill. [14] What the Meaneys did not realize was that, because the fiscal year changed on July 1, 2010, the April 1, 2010 charges from the prior fiscal year would *not* be added to any future water and sewer bill but, instead, go on the tax account for collection there. None of these charges appeared on any later water and sewer bill.

**\*7** Worcester does not sell its tax receivables as soon as they are overdue. Instead, it waits until it has a large number of them, and then schedules a public auction. Each taxpayer whose receivable will be auctioned is mailed notice of the auction, and that occurred here. By letter from the City Treasurer dated February 7, 2011, sent to their new address in Natick, the Meaneys were told that, unless they paid $597.23 by no later than March 16, 2011, [15] a collector's deed granting the right to collect their "fiscal year 2010 outstanding Real Estate tax due" on the 28 Caro Street property would be

auctioned on April 5, 2011.[16] The letter went on to say that the collector's deed "will grant authority to a third party purchaser to proceed with collection actions as provided by the statute [G.L. c. 60, § 43] including perfecting a lien on the property and filing a Foreclosure complaint with the Massachusetts Land Court." Notice of the auction, with specific identification of the 28 Caro Street property, was also published in the Worcester Telegram on March 22, 2011.

The Meaneys claim that they did not see this letter or the published notice. Again, I am not convinced. Four such letters were sent, one for each of the four properties with an April 1, 2010 unpaid water and sewer bill. Surely at least the *envelope* from at least one of those letters would have been seen. They were, after all, from the City—not an advertisement or solicitation from a bulk mailer. But I give full credibility to this: the Meaneys were in the midst of a health and related family crisis, and many things simply fell through the cracks. The City's letters said they were for "outstanding Real Estate tax due," an accurate but misleading statement (many people —perhaps most, including the Meaneys at this time—have no appreciation that unpaid municipal water and sewer charges fall within the category of "real estate tax due")[17] and the Meaneys, quite understandably, believed that Sovereign Bank was attending to all such taxes through their tax escrow, paid monthly by automatic deduction from Mr. Meaney's bank account.[18] Moreover, I agree (and so find) that the Meaneys' health and family issues were both overwhelming and the primary reason why more attention was not paid to both this and later notices. These issues were as follows.

As noted above, the Meaneys are a young family with young children. In January 2010, while on a family vacation in Arizona, Mrs. Meaney began experiencing a "tingling" sensation in both of her feet. She also lost strength in her right arm, and was unable to lift anything with weight. She sought medical attention immediately upon returning to Boston, and was told her symptoms were likely caused by a pinched nerve. They worsened, however—she lost all strength in her right side and dropped her daughter when she ran to her after ballet practice—and thus began the first of many brain scans and other tests. Her condition was not diagnosed at that time (the MRIs could not identify anything specific), but she was told that she had a "strong potential" for multiple sclerosis (MS)—a chronic, typically progressive disease involving damage to the sheaths of nerve cells in the brain and spinal cord, whose symptoms may include numbness, impairment of speech and muscular coordination, blurred vision, and severe fatigue, *see* The Concise Oxford Dictionary (10th Ed.) at

1282 (Oxford University Press, 1999)—and, after many tests and many months, this diagnosis ultimately was confirmed. The tests themselves caused problems. Among them was a spinal tap leak, undetected, that caused blinding headaches and an emergency ambulance ride to the hospital. In addition, Mrs. Meaney began having gastrointestinal issues and was housebound as a result. Cervical and colon biopsies gave troubling results, there was concern that Mrs. Meaney might have celiac disease,[19] and she also had an abnormal pap smear.

**\*8** These events had profound effects on the Meaneys' family life. The children were terrified that their mother might be dying and regularly had nightmares, waking up four and five times a night. Moreover, at this same time, Jack was diagnosed with a learning disability, doubtless not helped by his concerns for his mother, which required special schooling and therapy. Kate developed vision problems that needed regular therapy sessions. Mr. Meaney, as fearful for his wife as the children, pushed his work aside to take his wife to her numerous doctor and hospital visits (she could not drive herself) and to be with the children both at home and their activities. Mail would come in and be scattered around the house. Tenant rent checks went uncashed. Other tenants skipped paying, leaving town before Mr. Meaney noticed and could take effective action. Many of Mr. Meaney's long-time clients fired him because he was distracted from their work. A babysitter was hired to help out, but described her work as "damage control." All this continued through December 2012, when family life began stabilizing. In addition, for much of this time, the Meaneys were involved in a zoning dispute with the City, including complaints for contempt, over whether the apartments in their Caro Street properties were "lodging houses" being operated without a license[20] — a dispute not finally resolved until the Supreme Judicial Court ruled in the Meaneys' favor on May 15, 2013. *City of Worcester v. College Hill Properties LLC, et al.,* 465 Mass. 134 (2013) (addressing the Meaneys' case and those of other similarly-situated apartment owners).

The auction notice letters from the City arrived at the Meaneys' house in early February 2011, and it is not surprising that they were pushed aside for a later attention that never occurred. The auction itself took place April 6, 2011. Coco Bella LLC purchased the collector's deeds for 21, 23 and 25 Caro Street, and Tallage purchased the collector's deed for 28 Caro Street—the property at issue in this case. Each of these deeds was recorded at the Worcester Registry in May.

Tax lien foreclosure cases were filed in the Land Court in November 2011 against each of the four properties—*Coco Bella LLC v. Meaney,* 11 TL 143163 (21 Caro Street), *Coco Bella LLC v. Meaney,* 11 TL 143157 (23 Caro Street), *Coco Bella LLC v. Meaney,* 11 TL 143161 (25 Caro Street), and *Tallage LLC v. Meaney,* 11 TL 143094 (28 Caro Street). Each arose from an unpaid water and sewer bill from April 2010—none in a principal amount over $500 [21] —and each sought foreclosure and the resulting "absolute title" to the entirety of the property. Following the usual Land Court procedures, a title examiner was appointed in each of these cases to determine all persons with an interest in the property so that certified mail citations could be sent. [22] The title examiners completed their work in early 2012 and, in April 2012, citations were sent in each case to each of the Meaneys (Paul and Michele, in separate envelopes), mailed to their former address on Commercial Street in Boston (these were forwarded by the post office to the Meaneys' Natick home), and to the Meaneys' mortgagee bank, Sovereign, mailed to its central mailroom located at 1130 Berkshire Boulevard in Reading, Pennsylvania.

**\*9** The notices sent to the Meaneys were either signed-for by their babysitter, Christine McDonough, or by Mrs. Meaney. The notices to Sovereign Bank were signed-for by an employee of Pitney Bowes (a third-party contractor that receives and sorts Sovereign's mail), who should have forwarded them to Sovereign's Escrow Servicing department at 601 Penn Street in Reading, but instead sent them to the Default Operations department, located at 450 Penn Street —a separate building. The Default Operations department received them, but never forwarded them to Escrow Servicing or took any action regarding them. Part of this may be due to the wording of the Citations—a Land Court form that has since been changed. The wording in the Citations sent to the Meaneys and Sovereign said:

*NOTICE*

A tax lien complaint has been presented to said Court [the Land Court] by the above plaintiff(s) to foreclose all right of redemption concerning the land described as:

[DESCRIPTION OF LAND]

You have been named as a party who may have an interest in this proceeding.

If you desire to make any objection or defense to said complaint you or your attorney must file a written appearance and an answer, setting forth clearly and specifically your objections or defenses to said complaint, in the office of the Recorder of said Court in Boston, Three Pemberton Square, Room 507, or in the office of the Assistant Recorder of said Court at the local Registry of Deeds, on or before the return day set forth above.

Unless your appearance is filed, your default will be recorded, the said complaint will be taken as confessed and you may be forever barred from contesting said complaint or any judgment entered thereon.

The Citation then gave the name and contact information for the plaintiff's attorney. There was nothing on the form that gave any indication that the recipient's ownership interest was at risk, much less the entirety of that interest. [23]

Mr. Meany handles all business-related mail that comes to the house, and he first saw the letters and notices regarding the unpaid water and sewer charges, previously ignored or put aside, in mid-April, 2012. The ones he recalls seeing are the ones in the *Coco Bella* cases (not the ones related to this property, the deed to which had been acquired by Tallage), and he called Coco Bella's attorney to see what they were about. He spoke with her briefly, and subsequently received an email with invoices to redeem 21 Caro Street for $5,135.91 and 23 Caro Street for $4,648.28—figures that shocked him since the principal of the unpaid water and sewer charge for 21 Caro Street was only $354.08 (the demanded figure was over 14 times that amount) and $352.51 for 23 Caro (the demanded figure was over 13 times that amount). [24] Caught up in his family problems and believing that—at worst—he would simply owe money whose amount could be addressed later, he did not respond to those demands or follow up with Coco Bella's law firm at that time. At no time did he realize that he was at risk of losing the properties themselves. He did not call Tallage's attorney because he did not see the notices for the Tallage case, and he did not file answers in any of the four cases, Coco Bella's or Tallage's. Because of its internal mail-forwarding failures, Sovereign, likewise, did not file answers in any of the cases prior to entry of judgment.

**\*10** These failures to file responses in the court cases had consequences. Default judgments were entered in each of the four in July 2012, foreclosing both the Meaneys' and Sovereign's rights of redemption and, for Sovereign,

Tallage LLC v. Meaney, Not Reported in N.E.3d (2015)

terminating its mortgages on the properties. Coco Bella sold 25 Caro Street to HIGCO Corporation[25] for $150,000 on July 19, nine days after judgment in that case was entered, and Tallage sold 28 Caro Street to HIGCO for $150,000 on July 26, only fifteen days after the July 11 entry of judgment. HIGCO was aware in both instances that the interests it was purchasing came from tax lien foreclosures, and was thus on notice that those judgments and resulting titles could be vacated by the court on motion brought within a year. 🚩 G.L. c.60, § 69A. The deed it received from Tallage was a release deed, conveying only such interest as Tallage had acquired in the 28 Caro Street property with no warranties of any kind, and its agreement with Tallage contained an express provision addressing the possibility of a motion to vacate, as follows:

### 26. Tax Title—Buyer's Option for Indemnification

Buyer acknowledges that Seller's title to the Property is through the foreclosure of a municipal property tax lien pursuant to G.L. 60, and that under said statute interested parties may attempt to vacate the foreclosure judgment entered by the Land Court on July 11, 2012 within one year of the judgment. Buyer agrees that the Seller shall have no obligation to defend and indemnify Buyer for any damages, expense or loss arising out of any such action or motion to vacate the judgment, provided however that the Seller shall defend and indemnify the Buyer upon the occurrence of the following conditions precedent: (a) a motion to vacate the foreclosure decree is filed and docketed by the Land Court before July 11, 2013; and (b) within five days of the entry of such motion to vacate in the Land Court, the Buyer gives written notice to the Seller exercising its option to obtain Seller's defense and indemnification of said motion to vacate and Seller delivers $25,000 in good and clear funds to the Buyer. In the event that the Buyer exercises the option described above, the Buyer agrees to defer to the Seller's defense strategy, including any compromises of claims, and to fully cooperate in good faith with any such defense. The Buyer further agrees that the Seller may, at its option and in its sole judgment and discretion, take any justiciable appeals from any adverse rulings or judgments in connection with this defense. The Seller may, at its own option and in the absence of the Buyer's exercise of the option described above, defend against any such motion to vacate. The Seller's obligations to indemnify Buyer under this section 26 shall be limited to $175,000, expressly excluding any other damages or losses incurred by the Buyer such as carrying costs or costs to improve the Property, and shall only arise if the foreclosure decree is vacated by a court of competent jurisdiction following any and all appeals.

**\*11** Purchase and Sale Agreement, 28 Caro Street (Jul. 26, 2012) (Trial Ex. T–29).

The Meaneys learned of the 25 and 28 Caro Street conveyances in August when Mrs. Meaney's mother saw a report of the property transfers in the Worcester Telegram and called her about it. Mrs. Meaney then immediately called Mr. Meaney, who immediately contacted the attorney who was representing them in the zoning litigation (Gary Brackett), and attorney Brackett immediately called Coco Bella's attorney and negotiated the redemption of 21 and 23 Caro Street. Sovereign became aware of the situation at approximately the same time by notice from CoreLogic.

Coco Bella rejected the Meaneys' redemption of 25 Caro Street (the one it had sold to HIGCO) and, shortly thereafter, the Meaneys and Sovereign each filed a formal motion to vacate the judgment of foreclosure in that case.

Attorney Brackett made a similar request to Tallage to redeem the 28 Caro Street property, contacting its attorney on August 23, 2012. Tallage refused this request. Sovereign then filed a motion to vacate the 28 Caro Street judgment on October 9, 2012, and the Meaneys followed with their own motion to vacate on October 23, both well within the 🚩 G.L. c.60, § 69A one-year period. A consolidated evidentiary hearing on the motions to vacate in both the Coco Bella 25 Caro Street case and this case was subsequently held before this court. The motions to vacate were allowed at the conclusion of that hearing (April 1, 2013), with these explanatory findings and supplementary rulings to follow.

Coco Bella later came to agreement with the Meaneys on the terms of redemption in the 25 Caro Street case. *See Coco Bella LLC v. Paul Meaney, Michele Meaney and Sovereign Bank,* Tax Lien Case No. 11 TL 143161, Joint Motion for Approval of Agreement for Judgment, allowed by the court on June 27, 2013. Tallage has not agreed, leaving only that case for final resolution. These findings and rulings are thus addressed solely to that case.

*Discussion*

As noted above, even if no "due process" violation has occurred, judgments in tax lien cases foreclosing a taxpayer's right to redeem may be vacated if (1) a motion to do so is filed within one year after entry of the judgment, 🚩 G.L. c.60, § 69A, and (2) the court, after "careful consideration," finds that to do so "is required to accomplish justice," *see* 🚩 *Sharon*, 18 Mass.App.Ct. at 542. I find and rule that both conditions have been met.

There is no dispute that both Sovereign's and the Meaneys' motions to vacate the Tallage (28 Caro Street) judgment were filed within the year. Indeed, the evidence showed that they were filed promptly after the Meaneys and Sovereign learned of that judgment, and shortly after the Meaneys' offer to Tallage to redeem the property was rejected.

I begin with a fundamental point. "[T]he only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of the taxes due on the property, together with other costs and interest. When an owner of property taken for the nonpayment of real estate taxes comes forward with sufficient funds to redeem the property, the purpose of the statute has been fulfilled." *Lynnfield v. Owners Unknown,* 397 Mass. 470, 474 (1986). *See also* 🚩 *Boston v. James,* 26 Mass.App.Ct. 625, 631 (1988) (quoting *Lynnfield* ). "In keeping with the respect with which our society regards the private ownership of property, the long standing policy in this Commonwealth favors allowing an owner to redeem property taken for the nonpayment of taxes." *Lynnfield,* 397 at 473–474.

**\*12** The Meaneys should have been more attentive to the many notices sent their way, but I fully credit their explanation that (1) they were overwhelmed with Mrs. Meaney's and the children's health issues at the time the notices were sent, (2) once they were able to focus on their mail, they fully intended to take care of these obligations, (3) as a backstop, they assumed their bank would take care of anything related to their tax account, and they'd have their mortgage tax escrow adjusted accordingly, and (4) they had no idea—no idea at all—that their failure to pay what started out as minor utility bills could result in the total loss of their properties. The fact that rent checks sent to them went uncashed and tenants' skipped rental payments went unnoticed shows the depths of the crises they were experiencing, and negates any thought that they intentionally ignored these bills and notices.[26] These are "extraordinary" circumstances fully justifying the exercise of this Court's discretion to vacate the foreclosure.

*See* 🚩 *Sharon,* 18 Mass.App.Ct. at 542 (citing *Lynch v. Boston,* 313 Mass. 478, 480 (1943)). Moreover, in these circumstances, it would be inequitable to allow Tallage to profit from such a windfall—the acquisition of full title to a $270,000 property for $1052.84 plus court expenses, which it immediately turned around and sold for $150,000.

Tallage bases both its refusal to agree to redemption, and its opposition to any court order vacating the foreclosure of that right, on an argument that the one-year period for the owner to file a motion to vacate the foreclosure judgment is superseded and ends once the property is sold to an "innocent third-party purchaser for value," citing G.L. c.60, § 69. Tallage is incorrect, however, both in its reading of the law and in its factual assertion that HIGCO is an "innocent purchaser for value." By its express terms, G.L. c.60, § 69 only bars the *petitioner* in the tax lien foreclosure case (here, Tallage) from moving to vacate the judgment foreclosing the right of redemption once the property has been sold to an innocent purchaser for value. 🚩 G.L. c.60, § 69A governs motions to vacate by "any person *other* than the petitioner" (emphasis added)—for example, as here, by the owners and their mortgagee bank—and is thus the applicable provision. *See Glusgol v. Ortiz,* Land Court Tax Lien Case No. 10 T.L. 141689(DJP), Order Granting Motion to Vacate Judgment (Dec. 20, 2011), cited *supra.* Moreover, HIGCO is not an "innocent purchaser for value," and Tallage did not sell the property to HIGCO as such. The fair market value of 28 Caro Street is in excess of $270,000. Its rushed sale by Tallage to HIGCO for approximately half that was a recognition, by both Tallage and HIGCO, that the property might well be redeemed by either the Meaneys or their mortgage bank (Sovereign, with $230,500 at risk) within the one-year period set forth in 🚩 G.L. c.60, § 69A. This is corroborated by the fact that Tallage's deed to HIGCO was a *release* deed, conveying only whatever interest Tallage had, with no warranties or covenants of any kind. Moreover, the purchase and sale agreement between Tallage and HIGCO contained a specific provision addressing a 🚩 G.L. c.60, § 69A motion to vacate, and was thus an explicit allocation of risk between the two of them if such an event occurred. As the agreement provides, once the motion to vacate is granted and redemption occurs, HIGCO gets its money back (the $150,000 it paid Tallage, plus the $25,000 it advanced to fund Tallage's opposition to the motion to vacate) and the parties have no other obligations to each other.

*Relief*

**\*13** As ordered at the conclusion of the evidentiary hearing, the motion to vacate the judgment foreclosing the Meaneys' right of redemption is **ALLOWED**. The property has been the Meaneys' since that time, with only the dollar amount owed Tallage for the redemption in question. Unlike Coco Bella,[27]

and although it had full power to do so,[28] Tallage has not come to an agreement with the Meaneys on that number, leaving this court to set it.[29] The cause of this is plain from their differing submissions.

Tallage identifies and itemizes its requests as follows:

| | |
|---|---|
| Principal paid at auction: | $626.24[30] |
| Interest and fees paid at auction: | $554.04 |
| Principal interest (post auction): | $75 |
| Recording cost of collector deed: | $125 |
| 2011 tax payment: | $1150.59[31] |
| Recording cost–2011 tax payment certificate: | $75 |
| Recording administrative fee (2011 tax certificate): | $75 |
| Tax lien foreclosure petition deposit with Land Court: | $515 |
| Supplemental title and other services: | $137 |
| Recording cost of notice of filing petition: | $75 |
| Administrative fee (notice of filing petition): | $75 |
| Recording cost of final decree/judgment: | $75 |
| Administrative fee (final decree): | $75 |
| Property management and insurance: | $162.87 |
| Recording cost of vacation of judgment/withdrawal: | $150 |
| Administrative fee (withdrawal/vacate): | $200 |
| Closing costs (to HIGCO) (deed stamps, etc.): | $884 |
| Legal fees-Law Offices of Daniel C. Hill: | $25,582.50 |
| | |
| TOTAL: | $30,612.24 |

FN 30. This figure has a minor typographical error. As reflected in the parties' agreed facts, the actual principal paid was $626.25.

FN 31. As discussed above, however, Tallage received a $724 refund within days after making this payment. The net paid for this portion of the purchase price was thus $426.59.

Sovereign, joined by the Meaneys, offered redemption as follows:

| | |
|---|---|
| Principal paid at auction: | $626.25 |

Tallage LLC v. Meaney, Not Reported in N.E.3d (2015)

| | |
|---|---|
| Interest at 16% on the tax sale figure of $626.25 from the date of the tax sale deed (May 6, 2011) to May 1, 2013 (the motion to vacate was allowed April 1, 2013): | $199.03 |
| 2011 tax payment ($1,150.59 payment minus $724 refund by the City of Worcester): | $426.59 |
| Interest at 16% on $426.59 tax payment from date of payment (May 6, 2011) to May 1, 2013) | $135.57 |
| Land Court filing fee: | $515 |
| Record tax collector's deed: | $125 |
| Record notice of filing at the Registry: | $75 |
| Title search: | $137 |
| Record 2011 tax payment certificate: | $75 |
| Record final decree/judgment: | $75 |
| Record vacated judgment: | $75 |
| Record withdrawal: | $75 |
| Legal fees: | $4,455 [32] |
| TOTAL: | $6,994.44 |

FN 32. This figure included all of Tallage's legal fees incurred in connection with the conveyance of Tallage's interest in the property to HIGCO, including the negotiation and drafting of all related documents. As discussed below, I find and rule that these fees are not properly part of the appropriate redemption amount.

Interest, costs and fees in tax lien cases are governed by G.L. c .60, §§ 65 & 68. Interest is set at 16%, "costs of the proceeding" are to be awarded, and the petitioning party is entitled to "such counsel fee as the court deems reasonable", not to exceed the actual costs incurred, and taking into account "the taxpayer's ability to pay said fees in any such fee award." Id.

I need not and do not reach the question of whether the 16% interest rate should be abated to some degree in this case, since

neither Sovereign nor the Meaneys has requested I do so. I likewise need not and do not reach the question of whether the interest period should end on the date the Meaneys offered to redeem the property (August 23, 2012), the date I find a *municipality* would have accepted that offer, since, again, neither Sovereign nor the Meaneys has made that request. I do, however, concur with the defendants that the interest period stops on the date the motions to vacate were orally granted in court (April 1, 2013), with the one-month extra (to May 1, 2013) which the defendants apparently accept as the time by which the funds would have been paid. As explained more fully below, the fact that this matter did not end at that time is entirely due to the amount Tallage insisted upon receiving, which I find unjustified.

**\*14** The appropriate redemption figure certainly includes the principal paid at auction for the water and sewer lien at

issue ($626.25), plus interest on that amount at 16% from the date of auction (May 6, 2011) to May 1, 2013 ($199.03). It also includes the net tax payment made the day of the auction ($426.59), plus 16% interest to May 1, 2013 ($135.57).

The appropriate redemption figure also includes the costs of this proceeding: the Registry charge to record the Collector's Deed ($125), the Land Court filing fee ($515), the Registry charge to record the Land Court petition ($75), the cost of the Land Court examiner who searched the title to ascertain the persons entitled to notice ($137), the Registry charge to record the 2011 tax payment certificate ($75), the Registry charge to record the foreclosure judgment ($75), and then the Registry charges to record the redemption documents— $75 for the order vacating the foreclosure judgment ($75), and then $75 for the document withdrawing the Land Court case ($75). None of these recording fees are contested by the defendants.

The core of the dispute is over the legal and HIGCO-related charges.

I begin by allowing what Tallage characterizes as the "administrative charges" related to the various Registry filings, but which more properly should be seen as "legal fees" so related—the law firm's fee for the time it took to have the filings taken to the Registry by a legal assistant or similarly-qualified employee or outside contractor, and put on record. A fee for such time is appropriate and, with two exceptions, awarded in the requested amounts: $75 total (not $150) for the time involved in recording the tax collector's deed and 2011 tax payment certificate ($75),[33] $75 for the time involved in recording the Land Court petition ($75), $75 for the time involved in recording the foreclosure judgment ($75), and $75 (not $200) for the time involved in recording the order vacating the foreclosure judgment and the document withdrawing the Land Court case ($75).[34]

Tallage's request for "property management and insurance" ($162 .87) is unusual but, in the context of these proceedings, reasonable. It reflects the cost to oversee and ensure the property while it was formally in Tallage's name (after the July 11, 2011 foreclosure judgment was entered, and before the August 23, 2012 request for redemption was received), and it would have been irresponsible for insurance and supervision not to have been irrefutably in place at that time.

Tallage's legal fees related to the preparation and filing of the petition to foreclose, and then in connection with the action to foreclose, to and including the time it received the Meaneys' request to vacate the foreclosure judgment and redeem the property (Aug. 23, 2012) and then, thereafter, its receipt and evaluation of the actual motion to vacate (Oct. 15, 2012),[35] are an appropriate part of the redemption figure and, tracking the Hill Law Affidavit of Legal Fees and attached invoices submitted (Apr. 8, 2013), are awarded as follows:

> FN 36. I find both the time and rate reasonable for these services. Attorney Hill is a highly capable, experienced, and efficient attorney, and a $225 rate for his time is more than reasonable in the Cambridge/Boston area. The preparation and filing of the Land Court petition were clearly appropriate, and a title search and evaluation of the sufficiency of the city's tax taking was an appropriate Mass. R. Civ. P. 11 investigation to perform prior to filing the petition.

*15 Legal fees and other expenses related to Tallage's almost-immediate sale of its interest to HIGCO—a transaction it knew was problematic, at best, until the one-year period for filing a motion to vacate the foreclosure judgment had passed—and the legal fees and expenses Tallage incurred in opposing the motions to vacate, are not appropriately a part of the sum the Meaneys and Sovereign should pay to redeem the property, nor is anything else. The foreclosure judgment had been entered by default, so Tallage knew that the merits of any response by the Meaneys and/ or Sovereign had never been reviewed by the court. The disparity between the fair market value of 28 Caro Street (in excess of $270,000) and the price Tallage paid to acquire the tax lien title ($1,052.84), not to mention Sovereign's interest in preserving its $230,500 mortgage, were such that a motion to vacate was *certainly* to be expected, and the rush to sell the property to HIGCO (by release deed, with no warranties or covenants, at approximately *half* its fair market value), along with the detailed defense/indemnification clause contained in the purchase and sale agreement, show that Tallage *fully* expected its filing. Quite apart from the health and other circumstances of the Meaney family, that disparity alone put Tallage on notice of the high likelihood that the Land Court would vacate the foreclosure and allow redemption. Moreover, the court's allowance of such a motion in the *Glusgol* case, discussed *supra,* seven months before the default judgment in this case was entered and expressly rejecting the argument that a third-party sale terminated the otherwise one-year period, was further notice that any sale

Tallage LLC v. Meaney, Not Reported in N.E.3d (2015)

prior to the end of the one-year period, challenged by a timely-filed motion to vacate, would likely not remain. Simply put, Tallage should have agreed to redemption at that time, and its opposition thereafter was unreasonable and cannot monetarily be assessed against the defendants in any amount.

Tallage for the redemption is $4,599.81. Payment shall be made no later than thirty (30) days from the date of this Order. Since this is less than the $6,994.44 figure the defendants offered in April 2013,[37] no interest is owed.

**SO ORDERED.**

*Conclusion*

For the foregoing reasons, the court's order vacating the foreclosure judgment is confirmed, and the amount to be paid

**All Citations**

Not Reported in N.E.3d, 2015 WL 4207424

## Footnotes

1   The owner remains personally liable on the promissory note, but is now no longer able to sell the property to satisfy that obligation or, if an income property, to apply its rents to the mortgage obligation. The mortgagee no longer has a secured interest in the property.

2   All receivables of $10 or more are offered at auction (G.L. c.60, § 2 abates receivables less than that amount). The City retains all unsold receivables, and later acts on those itself.

3   In addition to the amount of the unpaid 2010 water and sewer bill ($492.51) and the interest accrued on that bill to the date of the auction ($133.74), the City required bidders to pay all 2011 property taxes and water and sewer charges accrued to that date, even if not yet due. These 2011 charges totaled $1150.59. Unaware of the auction, the Meaneys' bank paid the property-tax portion of that sum ($724) out of the Meaneys' tax escrow account on May 6, 2011. Rather than contacting the Meaneys or their bank about the payment, the City simply refunded $724 to Tallage. Tallage's net total payment for 28 Caro Street was thus $1052.84.

4   In addition to the judges of this court, the Recorder has statutory authority to hear and decide tax lien matters. G.L. c.185, § 6.

5   The two charges (one for water, one for sewer), listed separately, were on the same invoice. Only one such invoice was ever sent and, as discussed more fully below, the unpaid balance never appeared on any subsequent invoice. Those subsequent invoices only reflected subsequent water and sewer charges.

6   The Land Court has exclusive jurisdiction over such actions. G .L. c.185, § 1(b); G.L. c.60, § 64.

7   Mortgage holders are given notice of tax foreclosure proceedings because, since Massachusetts is a "title theory" state, *see Faneuil Investors Group, LP v. Bd. of Selectmen of Dennis,* 458 Mass. 1, 6–8 (2010), they have a title interest in the property securing the mortgage.

8   Note, however, that the due process clause of the Fourteenth Amendment to the United States Constitution does not require a property owner to receive *actual* notice of foreclosure proceedings. *Jones v. Flowers,* 547 U.S. 220, 226 (2006) (citing *Dusenbery v. United States,* 534 U.S. 161, 170 (2002)). Rather, due process only requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quoting

*Mulane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)); *Andover v. State Financial Services, Inc.,* [8] 432 Mass. 571, 574 (2000) (same). The Supreme Court "has implicitly accepted the fallibility of mail delivery and the possibility that some interested parties may not in fact receive notice delivered by this method." *Andover,* 432 Mass. at 574–75 (citing *Tulsa Professional Collection Serv., Inc. v. Pope,* 478, 489–90 (1988)). However, if the government becomes aware that notice has failed, it must take "additional reasonable steps to notify [the property owner], if practicable to do so." *Jones,* 547 U.S. at 234. "What steps are reasonable in response to new information depends upon what the new information reveals." *Id.*

9    These include the power to set legal fees, taking into consideration the property owner's ability to pay (G.L.c.60, § 65), and may also include, for example (analogous to partition cases), the power to appoint commissioners to sell properties, preserving "surplus" for the property owner and other creditors, and the appointment of guardians, receivers or representatives to take action on behalf of absent heirs, with "escrow" funds established to hold those surplus funds. (*see* G.L. c.241, §§ 9, 22, 31, 34, 35). They potentially also include the power to reduce interest. *See* G.L. c.60, § 62A (allowing a municipality to do so). The court does not have the power to reduce principal, since that is the exclusive province of the Appellate Tax Board in abatement proceedings.

10   For example, a private investor has no incentive to "compromise" any aspect of a tax bill, either interest or principal, and every incentive to acquire the property itself (eliminating all owner and mortgagee interests) for development and re-sale at often considerable profit. This is why investors, when bidding on properties, are often willing to pay a "premium" for the tax title over and above the actual taxes owed. As testimony in other tax lien cases brought by private investors has shown, at least some of those investors will not voluntarily enter into any kind of payment plan with the property owner, forcing the owner to come to court to request and obtain a court-ordered plan.

11   For consistency and clarity of reference, I will refer to the bank as "Sovereign" throughout these Findings and Rulings since Sovereign was the originally-named bank defendant and the substitution of Santander as successor defendant (due to a corporate name change) did not occur until after trial.

12   Worcester's fiscal years, like the commonwealth's and all its municipalities, go from July 1 to June 30. Thus, fiscal year 2010 runs from July 1, 2009 to June 30, 2010.

13   It appears on a CoreLogic record from that date.

14   The Meaneys notified Worcester of their change of address on September 16, 2010, specifically noting that it was for both "real estate" and "water/sewer" bills.

15   Although the letter did not say so (it nowhere stated that the amount arose from an unpaid water and sewer bill), the amount demanded in the notice consisted of the $492.51 unpaid water and sewer charge plus accrued interest.

16   Similar letters were sent for the other properties.

17   Worcester has a document entitled Notice of Intent to Lien which it claims it sends to property owners who have not paid their water and sewer charges, letting them know that unpaid balances "will be added to the Real Estate tax bills as a lien." There was no evidence, however, that any such notice was sent to the Meaneys, and I find that it was not.

18   This was not an unreasonable expectation. As noted above, Sovereign had done so in the past. Moreover, Sovereign's tax-monitoring contractor, CoreLogic, became aware of the delinquency on January 6, 2011 as

the result of a periodic check of the City's tax delinquency records. *See* Trial Ex. T–5. In the ordinary course of things, it would have paid the delinquency, informed Sovereign, and Sovereign would then have readjusted the Meaneys' tax escrow payments. As previously noted, neither Sovereign nor CoreLogic could explain why this did not happen.

Continuing the series of unfortunate events, this deficiency would never have remained unpaid had it not taken place at the end of the 2010 fiscal year. According to the City's testimony, newly received tax payments are applied to the oldest pending balance. Sovereign's next payment (through CoreLogic) from the Meaneys' tax escrow (all new tax bills were fully and timely paid) would thus have been applied to this deficiency, putting the *new* tax bill in shortfall. But this only occurs if the obligation in deficiency and the new bill being paid are in the same tax year. Each tax year has a separate account. By the time this unpaid water and sewer bill (a 2010 obligation) was added to the tax account, the new payments were being made for fiscal 2011 obligations and were thus not applied to 2010 balances.

19    A chronic nutritional disturbance, caused by the inability to metabolize gluten and resulting in malnutrition and a distended abdomen. *See* The Concise Oxford Dictionary (10th Ed) at 232 (Oxford University Press, 1999).

20    The cases were filed in the Housing Court on January 13, 2010.

21    The principal amounts of the unpaid water and sewer charges were $354.08 for 21 Caro Street, $352.51 for 23 Caro, $290.49 for 25 Caro, and $492.51 for 28 Caro.

22    Service of process in tax lien cases is made by certified mail/return receipt requested "citations" (the tax lien action equivalent of a summons and complaint), mailed directly to each defendant by the Land Court Recorder's Office in a Land Court-headed envelope. There is thus no mistaking that it comes from a court. All persons and entities identified as having an interest in the property become named defendants, and a diligent search is conducted to learn their addresses. Where addresses cannot be found, service is made by publication. Service on corporate entities no longer in business and without successors is made on their former officers and directors and by publication.

23    The Land Court has since remedied this. The new form accompanying the Citation in cases brought by private purchasers of tax liens now reads as follows:

> *PLEASE READ THIS NOTICE CAREFULLY IT CONTAINS IMPORTANT INFORMATION REGARDING YOUR PROPERTY RIGHTS*
>
> This is a Tax Foreclosure Action concerning the property identified in the attached Citation.
>
> You are being sent this Notice because property taxes and/or water and sewer bills are owed, the statutory interest rate is *16%,* and the Land Court has determined that you are the owner of the property referenced above OR that you may have a legal interest in that property. *You are at risk of foreclosure. If a judgment of foreclosure is entered you will lose ALL of your ownership or other rights in this property, regardless of the amount of the tax lien, and you will not be refunded any amount exceeding the balance due.*
>
> The private party named in the enclosed Citation has purchased the tax lien on this property from the City or Town that assessed it. This lien may also include unpaid water and sewer bills. The private party is now the Plaintiff in this Action.
>
> You can keep your interest in this property and avoid foreclosure by promptly paying the Plaintiff the amount currently owed. Contact the Plaintiff's attorney directly to make this arrangement.
>
> You can *OBJECT* to the amount sought by the Plaintiff, raise any defenses you believe you may have, or *REQUEST MORE TIME TO PAY* by filing a written appearance and answer with the Land Court, Room 507,

Suffolk County Courthouse, Three Pemberton Square, Boston, MA 02108, *prior to the return date listed on the attached Citation* . Your appearance and answer must give your name, your address, the case number, and state whether you plan to pay or contest the total balance due. It must also state and explain any defenses you wish to raise. You must send a copy to the Plaintiff's attorney as well as to the Court. After the return day, you may schedule a hearing or wait for the Plaintiff to do so. You must attend the hearing on the date and time scheduled. If you do not attend this hearing, you risk a default judgment being entered against you. If you have any questions about this proceeding please contact John Harrington at the Land Court, (617) 788–7480.

*IF YOU FAIL TO RESPOND TO THIS NOTICE* the Land Court may enter a Final Judgment against you. If so, this will give the Plaintiff complete ownership of your property. The Plaintiff will have authority to SELL your property and keep any and all proceeds, *INCLUDING ANY AMOUNT EXCEEDING THE TOTAL BALANCE DUE.* You will lose any and all ownership rights you may have in your property.

24    Nearly half the sums demanded were for Coco Bella's attorneys' fees and the title search it conducted before bidding on the lien, which it insisted it be paid, in full, before it would agree to the properties' redemption. The email indicates that it also attached an invoice for the third Coco Bella-acquired property—25 Caro Street— but that invoice was not attached to the exhibit introduced into evidence at trial. I infer from the testimony at trial that this missing invoice made demands in amounts similar to those for the other two properties.

25    HICGO's business is the acquisition of apartment buildings and the subsequent rental of their units.

26    Because I find and rule that the Meaneys may redeem the property, I need not and do not separately address the merits of Sovereign's motion to vacate, except to note that Sovereign has far less excuse for having left the court's Citation unattended. Sovereign is a sophisticated institution, one of the world's largest banks, no stranger to court proceedings, and should arrange its internal mail sorting and delivery appropriately. Its agent, CoreLogic, was also at fault. As shown by its own records, CoreLogic learned of the tax delinquency in January 2011, well before the tax collector's auction and thus at a time when it could have been satisfied for less than $600 ($597.23 to be exact, *see* Trial Ex. T–11), and yet failed to act.

27    *See Coco Bella LLC v. Paul Meaney, Michele Meaney and Sovereign Bank,* Tax Lien Case No. 11 TL 143161, Joint Motion for Approval of Agreement for Judgment, allowed by the court on June 27, 2013, discussed above.

28    *See* Purchase and Sale Agreement, 28 Caro Street (Jul. 26, 2012) at 9 ("In the event the Buyer [HIGCO] exercises the [defense and indemnification] option described above [it did], the Buyer agrees to defer to the Seller's [Tallage's] defense strategy, including any compromises of claims, and to fully cooperate in good faith with any such defense.").

29    *See* n.10, *supra,* discussing how private investors' incentives to compromise differ markedly from municipalities'.

33    These would have been recorded at the same time, involving only one trip to the Registry. I thus do not award the additional $75 requested.

34    Again, these would have been recorded at the same time, involving only one trip to the Registry. The time involved should be the same as that for the other documents. Since $75 was the fee requested for those trips, it should also (not $100) be sufficient for these.

35    I allow case-related legal fees after the request to redeem was made, to and including the time the motion to vacate was actually filed (and no further), because the filing of that motion was absolute confirmation that redemption would be pursued and that Sovereign would fund it if necessary, removing any possible doubt.

| Date | Description | Amount |
|---|---|---|
| 11/7/2011 | Perform title search and evaluate sufficiency of city's tax taking, prepare complaint to foreclose and related papers; file same in Land Court 4 hours @ $225/hour | $900 [36] |
| 12/20/2011 | Prepare and file notice of petition with registry of deeds .2 hours @ $225/hour | $45 |
| 6/19/2012 | Prepare and file motion for default, military affidavit .7 hours @ $225/hour | $157.50 |
| 7/25/2012 | Land court research; pull files/obtain copies of returns of service .3 hours @ $225/hour | $67.50 |
| 7/25/2012 | Deliver copy of judgment to Tremont Street [Tallage's office], which I presume also included a discussion with Tallage regarding that judgment .6 hours @ $225/hour | $135 |
| 8/23/2012 | Review letter from G. Brackett [the Meaneys' attorney]; conference with client re: options, defenses; tc with buyer re status .5 hours @ $225/hour | $112.50 |
| 10/15/2012 | Review motion to vacate; tc with client re: same; emails re Same .8 hours @ $225/hour | $180 |

37    Sovereign Bank's Submission as to Redemption Figure (Apr. 12, 2013), joined in by the Meaneys (Apr. 23, 2013).

# EXHIBIT K

2016 WL 3745960
Only the Westlaw citation is currently available.
Massachusetts Land Court.
Department of the Trial Court, Hampden County.

TOWN OF RUSSELL, Plaintiff,
v.
James E. BARLOW and Marita M. Barlow, Defendants.

No. 03 TL 130055(RBF).
|
July 13, 2016.

### MEMORANDUM, FINDINGS, AND ORDER ALLOWING MOTION TO VACATE

**\*1** Defendants James and Marita Barlow (the Barlows) filed this motion to vacate judgment to prevent the foreclosure auction and sale of property in Russell (the Subject Property), formerly owned by the Barlows and acquired by the Town of Russell (the Town) through a tax taking in 1991 and a judgment foreclosing the Barlows' right of redemption entered in this action on February 28, 2008. The Barlows seek to have the judgment vacated on the grounds that the tax taking and foreclosure were invalid because the Town violated their due process rights. They also seek sanctions against the Town for spoliation, arguing that the Town lost or destroyed records of tax assessments and payments related to this matter. The Town vehemently opposes the Barlows' motion to vacate the judgment, arguing that there was no due process violation and if there was such a violation, the Barlows failed to seek to vacate the judgment within a reasonable period of time by waiting over six years after the entry of final judgment before bringing this motion. The Town also asserts that there is no evidence suggesting that records relating to the Barlows' tax title account were destroyed or lost and the motion for sanctions should be denied. In a two-day trial, I heard evidence and testimony on all these issues. As discussed below, based on my findings and conclusions of law, the Barlows' Motion for Sanctions Based on Claims of Spoliation is DENIED, and their Motion to Vacate is ALLOWED.

### *PROCEDURAL HISTORY*

On September 16, 2003, the Town filed its Complaint to Foreclose Tax Lien. The Land Court citation was sent to the Barlows on December 19, 2003. On November 23, 2004, a Motion for General Default and Affidavit of Military Service was filed and allowed, but no judgment was entered. A few years later, on February 11, 2008, the Town again filed a Motion for General Default and Affidavit as to Military Service. The Motion for General Default was allowed and the court entered a decree of Final Judgment on February 28, 2008.

On April 7, 2014, the Barlows filed a Petition to Vacate Decree, an Ex–Parte Motion for Temporary Restraining Order or Preliminary Injunction pending Petition to Vacate Decree, and an Affidavit in Support of Petition to Vacate Decree and Motion for Ex Parte Temporary Restraining Order or Preliminary Injunction. A hearing on Defendants' Ex–Parte Motion for Temporary Restraining Order or Preliminary Injunction Pending Petition to Vacate Decree was held on April 7, 2014 and the court allowed the motion. The court ordered the Town not to hold any auction on the Subject Property pending a hearing on Defendants' Motion for Preliminary Injunction.

On April 11, 2014, the Town filed a Motion in Opposition to Defendants Motion for Preliminary Injunction pending Petition to Vacate Decree, Memorandum in Support of Motion in Opposition to Defendants Motion for Preliminary Injunction pending Petition to Vacate Decree, and Affidavit in Support of Motion in Opposition to Defendants Motion for Preliminary Injunction pending Petition to Vacate Decree. The Defendants' Motion for Preliminary Injunction was heard on April 14, 2014 and was taken under advisement. On April 18, 2014, the Barlows filed a Reply to Opposition to Motion for Preliminary Injunction pending Petition to Vacate Decree, an Affidavit of Damien Pittola in Support of Preliminary Injunction, and a Motion to File Answer Late pending Petition to Vacate Decree.

**\*2** On April 22, 2014, the Barlows filed an Answer. On April 24, 2014, the Town filed Plaintiff's Motion to Strike Defendants Assertion of Spoliation, Affidavit by Damien Pittola, and Motion to File Late Answer pending Petition to Vacate Decree from Reply Brief. On April 28, 2014, the Barlows filed an Opposition to Plaintiff's Motion to Strike Defendants Assertion of Spoliation, Affidavit by Damien Pittola, and Motion to File Late Answer pending Petition to Vacate Decree from Reply Brief. On May 23, 2014, the court allowed the Barlows' Motion for Preliminary Injunction.

On December 9, 2014, the Barlows filed Defendants' Memorandum in Support of 1) Motion to Set Schedule for Filing Motion for Summary Judgment on their Petition to Vacate Tax Title Foreclosure and File Answer Late; 2) Motion to Claim a Jury Trial on their Counterclaims for Damages for Violation of Civil Rights, and 3) Motion for Sanctions Based on the Failure of Plaintiff to Preserve Evidence and Retain Records as Required by Law. On January 9, 2015, the Town filed Plaintiff's Opposition to Defendants' Motion to File Late Answer and Assert Counterclaims and Plaintiff's Opposition to Defendants' Motion for Sanctions Based on Claims of Spoliation. On January 21, 2015, the Barlows filed Defendants' Reply Memorandum in Response to Opposition to Motions for Sanctions and Defendants' Reply Memorandum in Response to Opposition to Motions to File Answer Late, and Claim for a Jury Trial on their Counterclaim for Damages.

On January 23, 2015, a pre-trial conference was held where the court denied Defendants' Motion to File Late Answer and Assert Counterclaims, the Barlows withdrew their request for a jury trial apart from the counterclaims, and the court ruled that the Barlows' Motion for Sanctions Based on Claims of Spoliation would be decided at trial. A trial was held on July 14–15, 2016. Exhibits 1 through 26 were marked. Testimony was heard from Wendy Thompson, Dennis Moran, Jerry York, Marita Barlow, Susan Maxwell, Nancy Boersig, James Barlow, and Joseph Cennamo. On the second day of trial, July 15, 2015, the Town filed Plaintiff's Motion for Directed Verdict and the Barlows filed Defendants' Motion for Required Finding. The court heard and denied both motions. At the end of the second trial day the court heard and denied both Defendants' Renewed Motion for Required Finding and Plaintiff's Renewed Motion for Directed Verdict.

On October 29, 2015, the Town filed Plaintiff's Post–Trial Brief. On November 2, 2015, the Barlows filed Defendants' Request for Findings and Conclusions. The court heard closing arguments on November 24, 2015 and took the motion under advisement. This memorandum and order follows.

### FINDINGS OF FACT

Based on the undisputed facts, the admitted exhibits, the sworn testimony of the witnesses at trial, my assessment of credibility, and the inferences I draw from the entirety of the evidence, these are the facts as I find them after trial:

### The 1984 Agreement

**\*3** 1. On April 6, 1979, the Barlows took title to property at 163 Main Street in Russell (the Subject Property) by deed recorded in the Hampden County Registry of Deeds (registry) at Book 4750 Page 123. On the same day, they gave a mortgage to Westfield Savings Bank (Bank), recorded at the registry at Book 4750, page 125. The Barlows have five children (Kolleen, Kathleen, Karrie, Kristy, and Kaitlyn) and several grandchildren. Kolleen and her children have also resided at the Subject Property the majority of the time. Exh. 1, ¶ 1; Tr. 1:84, 174; Tr. 2:116.

2. In 1983, one of the Barlows' children, Kathleen, was born with a severe heart condition that progressively got worse and required open-heart surgery the following year, when Kathleen was only nine months old. The Barlows did not have health insurance and had to pay the medical bills out-of-pocket and upfront. Tr. 1:87, 145–147.

3. Prior to the surgery, the Barlows allegedly sought financial relief from the Bank. Marita Barlow (Mrs. Barlow) testified that she spoke with Richard Mansfield (Mansfield) at the Bank and informed him of their family's medical situation. Mrs. Barlow stated that Mansfield proposed that the Barlows pay for Kathleen's heart surgery and when they could afford to make mortgage payments they would be applied to the principal. Tax payments to the Town would be made from the Barlows in the form of escrow disbursements from the Bank. When the Barlows could start making complete payments for the mortgage and taxes, the payments would be applied to the current year and any extra to the arrears. I credit Mrs. Barlow's testimony. Tr. 1:146–148, 174.

4. In early 1984, Mrs. Barlow and Mansfield spoke to the Town and sought a similar arrangement like the Barlows had with the Bank. Mrs. Barlow testified they went to a board of selectmen meeting where they reached a handshake agreement between Town selectmen George Tarbell (Tarbell) and Bob Drake (Drake) regarding the payment of their real estate taxes (the 1984 Agreement). Mrs. Barlow recalled that another selectmen, David Gerald York (York), was not present at the meeting where they reached the Agreement. To enable the Barlows to pay for Kathleen's medical bills, the Town, like the Bank, purportedly agreed that the Barlows would only pay the principal on their mortgage for each current year (through the Bank's escrow disbursements) and after the mortgage was

brought current, any extra amounts paid would be allocated to arrears in real estate tax. Mrs. Barlow testified that there was no grace period that the Town set for not paying the real estate taxes and the board members told her that no interest would be charged on the overdue amounts. I credit Mrs. Barlow's testimony that the Town, through Tarbell and Drake, entered into an oral agreement with the Barlows regarding their real estate tax payments and that York was not present when the agreement was reached. This agreement was never memorialized in writing. Exh. 21, pp. 19–20; Tr. 1:87–88, 139–140, 146–152, 165–166, 172–174; 2:9–10.

*4  5. Mrs. Barlow testified that Drake was the individual she was most in contact with regarding the 1984 Agreement and the status of their ability to make payments. She would often go to his house and talk about where things were at with their family's health and their ability to make payments. Drake is now deceased, as is Tarbell. I credit Mrs. Barlow's testimony. Exh. 21, pp. 19–20; Tr. 1:149–152; 165–166.

6. York was on the board of selectmen from 1974 to 1986. York testified in his deposition that he did not recall any interactions with the Barlows during his time in Russell as a board member. York denied ever even meeting the Barlows. Conversely, the Barlows testified that York knew them from working for the Russell Fire Department and Mr. Russell would occasional get a beer with York after work. York also did not remember any agreements that were made between the Town and the Barlows, nor any other taxpayers in Russell, regarding the payment of real estate taxes. York testified that the board of selectmen would keep minutes of all their meetings and kept records of those minutes in the Town archives, but as he now lives out of state, he was not able to check the Town archives for a record of minutes in reference to the 1984 Agreement. No meeting minutes are in the record. I find that York was not present at any meeting that took place between the Barlows and the board of selectmen. Further, I do not credit York's testimony because despite knowing the Barlows for several years through the fire department, York could not recall them. Exh. 21, pp. 11–13, 28–30, 34–37; Tr. 1:85–86; Tr. 2:117–119.

7. Dennis Moran (Moran), a member of the board of selectmen from 1989 to 2010, testified at trial that he was not aware of any prior agreements the Town had made with the Barlows related to providing them a grace period in which to pay taxes owed. While serving on the board of selectmen, Moran stated that they never entered into an agreement with the Barlows and is not aware of any other similar agreements

the Town entered into with other residents of Russell. Tr. 1:79–82.

8. Though I credit Mrs. Barlow's testimony and find that the 1984 Agreement existed, because of the lack of evidence regarding the terms of the agreement and its informal nature, I find that such an agreement is not enforceable against the Town. The 1984 Agreement was a "handshake" agreement, meaning there was never any written agreement setting out the terms for deferring payment of taxes or how the Barlows payments on the taxes would be applied. The only person that testified as to such an agreement was Mrs. Barlow. York was not present at the meeting where the alleged agreement was made and the other two selectmen that supposedly were at the meeting are both deceased. Moran was not aware of any agreement regarding delaying payment of property taxes or late payment application made between the Town and the Barlows, or any resident in Russell for that matter, while he was on the board of selectmen. Additionally, no meeting minutes regarding the 1984 Agreement were provided from the Town archives. Under these circumstances, I find that the agreement between the Barlows and the Town cannot be enforced.

### The 1991 Taking

*5  9. In 1989, the Barlows sought and obtained additional financing in the form of an equity line mortgage from the Bank. Tr. 2:10–11; Exh. 25.

10. Prior to 1990, the Barlows were mainly making principal mortgage payments when they could. Between 1981 and 1991, the Town received only a few tax payments from the Barlows in the form of escrow disbursements from the Bank. Exh. 2; Tr. 1:113, 152–154.

11. On December 23, 1991, the Town executed an Instrument of Taking (taking) of the Subject Property for unpaid taxes from years 1982 through 1990. The taking was recorded on February 5, 1992 with the registry at Book 7929, Page 161. According to the taking, the total amount owed was $13,493.43–$7,862.12 in principal taxes owed, $5,571.31 in interest, and $60.00 in additional charges. Exh. 1, ¶ 2.

12. Payments received by the Town prior to 1992 were accounted for in the taking balance. Exhs. 15, 18; Tr. 2:92–99.

13. The Barlows were aware of the recorded taking, but Mrs. Barlow could not recall whether she spoke to anyone from the Town at that time. Exh. 15; Tr. 1:171–173.

### The 2004 Complaint to Foreclose Tax Title

14. Following the taking, the Barlows were eventually able to start making more consistent payments to the Bank on their mortgage and real estate taxes. The Town continued to receive these payments in the form of escrow disbursements from the Bank. Exh. 1, ¶ 4; Exh. 2; Tr. 2:10.

15. The Barlows' health problems did not end with their daughter Kathleen's heart condition and surgery. In 1992, Mrs. Barlow was diagnosed with mastocytosis, a form of mast cell leukemia. She cannot work because of the illness. The symptoms of the disease are described as "a constant allergic reaction and anaphylactic shock." James Barlow (Mr. Barlow) does work as a truck driver based out of Illinois and is on the road from Monday 2:00 a.m. until Friday night. Because of Mr. Barlow's work schedule, Mrs. Barlow primarily communicated with the Town and the Bank, as well as handled retaining counsel in connection with the taking. Tr. 1:138–140; 2:114–115, 122–123, 127.

16. In 2002, the Barlows obtained a car loan through the Bank. At this time, the Barlows were notified by the Bank that it was still paying arrears on their property taxes. The Bank provided a printout for the period 1995 to 2002, which was the earliest record retained by the Bank. Tr. 1:88–89, 166, 170–171; Tr. 2:11–12, 89; Exh. 4.

17. Shortly after, on April 16, 2002, Mrs. Barlow delivered a letter to the Town submitting the Bank's record printout and stating that the Town had failed to apply their tax payments according to the 1984 Agreement. Instead of applying payments to the current year's taxes due, and then the remaining amounts applied to arrears, the Town applied their payments to the debt memorialized in the 1991 taking, paying it in full but still leaving the Barlows in arrears again for taxes accrued after the taking. Mrs. Barlow testified that she did not receive any response to her 2002 letter. Exh. 4; Tr. 1:89, 94–95, 170–171, 173–175; Tr. 2:12, 76–77.

**\*6** 18. Around this time, the Barlows did not attend any board of selectmen meetings to discuss the taking or the application of their payments to outstanding taxes because Mrs. Barlow was taking care of her sick mother, who later

passed away in 2003, and because Mr. Barlow's health began to deteriorate. Mr. Barlow suffers from type II diabetes and has suffered two heart attacks. After the first heart attack, in 2002, Mr. Barlow underwent surgery and rehabilitation. Shortly after returning to work, Mr. Barlow suffered another heart attack in 2002. Additionally, he has four stents in his leg and is due for another surgery soon. Tr. 1:89–90, 175; Tr. 2:8, 116–117.

19. Since the early 2000s, the Barlow's daughter Kolleen and her three children (Taylor, Morgan, and Erika) have lived with the Barlows the majority of the time because of their serious health problems. Like Mrs. Barlow, Kolleen and her daughter Erika (the Barlows' granddaughter) were both diagnosed with mastocytosis. Tr. 1:137–139; Tr. 2:115–116.

20. Over the years, Mrs. Barlow periodically called or went into the Town Hall to discuss the status of taxes owed and how payments were being applied. Mrs. Barlow testified that along with the escrow disbursements from the Bank, her mother was also helping to pay off the real estate taxes. Because the Barlows have no documentation to support such payments made by Mrs. Barlow's mother, and she is now deceased, I cannot find that these alleged additional payments were made on behalf of the Barlows. Based on Mrs. Barlow's conversations with the Bank, the Barlows believed they were current on their mortgage payments and did not owe any taxes beyond the current year. Tr. 1:38–40, 79–80, 168–169, 179; Tr. 2:7–9, 12–13, 17, 23–26, 63–65.

21. On September 16, 2003, the Town of Russell commenced this action by filing a Complaint to Foreclose Tax Lien. The citation was served at the Subject Property on December 19, 2003. Exh. 1, ¶ 6.

22. On January 14, 2004, Mrs. Barlow sent a letter to the Land Court and Town counsel Dorothea McNeil, incorrectly believing she worked for the Land Court, contesting the foreclosure and stating that they were paying their real estate taxes through the escrow portion of their mortgage payment. She attached a copy of the 2002 letter sent to the Town. Mrs. Barlow testified that she believed her letter would constitute an answer in response to the Complaint. Exh. 1, ¶ 7; Exh. 5; Tr. 1:95–97, 176–179.

23. On January 20, 2004, the Land Court sent a letter to the Barlows informing them that the January 14, 2004 letter could not be accepted as an answer to the Town's Complaint since it did not have an original signature. The court instructed

the Barlows to contact the Town to make arrangements for filing a late answer. Although the Barlows acknowledge they received the letter from the Land Court, Mrs. Barlow believed she had filed her answer with an original signature and did not understand why it was not accepted, and thus, mistakenly took no further action. No late answer was ever filed. Exh. 1, ¶ 7; Exh. 6; Tr. 1:95–97, 178–181.

### The 2008 Final Judgment

**\*7** 24. On February 7, 2008, the Barlows received notice from the Town's tax title attorney, Dawn Bloom (Attorney Bloom), notifying them that the Town would be requesting a final judgment to be entered by the Land Court in the tax foreclosure case and all rights of redemption would be foreclosed upon issuances of the judgment. In the letter, Attorney Bloom also stated that all occupants would be requested to vacate the premises within 72 hours of issuance of the final judgment. Tr. 1:140, 181–182; Tr. 2:18; Exhs. 7–8.

25. The Barlows did not take further action in response to this letter in part because of the ongoing health issues in the family. Around 2008, Mr. Barlow had two more heart surgeries and was given a very limited life outcome. Kolleen underwent nine brain surgeries as well as surgeries on the back of her neck. Further, Kolleen's daughter Erika requires weekly infusions, administered by Kolleen, to treat the mastocytosis that involve four needles put into her stomach, a process that takes over two hours. These injections take place at the Barlows' home because that is where Erika is most comfortable. Also in 2008, Mrs. Barlow's father was diagnosed with Alzheimer's disease and colon cancer and had to move in with the Barlows so they could care for him until his death in March 2009. Exh. 8; Tr. 1:138–140; Tr. 2:18, 115–116

26. Final Judgment was entered by the Land Court on February 28, 2008. Exh. 1, ¶ 8.

27. Town accountant Nancy Boersig (Boersig) testified that at the time of judgment, payments made by the Barlows had generally been applied to the arrears with the exception of payments made in 2004, 2006, 2007, and 2008, which were applied to the current year. These payments were only applied to the current years when notations on the Bank's checks indicated that the payment was for a specific fiscal year. All of these payments only brought the account current as of 1993. Boersig stated that all payments sent from the Bank on

behalf of the Barlows have been received, accounted for, and credited to the Barlow account as of the judgment date. Tr. 2:68–69, 74–76, 80; Exh. 26.

### The Eviction and Foreclosure Auction

28. Between April and July 2009, Mrs. Barlow suffered three strokes leaving her with neuropathy on the left side of her body and a speech impediment. Exh. 8; Tr. 1:140–141.

29. On September 18, 2009, the Barlows were served a "30 Day Notice to Quit" and given until October 22, 2009, to vacate the premises. In response, Mrs. Barlow wrote another letter to the Town reiterating her family's medical issues and the 1984 Agreement she had with the Bank and the Town. Mrs. Barlow testified that she never heard back from the Town after submitting the 2009 letter. Exh. 8; Tr. 1:97–98, 130, 188; Tr. 2:18–20, 32–33.

30. The Barlows retained Attorney Hugh Flynn (Attorney Flynn) to represent them in challenging the eviction. On November 4, 2009, Attorney Flynn sent a letter to the Town accountant, Boersig, providing a printout from the Bank of payments made from 2001 to 2006. He stated that the Barlows had indicated they continued to pay the Bank's tax escrow payments and wanted to confirm the payments have been set off against the amount owed to the Town. He requested a breakdown of what would be currently owed. Exh. 14, 20; Tr. 1:99–100; Tr. 2:20–22, 37–40.

**\*8** 31. On November 30, 2009, Boersig responded to Attorney Flynn and attached a spreadsheet of what taxes were owed on the Subject Property following the Land Court judgment. The spreadsheet did not show payments or indicate how payments received from the Bank were applied to the taxes. Boersig stated that the Barlows should talk with the Bank if there was an issue with their escrow account. Boersig stated that the Town needed an answer by December 31 as to what actions they were planning on taking or the eviction process would continue. Tr. 1:131; Tr. 2:41–42; Exh. 9.

32. No summary process action was ever filed. Tr. 1:131; Exh. 9.

33. In July 2010, the Barlows' daughter Karrie died of a heart attack at the age of 40. Tr. 1:137.

34. On February 25, 2014, the Barlows received notice from the Town that the Subject Property would be sold at auction pursuant to the 1991 taking. It mistakenly stated that the auction was scheduled for May 29, 2014. The auction was in fact scheduled for March 29, 2014. Tr. 1:132–134; Exh. 22.

35. After receiving notice of the auction, the Barlows paid $2,100.00 to rent a new apartment and purchase furniture to assure that they would have a roof over their head in the event that the auction and eviction occurred. Tr. 1:136.

36. In response to the notice of auction, the Barlows obtained new counsel. Attorney Melissa Campagna (Attorney Campagna) inquired about what tax payments were received by the Town and how they were applied to the Subject Property. Attorney Bloom responded in an email on March 17, 2014 stating: "Attached is a list of every check on your behalf from Westfield Savings Bank ... You must be aware that NOTHING has been received from the bank since 1998 and we are now in FY 2014." Attached to her email were June 1996 and November 1999 taxes from the Bank to the Town. Attorney Bloom also noted that utilities were the Barlows' responsibility and unpaid bills are treated as a tax. Tr. 1:141–142; Tr. 2:47–53; Exhs. 18, 23.

37. Attorney Campagna responded and provided the Bank's escrow balance history from 2000 to 2009 showing numerous payments. Campagna questioned how the Town did not have any records of these payments. Exh. 18.

38. The following day, on March 18, 2014, Attorney Bloom responded to Campagna's email and stated "I spoke to Nancy [Boersig] from the Town of Russell this morning and have a better understanding of what happened with the Barlow's tax title account. I misunderstood what Nancy was saying yesterday about the payments received, and misspoke to Rita." She explained that because the outstanding balance of taxes for the Subject Property was so old and high, all payments received from the Bank were first applied towards the older taxes due. This only paid up the total taxes and interest due through fiscal year 1993. The earliest year outstanding, Bloom said, was 1994. Exh. 18; Tr. 2:50–52.

39. No records showing the application of payments to prior fiscal years were provided by the Town. Tr. 2:47–48.

*9 40. On March 29, 2014, the Town held an auction of the Subject Property, but received no acceptable offer for their asking price. The auction was adjourned to April 8, 2014, with

a minimum bid of $38,000. The Barlows filed their Petition to Vacate Decree and their Ex-Parte Motion for Temporary Restraining Order or Preliminary Injunction pending Petition to Vacate Decree on April 7, 2014. That day, the court issued a temporary restraining order against any sale of the Subject Property and on May 23, 2014, the Motion for Preliminary Injunction was allowed.

### The Town's Record Keeping

41. Russell is a small town with a population of only about 1,200 people. There is very little staff in the Town collector's and treasurer's offices, and residents of the Town often take up dual roles within the local government. Until recently, there were also no formal procedural guidelines for tax title properties in Russell. Tr. 1:32, 40, 70–71, 85.

42. At trial, Susan Maxwell (Maxwell), the Town treasurer from 1979 to 2013, and Wendy Thompson (Thompson), who currently serves the dual role as Town collector and treasurer, testified about the record keeping practices in Russell. The collector receives payments made on real estate taxes. Maxwell's system was that all taxes collected by the collector would be sent to her in total amount. When she received the money, it was not coded for any particular parcel of real estate. The payments would be manually tracked for individual parcels on the commitment list. Exh. 16; Tr. 1:32, 40,107, 110.

43. Maxwell kept a log of receipts of payments, known as a cashbook, which was a handwritten book where she posted payment into. It became computerized later in the form of an excel spreadsheet. Logs of payments received by the Town from the collector or treasurer only go back to 1992; there are no records of payments received before then. Since the taking, the Town contends it has received $30,312.14 as payment on behalf of the Barlows' real estate taxes. I credit this amount as the amount of payments received for the Subject Property. Tr. 1:32, 40, 49–50, 106–107, 110.

44. The collector receives the commitment list from the assessor, listing the taxes owed on each property in the Town for a particular year. The yearly lists are kept by the collector in a commitment book. Commitment records for the Subject Property go from 1982 to 2003. Using the receipts of payments found in the cashbook, the collector applies any payments made to the commitment list and calculates any remaining balance. Interest accrues at 14% on the principal

of any unpaid taxes prior to a taking. Exh. 16; Tr. 1:30, 50–51, 58, 65–67.

45. When a tax title taking is done on a property for failure to pay off any remaining balance owed, the collector's records get zeroed out and certified to the treasurer. The treasurer keeps a second record of subsequent taxes, known as certification records. Separate certification records of subsequent taxes for the Subject Property begin in 2004. There are no records of subsequent taxes prior to 2004. The interest on subsequent taxes not collected increases to 16% following the taking. Separate files and accounts are kept for each tax title property such as the Barlows. The certificate of subsequent taxes is then added to the corresponding tax title account. Tr. 1:51–53, 64–65, 70–72, 116; Tr. 2:53–59.

*10  46. When payments would come in for tax title properties, Maxwell would make a copy of any checks, deposit them, and post them in the cashbook. The cashbook was sent to the Town accountant, Boersig, who would reconcile the outstanding amount with the payments made for each parcel in tax title. Boersig balanced each tax title property once a year, corresponding with the time when the Town was going to be audited. After reconciling the payments, Boersig created a payoff spreadsheet for what was still owed to the Town as of a specific point in time, including interest. Each property in tax title had a corresponding payoff spreadsheet that was used as a rolling document year-to-year. Essentially, Boersig would start with the principal still owed, add new subsequent tax years and subtract payments from the oldest year's arrears' interest and then principal. Exh. 26; Tr. 1:110–115; Tr. 2:51–53, 67–69.

47. Maxwell testified that before 2004, the accounting system used for keeping track of tax title properties was simply for the collector (who at the time was Eva Drake) to draw a red check mark on the page of the commitment list as proof that subsequent taxes were certified at the end of each fiscal year. The collector's records were entered manually on the commitment list. For the Subject Property, red checks seen in the commitment book prior to 1991 were only entered following the taking. There was no policy or procedure dictating this method of record keeping; it was just the method that the former collector had used. In addition, Maxwell and Thompson acknowledged that in the commitment book for the Subject Property there were only red check marks and sometimes the word "tax title" for each year, but no payments were shown to have been made and applied except for 1982. They also identified several erasures and whiteout marks over

writings entered for the Subject Property in the commitment book, but had no explanation for the alterations. Exh. 16; Tr. 1:60–62, 119–121, 124–127; Tr. 2:96–98, 166–167.

48. Prior to the 1980s, the Town treasurer was not doing tax title. The Subject Property was the first tax title property Maxwell ever did. Maxwell testified that the Town did not start compiling documents for tax titles until the early 1990s. Tr. 1:119–121.

49. A new system of record keeping began in 2004, after the Subject Property had been taken and the foreclosure was initiated in this court. Policies and procedures issued by the Department of Revenue began being used for certification. Documentation of taxes owed and payments made on those taxes were no longer manual, but became computerized. Tr. 1:122, 126129.

50. Joseph Cennamo (Cennamo), an auditor, became involved in auditing the Town in the early 1990s. Cennamo performed annual audits in the Town around September or October of each year. He testified that over the years he became familiar with Eva Drake's red check system for certifying taxes and it was not unusual in the 1980s for towns to maintain records in such a way. He did not have any concerns regarding the process or the accuracy of the process for certifying taxes. Cennamo stated that he independently audited tax title takings by "[looking] at the document of taking and [making] sure that it [went] into the tax title account, that interest was computed on that tax title account to the point of taking and then possibly look at fees that would be associated with the trust and treasurer's interest." To audit a tax title taking he generally relied on supporting documentation, but sometimes confirmed with taxpayers themselves. For any opening balances at the end of the year, he would send a confirmation letter to those residents. If they replied that they subsequently paid their taxes, Cennamo would trace that to a subsequent receipt to confirm payment. If he got no response, he would still look at the subsequent receipts and assessor's records to determine if any payments were made. Every three years, Cennamo's own audits were peer-reviewed by CPA firms.

*11  As part of the audit, Cennamo was also required to issue a management letter evaluating the Town's internal control or financial reporting and accounting. Material weaknesses or significant deficiencies would be reported in the letters. From 2003 to 2014, Cennamo's management letter stated there was a significant deficiency that the Town did not have a specific

written accounting policy or procedures manual, which he testified could cause errors in the future for someone else trying to take over the accounting position. However, he noted that just because there wasn't a written manual didn't mean that the Town didn't have known policies in place.

In his 2003 and 2004 letters, he expressed concerns about residents having dual roles in the Town and the need to segregate duties as much as possible. Further, he stated that minutes of meetings of various boards did not contain details of matters discussed or decisions made and testified that "[s]uch minutes are an important part of the town's records and help to keep and demonstrate proper stewardship and accountability." Cennamo also found accounting records were nearly obsolete and its computer software systems were outdated and inefficient. He testified that there was no reasonable explanation for the erasures and whiteouts in the commitment book and that was not a proper record keeping policy. Despite all of the Town's deficiencies, Cennamo's management letters state that he did not believe any of the reportable conditions were material weakness. The Town was aware of these deficiencies and was working to remedy them by establishing the necessary policies and procedures. Exh. 19; Tr. 2:136–141; 143–147, 152–158, 161–168.

### DISCUSSION

This action was initiated by the Barlows' petition to vacate the foreclosure of their right of redemption. The Barlows seek to have the judgment vacated on the grounds that the tax taking and foreclosure were invalid because they violated their due process rights. Additionally, they brought a motion for sanctions for spoliation, claiming that the Town lost or destroyed records relating to this matter. For reasons more fully explained below, I find that there is no evidence that the Town destroyed any records relating to this action, and, therefore, the Barlows motion for sanctions based on spoliation is denied. I find that the Barlows did not receive sufficient notice and were not able to adequately participate in the foreclosure proceedings due to their family's systematic medical issues. While the Barlows did not move to vacate the judgment for some years, in the circumstances of this case, I find that their delay was excusable and that the interests of justice require vacating the judgment. The Town will be deemed to have moved for entry of judgment, and judgment shall enter one year from the date of this Memorandum and Order, or July 13, 2017, unless the Barlows will have redeemed during that time. The amount of redemption and the

treatment of taxes accruing since the judgment are discussed below.

### Spoliation

**\*12** Spoliation is the failure to preserve evidence. *Fletcher v. Dorchester Mut. Ins. Co.*, 437 Mass. 544, 549–550 (2002). Massachusetts, like the majority of jurisdictions, does not recognize a cause of action for spoliation of evidence. *Id.* at 547. But sanctions may be imposed where a duty arises and where "a reasonable person in the spoliator's position would realize, at the time of spoliation, the possible importance of the evidence to the resolution of the potential dispute." *Kippenhan v. Chaulk Servs., Inc.*, 428 Mass. 124, 127 (1998). There is a duty to preserve such evidence in the interests of fairness. *Id.* The court "has broad discretion to impose a variety of sanctions," but the general rule in the Commonwealth is that "a judge should impose the least severe sanction necessary to remedy the prejudice to the nonspoliating party." *Keene v. Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 235 (2003).

The Barlows argue that some of the Town's records showing the amounts owed and payments made are missing by either the Town's negligence or its intentional wrongdoing. They rest their assertion on several assumptions and claims that are unsupported by the evidence. The Barlows rely on the lack of any records supporting their alleged agreement as a basis for their claim of spoliation. The mere absence of records is not a sufficient basis on which to assert that particular documents once existed and to further surmise that those documents must have been lost or destroyed. Similarly, the Barlows argue that the Town failed to provide records for the Barlows' tax title account or certifications of subsequent taxes in response to the Barlows' public records request. Based on the record before the court, the Town provided each and every document necessary to prove and calculate the Barlows' tax title account dating back to 1981. These documents include commitment books, cash receipts, copies of checks from the Bank, and certification records. In fact, the Town produced documents evidencing payments made on behalf of the Barlows for which the Bank had no record. Although part of the Barlows' motion for sanctions relates to the manner in which the Town maintained their records, many small towns had similar record keeping practices before computerization and the Barlows' difficulty in interpreting the Town's records cannot form the basis for sanctions to be

imposed. The Barlows also argue that the Town improperly destroyed records from auditors. In accordance with state law, however, the Town was only required to maintain such records for a period of ten years, and they provided the Barlows with reports from auditors going back twelve years. See William Galvin, *The Commonwealth of Massachusetts Municipal Records Retention Manual* 50 (2011).

The only evidence indicating that certain documents may be missing came from the confusion or misstatement of Town counsel Bloom in asserting that payments had not been made by the Bank since 1998. This misunderstanding was corrected the following day when Attorney Bloom communicated to the Barlows that she misspoke and payments had been made by the Bank, but that subsequent payments to the tax taking had been credited to amounts owed prior, up through 1993. Exh. 18; Tr. 2:47–53.

**\*13** The Barlows have presented no evidence to substantiate their claims that missing records were either lost or destroyed negligently or intentionally by the Town. They provide only speculative arguments and inferences about how these missing records have prejudiced them because the Town cannot accurately calculate the tax title. In light of the absence of any reasonable evidence demonstrating that the Town failed to keep or destroyed records it was legally obligated to retain, the Barlows' motion for sanctions based on spoliation is DENIED. I now turn to the Barlows' substantive claim of a due process violation.

### Due Process Violation & Right of Redemption

The Barlows argue that insufficient notice or other irregularities in procedure violated their right to due process and are grounds upon which the court should vacate the final judgment. General Laws c. 60, § 69A provides that a petition to vacate a decree of foreclosure must be filed within one year after entry of the decree. The judgment may be vacated within one year if the court, "after careful consideration and in instances where ... [it is] required to accomplish justice." *Lynch v. City of Boston,* 313 Mass. 478, 480 (1943), quoting *Russell v. Foley,* 278 Mass. 145, 148 (1932). "Following this one-year period, the statute imposes an absolute bar on petitions to vacate. This bar protects the public's 'need for an efficient and final determination of any dispute regarding a public taking, so that title to the land taken can be settled.' " *Town of Andover v. State Fin.*

*Servs., Inc.,* 432 Mass. 571, 577 (2000), quoting *Town of Sharon v. Kafka,* 18 Mass.App.Ct. 541, 543 (1984). While courts are consistent in applying the statutory deadline, strict application of the one-year limitation may be excused when there has been a denial of due process. *Christian v. Mooney,* 400 Mass. 753, 760–761 (1987); *Town of Sharon,* 18 Mass.App.Ct. at 544. Such relief is usually based on a denial of the taxpayer's due process rights and of their ability to participate in the original litigation. *Town of Andover,* 432 Mass. at 574–575; *Town of N. Reading v. Welch,* 46 Mass.App.Ct. 818, 819–820 (1999) (failure to give owner of survivorship notice of tax title foreclosure resulted in denial of due process); *Town of Mashpee v. Norris,* No. 68684, 1990 WL 10092007 at \* 2 (Mass. Land Ct. March 15, 1990) (vacating decree of foreclosure after elapse of one year because Town did not provide adequate notice to heirs with an interest in the property).

Due process, both under the Fifth and Fourteenth Amendment of the U.S. Constitution and the comparable Massachusetts provisions (Massachusetts Constitution Part II c. 1, § 1, art. 4; Declaration of Rights arts. 1, 10, 12), requires "[n]otice by mail or other means as certain as to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party ... if its name and address are reasonably ascertainable." *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 800 (1983); see *Town of Andover,* 432 Mass. at 574–575 ("The notice provision of our tax title foreclosure law, G.L. c. 60, § 66, requires that notice of the petition to foreclose be sent to interested parties by certified mail."). Due process does not require a property owner to receive actual notice of foreclosure proceedings, only "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers,* 547 U.S. 220, 226 (2006), quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). Thus, a municipality has a constitutional obligation to provide notice to a taxpayer of a petition to foreclose rights of redemption, and courts have vacated the decree of foreclosure based on a violation of due process when they fail to do so. *Town of N. Reading,* 47 Mass.App.Ct. at 819–820; *City of Boston v. James,* 26 Mass.App.Ct. 625, 630 (1988); *Robertson v. Town of Plymouth,* 18 Mass.App.Ct. 592, 594 (1984). "It is within

the judge's discretion to determine whether a violation of due process has occurred." *City of Boston v. Johnson,* No. 04–P–1200, 2006 WL 1843404, at *1 (Mass.App.Ct. July 5, 2006) (unpublished decision).

**\*14** The evidence in this matter demonstrates, and I so find, that the Barlows were not given sufficient notice of the prior foreclosure proceedings nor an adequate opportunity to participate in the action at that time. Although Mrs. Barlow testified that she was aware of the 1991 taking, neither she nor Mr. Barlow could recall speaking to anyone from the Town in reference to it. Tr. 1:171–173. Their lack of attentiveness concerning the taking was primarily due to the fact that the Barlows were suffering through serious and ongoing medical issues in their family. Not only was their daughter Kathleen born with massive heart problems, but shortly after the 1991 taking, Mrs. Barlow was diagnosed with mastocytosis, the symptoms of which are described as "a constant allergic reaction and anaphylactic shock," and she became unable to work. Tr. 1:138–140.

Before and after the taking, the Barlows mistakenly believed that they were current on their taxes and that their tax payments were being applied by the Town in accordance with the 1984 Agreement. It wasn't until 2002, when the Barlows obtained a car loan from the Bank, that they were informed the Bank was still paying arrears on their property taxes. Tr. 1:88–89, 166–171, 170–171; Tr. 2:11–12, 23–26. Upon learning they were not caught up with tax payments, Mrs. Barlow testified she wrote and delivered a letter to the Town stating that the Town had failed to apply their payments in accordance with the 1984 Agreement. Unfortunately, the Barlows were unable to attend any board of selectmen meetings during this time to discuss the taking or the application of payments because of several health problems in the family. In 2002, Mrs. Barlow was taking care of her sick and dying mother. Mr. Barlow's type II diabetes worsened, he suffered two heart attacks that required surgery and rehabilitation, and had stents put in his legs. Their daughter Kolleen and granddaughter Erika, who were also diagnosed with mastocytosis, began living at the Subject Property the majority of the time. Tr. 1:90, 137–139, 175; Tr. 2:115–117.

Despite recording the instrument of taking in 1992, the Town did not commence a foreclosure action against the Barlows until September 16, 2003, and the citation for that action was served on December 19, 2003. The Barlows do not dispute receiving notice of the 2003 foreclosure complaint, but testified that based on the Town's inaction in nearly ten years

they believed they were current on their mortgage payments once again and did not owe any taxes beyond the current year. On January 14, 2004, Mrs. Barlow sent the Barlow's answer to the Land Court and Attorney McNeil, counsel for the Town, believing she had met all the requirements for the filing to be considered an answer in accordance with the rules. On January 20, 2004, the Land Court sent the Barlows a letter informing them that their January 14 letter could not be accepted as an answer to the Town's complaint because it did not have an original signature. Mrs. Barlow testified that she received the letter from the Land Court and understood that it meant the court was not accepting her answer, but was confused by the language in the letter as to why it was being rejected. Mrs. Barlow did not understand the term "original signature," and believed that because she had signed her own name it was an "original" that should have been accepted by the court. Tr. 1:95–97, 177–181; Exh. 1, ¶¶ 6–7; Exhs. 5, 6.

**\*15** Due to this confusion, and thinking that she had satisfied the filing requirements, Mrs. Barlow did not refile an answer. At this time, the Barlows were still dealing with many health issues in their family, which severely disrupted their lives and their ability to participate in the litigation. Unbeknownst to the Barlows, a default entered against them for their failure to timely respond to the complaint. Approximately four years later, on February 7, 2008, the Town sent further notice to the Barlows reminding them that the Land Court had rejected their "answer" and that no hearing would be required for entry of a final judgment. The letter urged the Barlows to obtain counsel to assist them in this matter. At trial, Mrs. Barlow testified that after receipt of the follow-up letter, she contacted Town counsel where she was again advised to retain an attorney. Judgment was entered on February 28, 2008. Tr. 1:179, 181–183; Exh. 7.

The Barlows, however, took no further action because they were once again in the midst of family medical crises. Tr. 1:96–97, 180–181. In 2008, Mr. Barlow had two more heart surgeries and was given a very limited life expectation. Kolleen underwent nine brain surgeries, as well as surgeries on the back of her neck. The Barlow's granddaughter Erika began requiring weekly infusions to treat the mastocytosis, which were done at the Subject Property. The infusions required four needles inserted in her stomach, a process taking approximately two and a half hours. In addition, Mrs. Barlow's father was diagnosed with Alzheimer's disease and colon cancer and he moved in with the Barlows so that they could care for him. He passed away in 2009. Between April and July 2009, Mrs. Barlow had three strokes that left her

with nerve damage along the entire left side of her body and a speech impediment. Exh. 8; Tr. 1:138–141; Tr. 2:18, 115–116. In September 2009, the Barlows received an eviction notice from the Town. After receiving the notice, the Barlows retained Attorney Flynn in November 2009. Tr. 1:98–99, 130; Exh. 20. No summary process action was ever filed. Tr. 1:131; Exh. 9. While successful in stopping the eviction process, Attorney Flynn made no attempt to contact the Land Court. The Barlows suffered further tragedy when their daughter Karrie died of a massive heart attack in 2010. In February 2014, the Barlows received notice of a foreclosure sale and auction of their property, which prompted them retain new counsel and file the present motion to vacate the judgment.

Based on the foregoing, I find that Barlows were not given an adequate opportunity to participate in the original foreclosure action. It is clear that the Barlows, who did not have an attorney when the original complaint was filed in 2003, were confused by the response from the Land Court rejecting their answer. Understandably unfamiliar with the specifics of the court's proper filing procedures, the Barlows mistakenly thought that their answer was sufficient to meet the requirements. Caught up with their family's health problems and believing their answer satisfactory, the Barlows did not respond to the Land Court or follow up with Town counsel at that time. Had the court clarified the grounds on which it was rejecting the answer, or instead of rejecting the document, accepted it subject to obtaining an original signature as a replacement, no default judgment would have entered and the Barlows' claims would likely have been heard in a timely fashion with redemption occurring on more reasonable terms.

**\*16** The question is whether this lack of opportunity to be heard justifies vacating the 2008 judgment when the Barlows did not bring their motion to vacate until 2014. That the time limit for redemption may be extended beyond one year does not mean that the time is extended indefinitely. *Town of Brewster v. Sherwood Forest Realty, Inc.,* 56 Mass.App.Ct. 905, 906 (2002). The public interest in providing conclusiveness to foreclosure decrees must also be considered. "[T]he time factor is properly weighed against the party challenging the tax title, especially where ... the party making the challenge has sat on his rights for years after hearing of the foreclosure." *Id.* (internal citations omitted); *Town of Lancaster v. Foley,* 15 Mass.App.Ct. 967, 968–969 (1983) (finding facts not sufficient to excuse the failure to raise defects in the foreclosure proceedings for 19 years and in regards to another parcel, there was no effort to pay taxes

for almost 37 years); *Town of Sharon,* 18 Mass.App.Ct. at 543 (finding legislative determination that "public interest in marketable titles ... 'outweighs considerations of individual hardship' after one year"); *Robertson,* 18 Mass.App.Ct. at 596 ("[W]hen the validity of tax titles is put in question long after the event, it is appropriate for the judge ... to weigh the factor of time against those making the challenge."), quoting *Krueger v. Devine,* 18 Mass.App.Ct. 397, 402 (1984). "Whether the owner delayed unreasonably in seeking to vacate a foreclosure decree after learning of its entry is a question of fact." *Town of Brewster,* 56 Mass.App.Ct. at 906.

Certainly the Barlows' six-year delay in moving to vacate the judgment could be found unreasonable and foreclose any motion to vacate, although many of the relevant cases involve much longer delays. See, e.g., *Deveney v. City of Boston,* 346 Mass. 764, 764 (1963) (finding that "the petitioner had every opportunity to file an answer 'in the tax lien case' and to raise any competent matter, and that the ends of justice would not be promoted by reopening the case"); *Town of Brewster,* 56 Mass.App.Ct. at 926 (finding 23 year delay in seeking to vacate foreclosure decree after learning of its entry was an unreasonable delay); *Town of N. Reading,* 46 Mass.App.Ct. at 819–820 (five-year delay not unreasonable); *Lamontagne v. Knightly,* 30 Mass.App.Ct. 647, 657–658 (1991) (holding that the party making the challenge sat on his rights for years after hearing of the foreclosure); *Town of Lancaster v. Foley,* 15 Mass. at 968–969 (nineteen-year delay unreasonable); *Town of Brewster v. Owners Unknown,* No. 86 TL 079199 (Mass. Land Ct. July 8, 2016) (Patterson, Recorder); *Town of Yarmouth v. Snowden–Lebel,* 17 LCR 654, 656 (2009)*Town of Yarmouth v. Snowden–Lebel,* 17 LCR 654, 656 (2009) ("At some point, the balance tips in favor of the certainty of title, and the decree of foreclosure ordinarily becomes absolute and final, with all claims against the resulting title forever barred.").

**\*17** On the other hand, given the Barlows' understandable mistake in failing to file a proper answer based on the lack of clarity in the court's letter and the family's significant medical issues that prevailed throughout the pendency of this action, foreclosing the Barlows' right of redemption with no opportunity to redeem is not supported by principals of equity. Where a party is seeking to redeem property taken in tax title, equitable principles apply in addition to constitutional concerns of due process. Certain cases of extraordinary circumstances cry out for equitable relief. See *Town of*

*Sharon,* 18 Mass.App.Ct. at 543; compare *Town of Brewster,* 56 Mass.App.Ct. at 907.

In *Tallage, LLC v. Meaney,* the Land Court addressed whether health issues in a family were justifiable grounds for vacating a foreclosure decree. *Tallage, LLC v. Meany,* 23 LCR 375, 375–376 (2015)*Tallage, LLC v. Meany,* 23 LCR 375, 375–376 (2015). The property owners' children had serious health issues at the time notices regarding unpaid water and sewer bills were sent to their home and took no action on them. *Id.* at 376. The court noted that they fully intended to take care of such obligations once they were able to focus on their mail and had no idea that failure to pay minor utility bills could result in the total loss of their property. *Id.* at 382. The property owners' moved to vacate the judgment within one year after entry of judgment. *Id.* at 381. The court found that these were "extraordinary" circumstances fully justifying the exercise of its discretion to vacate the foreclosure. *Id.* at 382. In reaching its decision, the court also relied on principles of equity, finding that without vacating the judgment, the lien holder would profit from a windfall by obtaining full title to the property for the small amount of principal and interest outstanding on the utility bills. *Id.*

Although in *Tallage* only minor utility bills were unpaid and the owners promptly filed a motion to vacate the judgment shortly after learning of it, the facts pertaining to the fairness to the property owners in foreclosing their right of redemption similarly apply to this case. Like the family in *Tallage,* the Barlows also suffered serious health ailments over the years that dominated their lives and caused issues related to the payment of taxes and foreclosure to take a back seat. The Barlows testified at length that during the foreclosure proceedings their family was overwhelmed with health issues and not much attention was paid to notices or filing requirements. Not only were the Barlows inundated with the health problems of their children, grandchildren, and aging parents who they took care of, but they also suffered from critical illnesses themselves. Undoubtedly, the health issues in the family caused the Barlows to lose focus on the payment of taxes and the foreclosure proceedings that followed.

"Generally tax redemption statutes, being remedial in their nature, are interpreted liberally in favor of a person seeking to recover his land." *Union Trust Co. v. Reed,* 213 Mass. 199, 201 (1912). "In keeping with the respect with which our society regards the private ownership of property, the long standing policy in this Commonwealth favors allowing an owner to redeem property taken for the nonpayment of taxes." *Town of Lynnfield v. Owners Unknown,* 397 Mass. 470, 473–474 (1986). Moreover, "[t]he purpose of those provisions is not to provide municipalities with a method of acquiring property for municipal purposes without paying the owner of the property fair compensation as in eminent domain proceedings. The redemption provisions were enacted by the Legislature to provide municipalities with a mechanism for the prompt collection of delinquent real estate taxes." *Id.* at 474; *City of Boston v. James,* 26 Mass.App.Ct. at 630 (the only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of taxes due on the property, together with other costs and interest). The risk to the Barlows, the loss of their residence, outweighs the fiscal and administrative burdens on the government, which are small in comparison. The municipality has not sold the property to any third party and the Barlow family remains the occupants of the home.

**\*18** Under the circumstances of this case, the Barlows' six-year delay in bringing their motion to vacate is not unreasonable. See *Town of N. Reading,* 46 Mass.App.Ct. at 819–820. Justice is served by allowing the Barlows' Motion to Vacate, but also deeming the Town to have made a motion for entry of judgment. This motion for judgment shall be allowed one year from the date of this Memorandum and Order, or July 13, 2017, unless the Barlows have within that time redeemed the Subject Property by paying the amount due as set forth below. If the Barlows do not redeem before July 13, 2017, judgment shall enter foreclosing their right to redeem.

### Amount Required to Redeem

The amount necessary to redeem is another point of contention in this case. The Barlows maintain that the Town failed to comply with the Massachusetts statutory and regulatory requirements for the collection of payments received and application of those payments to outstanding taxes, as well as the record keeping requirements for notice and retention of records. They assert that the Town did not ensure that it correctly assessed their property, nor did the Town ensure that there was no error in the taking that may be deemed "substantial" or "misleading." G.L. c. 60, § 37. I find that while the Town's record keeping practices were not the most efficient and readily ascertainable, the testimony of several witnesses at trial indicates that the records reflect all of the real estate taxes assessed against the Barlows during

the relevant time period (1982 to 2008) and there was no evidence presented that suggested the records of amounts assessed were inaccurate or incomplete. Exh. 16.

I credit the Town's calculation that at the time of the 2008 judgment, the total amount of assessed taxes (without interest) owed was $33,959.86. This amount includes the amount in taking ($7,862.12) and the taxes assessed between the taking up until the entry of judgment ($26,097.74). Tr. 2:76; Exh. 16. Similarly, I find that the Town properly maintained records of all payments received for real estate taxes by or on behalf of the Barlows. At trial, Boersig testified that the Town kept track of every payment received for the Subject Property over the years. Tr. 1:107–108; Tr. 2:77–80; Exhs. 12, 17. Those payments were recorded in the cashbook. Maxwell stated that she also double-checked with the Bank to verify that there were no missing payments made for which the Barlows were not credited. Tr. 1:112–113; Exhs. 2, 3. I credit the Town's contention that it has received $30,312.14 as payment on behalf of the Barlows' real estate taxes since the taking. Exh. 17; Tr. 2:91–92. There is nothing in the evidence to support Mrs. Barlow's assertion that her now deceased mother made additional payments not credited to the account. Mrs. Barlow admitted at trial that she had no documentation of any such payments that were not reflected in the Town's records. Tr. 1:145, 162–163.

**\*19** Though the Barlows may not be satisfied with the application of their tax payments, because the 1984 Agreement is not enforceable, I find that the Town applied the Barlow's payments to their tax title account pursuant to G.L. c. 60, § 3E—first to any interest due, then to any collection costs, and lastly to the principal tax. See Property Tax Bureau's Informational Guideline Release, No. 03–210Release, No. 03–210, *Collection Costs and Procedures* 3 (Aug.2003). The Town properly certified the unpaid taxes on the Subject Property into tax title and appropriately applied all payments. The Town auditor, Cennamo, was aware of the process used by the Town in certifying unpaid taxes into tax title and he had no concerns about the accuracy of the process. Tr. 2:143–145.

Once the property went into tax title in 1991, unpaid taxes for all prior years that were included in the taking were certified over from the collector to the treasurer. Each year thereafter, the unpaid taxes for that fiscal year were similarly certified over to the treasurer. The underlying records were consolidated by Boersig into a rolling record of taxes assessed each year and payments received towards the tax title. When payments were received on behalf of

the Barlows, they were applied to the most arreared year's interest, then to its principal. Slowly, the payments chipped away at the outstanding taxes. The rolling record created by Boersig would account for these payments and as prior years taxes would be paid off, the record would eliminate the corresponding year from tax title. Tr. 2: 96–100. As of the date of judgment, February 28, 2008, the rolling record reflects the Barlows were paid off through fiscal year 1993, with a total of $39,308.67 (including interest) still owed. Exh. 26. Therefore, I find that the Barlows may redeem the Subject Property upon payment to the Town of the sum of $39,308.67, within a year of this Memorandum and Order, or by July 13, 2017.

Interest in tax foreclosure cases is unusually high and uniquely calculated. The interest accrues at 14% from the time taxes are due until the tax taking occurs, and at 16% thereafter. ▢ G.L. c. 59, § 57; G.L. c. 60, § 62. This means that a relatively small bill can become larger quickly and make it easy for people to fall behind, especially when they have other significant and pressing life concerns. See *Tallage LLC*, 23 LCR at 377. "Because this rate is provided for in the statute, this huge accrual of interest on a valid lien [cannot] be challenged." *Abdelahad v. Town of Grafton*, 23 LCR 433, 435 (2015)*Abdelahad v. Town of Grafton*, 23 LCR 433, 435 (2015). While "[p]roperty owners should pay their taxes ... a Procrustean application of 14 %/16 % interest rates and a complete loss of equity once redemption rights are foreclosed can arguably lead to inequitable results." *Tallage LLC*, 23 LCR at 377. The Land Court may "exercise other potential powers to address inequities, either inherent or conferred by statute, expressly or by implication." *Id.* at 377, n. 9 (stating these include the power to set legal fees and the power to reduce interest). Having found that substantial interest accrued as a result of Mrs. Barlow's reliance on the 1984 Agreement with the Town and the court's error in failing to adequately notify the Barlows as to why their answer was rejected, it is unjust and inequitable to subject the Barlows to an additional 16% interest on the unpaid taxes that has continued to accumulate since judgment was entered. Therefore, in the interests of justice and equity, no additional interest will be added to the taxes owed as of the date of the 2008 judgment. If the Barlows are able to redeem within a year, assessed taxes that have accrued from the judgement to the date of redemption will then become outstanding. I credit the Town's submissions that from fiscal years 2008 to 2015, the total taxes accrued on the Subject Property without interest is $17,296.18. Taxes for fiscal years after 2015 to the date of redemption will have to be assessed and calculated.

**\*20** The amount of redemption for taxes subsequent to the 2008 judgment would also include all interest accrued since the debts became delinquent. General Laws c. 59, § 57 provides that interest on unpaid taxes runs from certain dates in the fiscal year in which the tax is payable. That interest accrues at the rate of 14% per year. Should the Barlows redeem within the allotted time, the fiscal year in which the remaining unpaid taxes from the 2008 judgment to the date of redemption were payable is hereby deemed to be the fiscal year of the date of redemption, and interest on those unpaid taxes shall be calculated accordingly pursuant to G.L. c. 59, § 57.

### Attorneys' Fees and Costs

The Town also seeks payment of all attorneys' fees and costs associated with collection of these unpaid taxes pursuant to G.L. c. 60, § 65. This court "may upon motion, order the payment of legal fees to a city or town, which amount shall be added to the tax title account of the land to which the right of redemption is being foreclosed; in no event shall the legal fees awarded exceed the actual costs incurred and the judge shall consider the taxpayer's ability to pay said fees in any such award." G.L. c. 60, § 65. Such an order is permitted to the extent the costs and attorney's fees are reasonable. G.L. c. 60, § 68; see *Town of Abington v. Walsh*, 18 LCR 290, 292–293 (2010)*Town of Abington v. Walsh*, 18 LCR 290, 292–293 (2010).

Since the complaint was brought in 2004, counsel for the Town has dedicated significant time and effort to resolving this matter. Numerous pleadings, motions, and affidavits were prepared and appearances in court by counsel made in connection with the foreclosure proceedings. The Town is, thus, entitled to payment of reasonable attorneys' fees and costs associated with the collection of these unpaid taxes and in bringing the foreclosure action. G.L. c. 60, § 65. Town counsel is not, however, entitled to fees and costs incurred after the Barlows' motion to vacate was filed. As the motion to vacate is allowed, the Barlows are a prevailing party. For this reason, the Barlows are not accountable for any attorneys' fees and costs stemming from the motion to vacate.

The Town submitted two affidavits from counsel attached to their post-trial brief. Specifically, the Town seeks payment of $21,434.60 in legal fees and costs for services rendered by Attorney Bloom as of October 27, 2015 and $85,827.36 for legal fees and costs for Attorney Jesse Belcher–Timme as of October 28, 2015. See Plaintiff's Post–Trial Brief, Exhs. B, C. Because the affidavits do not provide a breakdown of legal services performed in this matter, I am unable to adequately assess whether the fees requested are reasonable. Counsel shall submit a fee affidavit to the court detailing the computation of attorneys' fees and costs asserted by the Town in relation to the foreclosure proceedings within 21 days of the date of this Memorandum and Order. The Barlows shall file their response, if any, within 14 days. The court will then in its discretion approve those fees and costs it deems to be reasonable without further hearing.

### CONCLUSION

**\*21** As set forth above, I find and rule as follows: (1) The Barlows' Motion for Sanctions Based on Claims of Spoliation is DENIED. (2) The Barlows' Motion to Vacate is ALLOWED. (3) The Final Judgment entered in this action on February 28, 2008, is hereby VACATED. (4) The Town is hereby DEEMED to have moved for entry of final judgment. (5) Final judgment shall enter, foreclosing the Barlows' right of redemption, on July 17, 2017, unless within that time shall have redeemed the Subject Property by payment to the Town of $39,308.67 plus attorneys' fees to be determined, with no additional interest to accrue. (5) If the Barlows successfully redeem, taxes assessed from the date of the 2008 judgment to the date of redemption will become outstanding; the fiscal year in which the remaining unpaid taxes from the 2008 judgment to the date of redemption were payable is hereby deemed to be the fiscal year of the date of redemption, and interest on those unpaid taxes shall be calculated accordingly pursuant to G.L. c. 59, § 57.

SO ORDERED

**All Citations**

Not Reported in N.E.3d, 2016 WL 3745960

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.