**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| STEPHEN D. WOODBRIDGE, | ) | No. 23-cv-30093 |
| and | ) | |
| ROBERTA BROWNING, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| CITY OF GREENFIELD, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**

The Takings Clause of the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const., Amdt. 5.

Relying on the Takings Clause, the United States Supreme Court, in Tyler v. Hennepin County, 143 S. Ct. 1369, 1375 (2023), unanimously held on May 23, 2023, that, while local governments are within their right to take and sell a taxpayer's home "to recover . . . unpaid property taxes," local governments "could not use the toehold of the tax debt to confiscate more property than was due." without violating the Takings Clause. Tyler v. Hennepin County, 143 S. Ct. at 1376 (holding that the plaintiff stated a viable claim for relief against the local government that seized the plaintiff's property and retained the surplus value of the seized property, rather than returning it to the landowner). "The taxpayer must render unto Caesar what is Caesar's, but no more." Id. at 1380 (emphasis added).

1

In the wake of <u>Tyler v. Hennepin County</u>, the plaintiffs, Stephen Woodbridge and Roberta Browning, brought this lawsuit against the defendant, the City of Greenfield ("City"), relying on the Takings Clause, because the City foreclosed on their family homes and, following those foreclosure proceedings, sold their homes for much more than the amounts owed to the City, but never returned any of the huge profit that the City reaped to the plaintiffs.  The City now attempts to evade liability through this motion to dismiss, but none of the grounds asserted have any merit.

First, this Court clearly has the authority to compensate the plaintiffs for the City's unconstitutional action, even if the City is correct that it was compelled to follow an unconstitutional state statutory scheme, which it was not.

Second, the plaintiffs' claims are not barred by the doctrine of res judicata because the plaintiffs did not challenge the City's unconstitutional conduct in the Land Court foreclosure proceeding since (a) the only issue before the Land Court was the legitimacy of the foreclosure, and (b) the City's unconstitutional conduct occurred well <u>after</u> the conclusion of the Land Court proceedings.

Third, the Supreme Court's holding in <u>Tyler v. Hennepin County</u> is controlling.  Like the Minnesota law at issue there, neither Massachusetts law nor the City's Ordinances provided either of the plaintiff property owners whose homes had been seized with any "defined . . . process through which the owner could claim the surplus."  <u>Tyler</u>, 143 S. Ct. at 1379.

Accordingly, the City's motion to dismiss must be denied.

## FACTUAL BACKGROUND[1]

1.      Each plaintiff owned a home in Greenfield, but was unable to pay the real estate

---

[1] The plaintiffs incorporate the complete factual allegations from their Amended Complaint, Doc. 6, as if stated here.

taxes that were due.  Amended Complaint ¶ 14 (Woodbridge), ¶ 24 (Browning).

2.      The City, after recording instruments of taking in the Franklin County Registry of Deeds, elected to file an action with the Land Court to foreclose on their respective properties pursuant to G.L. c. 60, §§ 53 and 54.  Amended Complaint ¶¶ 14-15 (Woodbridge), ¶¶ 24-25 (Browning).

3.      The City was not obligated under state law to file an instrument of taking or begin foreclosure proceedings.  Whether to bring a foreclosure action was in the City's pure discretion. See G.L. c. 60, § 53.[2]

4.      Once a foreclosure action was begun in the Land Court, there was a state statutory scheme as to how the City should proceed.  City's Mem. (Doc. 8) at 7-9

5.      In accordance with that statutory scheme, the City secured judgments at the Land Court that allowed the City to foreclose on and take ownership of the plaintiffs' respective properties.  Amended Complaint ¶ 16 (Woodbridge), ¶ 26 (Browning).

6.      The City then sold the plaintiffs' family homes to third parties for amounts that were well in excess of the amounts that the plaintiffs owed to the City.  Amended Complaint ¶¶ 17-21 (Woodbridge), ¶¶ 27-30 (Browning).  (The City retained one of the parcels it seized from Mr. Woodbridge.  Amended Complaint ¶ 18.)

7.      The City has not paid the plaintiffs any of the surplus value it received from their seized property.  Amended Complaint ¶ 22 (Woodbridge), ¶ 31 (Browning).

## STANDARD OF REVIEW

"Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when

---

[2] Section 53: "If a tax on land is not paid within fourteen days after demand therefor and remains unpaid at the date of taking, the collector **_may_** take such land for the town. . . ."  (Emphasis added.)

confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all

reasonable inferences in favor of the plaintiff . . . . Dismissal is only appropriate if the complaint,

so viewed, fails to allege a 'plausible entitlement to relief.'"  Cordell v. Howard, 879 F. Supp. 2d

145, 152 (D. Mass. 2012) (citing Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st

Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).

## ARGUMENT

The weaknesses of the City's motion is reflected by the fact that it does not so much as

mention the Supreme Court's decision in Tyler v. Hennepin County until the final section of its

Argument, beginning on page 16 of its memorandum.  This is despite the fact that in Tyler v.

Hennepin County, 143 S. Ct. 1369 (2023), the Supreme Court unambiguously declared that,

while local governments are within their right to seize and sell a taxpayer's home "to recover . . .

unpaid property taxes," local governments "could not use the toehold of the tax debt to

confiscate more property than was due," without violating the Taking Clause of the Fifth

Amendment.  Id. at 1376, 1380.  Amended Complaint ¶ 6.

The City does not assert that Tyler v. Hennepin County says anything to the contrary.

Instead, the City offers three arguments, each one with less merit than the one before it, as to

why, despite the Supreme Court's clear ruling, the Court should deny the plaintiffs the

opportunity to proceed with their claims.  Each of the City's arguments is addressed below in the

same order that the City raised the issues in its memorandum.

    a.    *As the Supreme Court made clear in* Tyler v. Hennepin County, *the City of*
            *Greenfield cannot escape liability simply because it chose to follow the*
            *unconstitutional policy of the Commonwealth of Massachusetts, which the City*
            *claims prohibited it from paying the plaintiffs the surplus value of the seized*
            *property.*

The City's first attempt to escape the clear holding of Tyler v. Hennepin County is a self-

contradictory claim, set forth in Section (a)(1) of its memorandum, that "the Amended

Complaint provides no factual allegations of any policy, formal or informal, that was in place when the Plaintiffs' property was taken." Mem. at 6.[3] It is self-contradictory since, as the plaintiffs predicted in their Complaint, the City goes on to argue that they should escape liability because they were compelled to comply with state law, and the Massachusetts Statute scheme has no provision allowing the return of excess profits to a landowner whose property has been seized. See Amended Complaint ¶ 34.[4]

More specifically, the crux of the City's eight-page discussion of Massachusetts tax lien foreclosure law, Mem. at 5-13, is that the City "had no alternative course of action" as Massachusetts law forbade the City from paying former homeowners the excess value of their seized homes post-foreclosure. Mem. at 12 (emphasis in original).

But that argument ignores a number of facts. First, Greenfield was not compelled to take the plaintiffs' homes or bring foreclosure actions. Rather, G.L. c. 60, § 53 states: "If a tax on

---

[3] In the Amended Complaint, the plaintiffs specifically allege: "At all times relevant to this dispute, the City maintained an **_official policy_** of retaining the value of property taken from individuals that was in excess of the amounts that those individuals owed to the City in taxes and other costs related to the property." Amended Complaint ¶ 32 (emphasis added). As evidence of the City's official policy, the plaintiffs quoted an excerpt from a statement by the City's Mayor, which the City posted on its website: "Presently, there is no legal mechanism for paying owners back for any equity the city may have retained in the past after all legal fees and expenses have been paid." Amended Complaint ¶ 33 (emphasis in original). Consistent with the City's policy, the plaintiffs allege that the City "took property they owned to recover unpaid taxes and then failed to compensate them for the excess value over and above the taxes and related expenses incurred during the taking by the City." Amended Complaint ¶ 1, 22 (Woodbridge), and ¶ 31 (Browning). The City argues that the Mayor's statement is irrelevant because it was made years after the plaintiffs' foreclosures, but, as is apparent from both the Mayor's statement and the plaintiffs' circumstances, the City's policy, referred to by the Mayor in 2023 was in effect at the time of the plaintiffs' foreclosures (i.e., their properties were sold and the City kept the excess value).

[4] Paragraph 34 of the Amended Complaint states: "[T]he City is attempting in this case to defend its seizure of the equity that taxpayers had accumulated in their family homes by hiding behind [Massachusetts law]."

land is not paid within fourteen days after demand therefor and remains unpaid at the date of

taking, the collector ***may*** take such land for the town...." (Emphasis added.) In other words, the

City had the discretion to take the plaintiffs' property and proceed with foreclosure proceedings,

or not.[5] But once the City chose to take actions that resulted in an unconstitutional taking, the

City then became liable for the damages to the plaintiffs from its unconstitutional actions.

The City's argument is fundamentally flawed for a second reason. Even, assuming

arguendo that the Massachusetts statutory scheme left the City with no other course of action, as

the plaintiffs allege in their Amended Complaint, "the City has no right to avoid its obligations

under the United States Constitution by relying upon an unconstitutional state statute."

Amended Complaint ¶ 35. That was precisely the Supreme Court's holding in Tyler v. Hennepin

County, where, like here, Minnesota state law did not provide seized property owners with the

right to recover the surplus value of seized property. 143 S. Ct. at 1379. The Supreme Court, in

a unanimous decision, held that individuals whose property was seized by local governments in

the state of Minnesota could bring claims against those local governments, despite the fact that

the municipalities were acting within the confines of state law, which, as is the case in

Massachusetts, "absolutely preclud[ed] an owner from obtaining the surplus proceeds of a

judicial sale." Tyler, 143 S. Ct. at 1379 (citations omitted). In other words, a local government

cannot escape liability for its clear violation of the Fifth Amendment by arguing that the state

made them do it. It is noteworthy that the City cites no case law to the contrary.

Moreover, it is far from clear from the City's memorandum that Massachusetts law

actually required the City, once it decided to foreclose on the plaintiffs' homes, to also violate

---

[5] A number of towns and cities do not seize property for unpaid taxes, but simply place a lien on the property in question and wait for it to be sold, at which time the municipality is paid in full for the unpaid taxes with 16% interest. See G.L. c. 60, § 62.

the plaintiffs' Fifth Amendment rights.  The City relies on and misconstrues G.L. c. 40, § 5,

arguing that § 5 prevents municipalities within the Commonwealth from paying seized property

owners the surplus value of the seized property following a taking.  Mem. at 9-10.  But the actual

text of G.L. c. 40, § 5 suggests no such thing: "A town may at any town meeting appropriate

money for the exercise of any of its corporate powers; provided, however, that a town shall ***not***

appropriate or expend money for any purpose, on any terms, or under any conditions

***inconsistent with any applicable provision of any general or special law***."  Contrary to the

defendant's assertions, G.L. c. 40, § 5, payments of surplus value to seized property owners

would not be "inconsistent" with "any general or special law."  To the contrary, such payments

would be perfectly consistent with the Fifth Amendment's <u>requirement</u> that, when a government

has "taken" property from a person, the government must provide that person with "just

compensation."  Indeed, the plaintiffs suggest that there is no better reason for a City to

appropriate funds than to compensate its residents for their unconstitutional actions.

In its defense of its practice of retaining the surplus value of seized property, the City

cites a litany of cases where government expenditures were deemed inappropriate.  Mem. at 10-

11.  But none of the cases that the City relies on involved a law, like the Fifth Amendment, that

explicitly required such an expenditure to be made.  See, e.g., <u>Lowell v. Boston</u>, 111 Mass. 454,

460-461 (1873) (in contrast to the Fifth Amendment's requirement to provide "just

compensation" to persons whose property was "taken," use of public funds to rebuild private

property destroyed by fire was not mandated by state or federal law); <u>Fowler v. Selectmen of</u>

<u>Danvers</u>, 90 Mass. 80, 85 (1864) (no law authorized rewards to residents who enlisted as soldiers

and therefore such awards were "unauthorized expenditure of money"); <u>Mead v. Inhabitants of</u>

<u>Acton</u>, 139 Mass. 341, 343-44 (1885) (no law provided for payment of bounties to civil war

soldiers for service); <u>Whittaker v. Salem</u>, 216 Mass. 483, 484-85 (1914) (no law allowed grant of

one-year leave of absence with payment of half his salary to a high school principal); <u>Jones v.

Inhabitants of Natick</u>, 267 Mass. 567, 570 (1929) (law did not allow settlement payment to an

individual for a dubious claim).[6]

      In short, regardless of the constraints that Massachusetts law may or may not have placed

on the City, the City has clearly admitted that it chose to engage in the very practice that the

plaintiffs have alleged is the City's "official policy," i.e., that the City maintained a policy of

retaining the surplus value of property that it seizes from its residents, including the plaintiffs,

which is in direct conflict with the Supreme Court's unanimous decision in <u>Tyler v. Hennepin

County</u>.  That is sufficient for the purpose of surviving the City's motion to dismiss.

      b.      *The plaintiffs' Land Court proceedings do not bar their claims under the doctrine of res judicata because those proceedings strictly involved the City's foreclosure of their property, which the plaintiffs do not challenge, and the plaintiffs' claims strictly involve the City's failure to pay them just compensation after selling their properties, which occurred well <u>after</u> the Land Court proceedings closed.*

      After arguing over the course of eight pages that Massachusetts law forbids

municipalities from paying seized property owners the surplus value of the property that was

seized, the City claims that it cannot be liable for retaining such surplus value because--despite

---

[6] What is particularly offensive is the City's suggestion that payment of these surplus funds to seized property owners would have somehow been unlawful because such payments would not have been "for some public service, or some object which concerns the public welfare."  Mem. at 9-10 (quoting <u>Lowell</u>, 111 Mass. at 460-461).  Protecting the City's most vulnerable property owners from being deprived of the equity in their homes would seem to serve a public service, and it would be responsive to the Supreme Judicial Court's commentary on the "archaic and arcane process of tax lien foreclosure," which "sometimes does result in catastrophic consequences for homeowners."  <u>Tallage Lincoln, LLC v. Williams</u>, 485 Mass. 449, 450, 452 (2020) (explaining the alarming reality that, unlike a sale following a "mortgage foreclosure," where a lender "pays any surplus back to the borrower," with a "tax lien foreclosure," "the foreclosure judgment extinguishes the taxpayer's remaining interest in the property" and "the taxpayer loses any equity he or she has accrued in the property, no matter how small the amount of taxes due or how large the amount of equity.").

the lack of any statute, administrative regulation, procedural rule, or municipal ordinance that the

plaintiffs could have invoked--the plaintiffs gave up their claims by failing to raise this issue

when their property was being seized from them during the Land Court foreclosure proceedings.

But the City's res judicata defense fails because the claims that the plaintiffs bring before this

Court do not share a common "identity of the cause of action" with the Land Court action, since

(1) the only issue before the Land Court was the foreclosure of their properties, which the

plaintiffs do not challenge, and (2) even more dispositively, the claims that the plaintiffs have

brought in this action are based on facts that arose well <u>after</u> the Land Court action concluded.

Their claims arose not when the City sold their properties but rather when it retained the surplus

value of those properties without returning any of the excess to the plaintiffs.  See <u>Cordell v.</u>

<u>Howard</u>, 879 F. Supp. 2d 145, 153-154 (D. Mass. 2012) ("This court finds that the conduct

complained of in the instant action is sufficiently distinct from the conduct at issue in the 2007

Action to distinguish Cordell's present claims from those asserted in the prior litigation.").

Your Honor's decision in <u>Residential Funding Co.</u> perfectly illustrates why the City's res

judicata defense must fail here.  As Your Honor explained in <u>Residential Funding Co., LLC v.</u>

<u>Randle</u>, No. 13-40076-TSH, 2013 U.S. Dist. LEXIS 167344, at *3-8 (D. Mass. Nov. 25, 2013),

to succeed on its res judicata defense under Massachusetts law, the City must establish all three

of the following elements: "(1) the identity or privity of the parties to the present and prior

actions, (2) identity of the cause of action, and (3) prior final judgment on the merits."  (Citations

to Massachusetts caselaw omitted.)  Your Honor further explained, "Causes of action are

identical for the purposes of res judicata if they grow out of the same transaction, act, or

agreement, and seek redress for the same wrong."  <u>Id.</u> (citations and internal quotations omitted).

The dispute in <u>Residential Funding Co.</u> arose because, following a lender's successful

Land Court action against the defendant-tenants to establish that the lender properly held the

subject mortgage, the lender sold the residential property to the plaintiff, Residential Funding

Co., by foreclosure sale.  But the defendants, who were still residing at the property, refused to

vacate the premises.  Residential Funding Co. therefore brought a summary process eviction

action in Worcester Housing Court, which the defendant-tenants removed to federal court.  Id. at

*2-3.  The defendant-tenants asserted affirmative defenses and counterclaims, alleging (1) the

lender who sold the property to Residential Funding Co. never held proper title to the underlying

mortgage, thereby rendering title defective, id. at *4-5, and (2) the foreclosure sale, which took

place after the Land Court action, was itself defective, id. at *8.  Residential Funding Co. cried

foul in response, asserting that the tenants' affirmative defenses and counterclaims were barred

by the doctrine of res judicata because the tenants already had the chance to adjudicate their

claims about the foreclosure in the Land Court, which the tenants themselves had initiated.  Id. at

*3-8.  Your Honor issued a nuanced split decision.

        Your Honor first concluded that the tenants were barred from re-litigating their claim that

the original lender who sold the property to the plaintiff lacked any interest in the mortgage

because that was the same claim that was adjudicated at the Land Court.  Id. at *6-8.  Such a

holding, if applied to the facts presently before this Court, would similarly preclude the plaintiffs

from challenging the legitimacy of the takings and tax lien foreclosures that resulted in the City

seizing their properties, because those were precisely the issues that were before the Land Court.

Of course, those are not the claims that either Mr. Woodbridge or Ms. Browning have brought

here, which leads us to Your Honor's second holding in Residential Funding Co.

        Your Honor next concluded that the res judicata did not bar the tenants' claims that the

foreclosure sale itself was defective, since the facts underlying those claims involved the actual

sale that occurred <u>after</u> the Land Court judgment issued.  <u>Id.</u> at *8 ("Defendants correctly assert

that the affirmative defenses and counterclaims relating to the conducting of October 26, 2011

foreclosure sale were not the previously litigated and are not barred by res judicata.").  The same

rationale applies here because the Land Court actions, whereby the City took ownership of the

plaintiffs' respective properties, strictly addressed the ownership of the properties.  Those actions

did not address the City's obligation to assess the surplus value of the seized property that was

due to the plaintiffs and then pay them that surplus amount, claims that arose after the Land

Court action had concluded.

Judge Woodlock reached a similar decision in <u>States Resources Corp. v. Capizzi</u>, No. 04-

10095-DPW, 2005 U.S. Dist. LEXIS 956, at *25-26 (D. Mass. Jan. 20, 2005), where he held that

the defendants' attempt to re-litigate the legitimacy of the underlying loan documents was barred

by res judicata, but that their allegations regarding events that occurred <u>after</u> the preceding

litigation were not barred, despite the fact that there was some overlap between the two sets of

claims:

> The attempt by SRC to characterize the other counterclaims made against it by the
> Capizzis -- i.e., unlawful and fraudulent foreclosure and violation of ch. 93A -- as
> within the scope of res judicata is not sufficient. ***Although these claims do rely, in
> part, on the same factual predicate as the barred claims*** -- namely that SRC was
> not entitled to foreclose upon the Property -- ***they also rest upon allegations related
> to the conduct of the foreclosure sale***, including the advertising of and the price
> obtained at the auction. Accordingly, there is lacking "sufficient identity [] between
> the causes of action in the two suits," <u>Cunan</u>, 156 F.3d at 114, for the claims to be
> precluded by res judicata.[7]

---

[7] Likewise, in <u>Cordell v. Howard</u>, 879 F. Supp. 2d 145, 152-155 (D. Mass. 2012), the court held
that res judicata did not apply where the plaintiff's claims were different than the claims in the
preceding action and, as is the case here, the factual predicate supporting the later action arose, in
part, <u>after</u> the preceding action had concluded:

> This court finds that the conduct complained of in the instant action is sufficiently
> distinct from the conduct at issue in the 2007 Action to distinguish Cordell's present
> claims from those asserted in the prior litigation. In the earlier litigation, Cordell

(Emphasis added.)  See also Jones v. Bank of N.Y., No. 12-11503-RWZ, 2013 U.S. Dist. LEXIS 97481, at *12 (D. Mass. July 12, 2013) (Judge Zobel held plaintiff's claims challenging assignment of mortgage were barred by res judicata due to a prior action, but "not all of Jones's [Fair Debt Collection Practices Act] claims are precluded by the prior state judgment. The FDCPA prohibits attempts to collect an otherwise valid debt using improper methods, and Jones makes several allegations to that effect.").[8]

---

challenged only the inability of the medical staff at FMC Devens to stabilize his blood system due to their alleged lack of knowledge about his medical conditions. (Def. Ex. A ¶ II). He did not allege facts showing that the named defendants engaged in any specific acts which violated his constitutional rights. (See Def. Ex. C). Thus, while Cordell claimed that the alleged failure to stabilize his blood system left him in an "over-toxined" state, he did not claim that the named defendants engaged in any affirmative conduct which caused him to suffer harm. (See Def. Ex. A ¶ II). Here, in contrast, Cordell has alleged specific conduct by the defendants, including overdosing him with medication and attempting to cover up the overdoses, which allegedly deprived him of his rights under the Eighth Amendment. Therefore, although both lawsuits generally concern medical care that Cordell received for his blood disorder while at FMC Devens, the nature of his present claims are substantively different than his claims in the prior action.

The record also shows that ***the conduct giving rise to the instant litigation postdates Cordell's claims in the 2007 Action***. As described above, Cordell filed his complaint in the 2007 Action on April 9, 2007. (Def. Ex. A). However, the alleged incidents of overdosing complained of here did not begin until July 31, 2007, and the last such incident did not occur until April 14, 2009. (Am. Compl. ¶ 13). For this reason as well, this court finds that the current complaint sets forth a new cause of action. See Shelby v. Factory Five Racing, Inc., 684 F. Supp. 2d 205, 212-13 (D. Mass. 2010) (even where nature of conduct is the same in both actions, res judicata does not apply where "subsequent conduct was broader and more far-reaching than the conduct which led to the original complaint." (quotations and citation omitted)).

(Emphasis added.)

[8] As the Supreme Court stated long ago: "A suit for taxes for one year is no bar to a suit for taxes for another year. The two suits are for distinct and separate causes of action. . . . [A]s was held in that case, where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points

12

Therefore, the plaintiffs' home equity theft claims in this action are not barred by the

doctrine of res judicata based on the Land Court action.  Not only were the plaintiffs barred from

raising the issue in the Land Court foreclosure action, but as is evident from the plaintiffs'

Amended Complaint, the factual predicate underlying the plaintiffs' claims arose <u>after</u> the Land

Court actions had been fully resolved, when the City disposed of the seized property by selling it

to third parties and then failing to return the excess to the plaintiffs.

      c.       *<u>Tyler v. Hennepin County</u> provides the plaintiffs with a viable claim against the City of Greenfield.*

Finally, at the end of its memorandum, the City makes an effort to distinguish its

constitutional transgressions from the clear and unambiguous holding in <u>Tyler v. Hennepin</u>

<u>County</u> by baldfacedly asserting that the plaintiffs' reliance on <u>Tyler v. Hennepin County</u> is

"disingenuous and ineffective."  Mem. at 16.  The City argues that <u>Tyler v. Hennepin County</u>

does not apply here based on the Supreme Court's distinction between Minnesota law, which

"provides no opportunity for the taxpayer to recover the excess value from the State," from states

like New York, which "***[do] not 'absolutely preclud[e]* an owner from obtaining the surplus**

**proceeds** of a judicial sale,' but instead *simply defined the process through which the owner*

*could claim the surplus*."  <u>Tyler</u>, 143 S. Ct. at 1379 (citing <u>Nelson v. City of New York</u>, 352

U.S. 103, 110 (1956) (emphasis added)).  But for the City to suggest that the plaintiffs had an

opportunity to recover the excess value from the state, after asserting over the course of eight

pages that Massachusetts law prohibited the City from making surplus payments to seized

property owners, is, in the City's parlance, "disingenuous and ineffective."

To be clear, the statutory scheme at issue in <u>Nelson v. City of New York</u> bears no

---

controverted, upon the determination of which the finding or verdict was rendered."  <u>Keokuk &</u>
<u>W. R. Co. v. Missouri</u>, 152 U.S. 301, 314-315 (1894).

resemblance to Massachusetts foreclosure scheme.  In that case, the Supreme Court explained its

basis for determining that New York City's foreclosure scheme did not violate property owners'

rights, namely that the New York foreclosure scheme provided a mechanism whereby property

owners could recover the surplus value of the property seized:

> [W]e do not have here a statute which absolutely precludes an owner from obtaining
> the surplus proceeds of a judicial sale. In City of New York v. Chapman Docks Co.,
> 1 App. Div. 2d 895, 149 N. Y. S. 2d 679, an owner filed a timely answer in a
> foreclosure proceeding, asserting his property had a value substantially exceeding
> the tax due. The Appellate Division construed § D17-12.0 of the statute to mean
> that upon proof of this allegation a separate sale should be directed so that the owner
> might receive the surplus. What the City of New York has done is to foreclose real
> property for charges four years delinquent and, in the absence of timely action to
> redeem or to recover any surplus, retain the property or the entire proceeds of its
> sale. We hold that nothing in the Federal Constitution prevents this where the record
> shows adequate steps were taken to notify the owners of the charges due and the
> foreclosure proceedings.

Nelson v. City of N.Y., 352 U.S. 103, 110 (1956).[9]

The City relies on a single, unpublished Massachusetts Land Court case, Town of

Arlington v. Holman, where a Land Court judge allowed a property to recover the surplus value

of seized property, purportedly pursuant to G.L. c. 60, § 68.  But G.L. c. 60, § 68 only permits a

seized property owner to try to "redeem" property in order to stave off foreclosure, while G.L. c.

60, § 62, requires the seized property owner to pay the tax deficiency to the municipality, with

interest (at the rate of 16%) and costs incurred by the municipality during the taking.  The statute

---

[9] The Court set out the language from the statute in Note 10 of Nelson v. City of N.Y.: "Section
D17-12.0 (a) provides in pertinent part, 'The court shall have full power . . . in a proper case to
direct a sale of . . . lands and the distribution or other disposition of the proceeds of the sale.' By
§ D17-6.0 it is provided, 'Every person having any right, title or interest in or lien upon any
parcel . . . may serve a duly verified answer . . . setting forth in detail the nature and amount of
his interest or lien and any defense or objection to the foreclosure.'"  Massachusetts' tax lien
foreclosure scheme provides no such opportunity to property owners whose property has been
seized to set forth their interest in the land.  Further, unlike in New York, no appellate court in
Massachusetts has ever construed such a right to exist.

does not create any right for seized property owners to recover surplus values of the property after it is seized. If it did, that would undercut the City's argument that there was no legal basis for the City to pay property owners the surplus value of the seized property.

The City's argument is akin to the argument the Supreme Court rejected in Tyler v. Hennepin County: "The County argues that the delinquent taxpayer could sell her house to pay her tax debt before the County itself seizes and sells the house. But requiring a taxpayer to sell her house to avoid a taking is not the same as providing her an opportunity to recover the excess value of her house once the State has sold it." Id. at 1379. Likewise, the City argues that delinquent taxpayers could demand that the City pay them the surplus value of the seized property while the foreclosure proceedings were pending before the Land Court, not based on any statute or rule, but solely due to the existence of a single Land Court judge who on a single occasion issued a decision allowing the recovery of the surplus value of seized property.

The unpublished Land Court decision is in stark contrast to the view of the Massachusetts Land Court as a whole, which, following the Supreme Court's decision in Tyler v. Hennepin County, issued a public statement confirming that the statutory scheme did not allow the relief that the City now claims was available to the plaintiffs at the time of their respective Land Court actions:

> Current Massachusetts tax laws do not address if or what money is owed to a property owner after the foreclosure is final. But the *Tyler* case makes clear that, under the U. S. Constitution, property owners will be owed compensation from a tax foreclosure—if the property taken by the government is worth more than the tax debt owed.
>
> Property owners who are undergoing tax foreclosure should be aware of their right to claim compensation for their "home equity"—the excess value of the property above the amount of the tax debt.
>
> Cities, towns, and other plaintiffs bringing tax foreclosure cases will now need to ensure they comply with these constitutional protections and provide just

15

compensation to property owners.

> The Massachusetts legislature, municipal government officials, and the courts each are assessing the impact of the *Tyler* opinion on Massachusetts law and practice. <u>There are a variety of ways the legislature might revise the tax foreclosure statutes in Chapter 60 to respond to *Tyler*</u>.  Several bills are pending.  <u>In tax foreclosure cases pending before the Land Court, the court will address any motions or other pleadings that may be filed based on the *Tyler* decision</u>.  Other state laws, procedures, or mechanisms now in place may let property owners claim compensation for taken property, see e.g., Chapter 79.

(Emphasis added.)[10]

Clearly, the Land Court's view was not that Massachusetts law presently provides property owners whose land was taken by a municipality with the ability to recover the surplus value of the seized land.  Rather, the Land Court made clear that, in light of the Supreme Court's decision in <u>Tyler v. Hennepin County</u>, going forward, both the Land Court and the Massachusetts legislature would have to take some corrective action to comply with the dictates of the Fifth Amendment's Taking Clause.  Therefore, neither the City nor the Commonwealth of Massachusetts had a "defined . . . process," like the State of New York, "through which the owner could claim the surplus." <u>Tyler</u>, 143 S. Ct. at 1379.

Accordingly, the City cannot escape the clear holding of <u>Tyler v. Hennepin</u>.

### CONCLUSION

For the foregoing reasons, the City's motion should be denied.

---

[10] The Land Court's full statement is available on the Commonwealth's website at https://www.mass.gov/doc/land-court-statement-on-tyler-v-hennepin-county-minnesota-08-2023/download and is attached as Exhibit A.  The Court may take judicial notice of the statement since it is a public document issued on the Commonwealth's own website, or alternatively, may consider the evidence by treating the City's motion as "one for limited summary judgment," which is permitted where a defendant files a motion to dismiss based on res judicata grounds. <u>Laverty v. Massad</u>, Civil Action No. 08-40126-FDS, 2009 U.S. Dist. LEXIS 143964, at *17-18 (D. Mass. July 6, 2009) (citing cases).

Respectfully submitted,

/s/ Michael Aleo

_____

Michael Aleo (BBO No. 672071)
aleo@LNN-law.com
Thomas Lesser (BBO No. 295000)
lesser@LNN-law.com
Lesser Newman Aleo & Nasser LLP
39 Main Street
Northampton, MA 01060
(413) 584-7331 (tel)
(413) 586-7076 (fax)

CERTIFICATE OF SERVICE

I, Michael Aleo, hereby certify that the above was filed through the ECF system and that I have caused a true and correct copy of the above to be served on counsel for the City of Greenfield.

Date:  October 23, 2023                    /s/ Michael Aleo_____