

**THE TRIAL COURT OF MASSACHUSETTS**
**LAND COURT**

Three Pemberton Square
Boston, MA 02108

**Gordon H. Piper**
Chief Justice

**Jill K. Ziter**
Deputy Court Administrator

VIA EMAIL

May 8, 2023

The Honorable Michael S. Day (Michael.Day@mahouse.gov)
Chair of the Joint Committee on the Judiciary
Massachusetts State House, 24 Beacon Street, Room 136
Boston, MA 02133

The Honorable James B. Eldridge (James.Eldridge@masenate.gov)
Chair of the Joint Committee on the Judiciary
Massachusetts State House, 24 Beacon Street, Room 511-C
Boston, MA 02133

RE:   **Senate Bill 921** - An Act protecting equity for homeowners facing foreclosure

Dear Chairs Day and Eldridge:

I write to you today about Senate Bill 921, which would substantially change the laws governing the foreclosure of real estate tax titles in the Commonwealth. This bill, and its companion, House Bill 2937, are two of many bills filed in this legislative session to reform the procedures for foreclosing property tax titles in the Commonwealth.[1] The Land Court has original exclusive jurisdiction over the foreclosure of a property owner's right of redemption after a municipality has taken land for nonpayment of real estate taxes.

The Land Court shares the evident goal of the proponents of this bill: to preserve home ownership and home equity for the Commonwealth's taxpayers. The bill seeks to provide land owners who have fallen behind paying their real estate taxes with a way to pay off their tax obligations without losing the entire value of their property. However, the bill before you, as currently drafted, might well ultimately result in worse outcomes for many homeowners facing foreclosure. For the reasons that follow, I urge this Committee to consider the potential impacts this legislation would bring about for property owners and municipalities in the Commonwealth. Substantial revisions to this bill would be necessary to make more equitable the outcomes for homeowners and municipalities.

---

[1] House Bill 2937 is pending before the Joint Committee on Revenue. Senate Bills 1774, 1876, and 1953, and House Bills 2883 and 2907, are all pending before the Joint Committee on Revenue. No hearings have yet been scheduled on these bills.

The subject of state property tax lien foreclosure is currently under a national spotlight as the Supreme Court grapples with the constitutionality of the tax foreclosure process in Minnesota.[2] Closer to home, the Massachusetts Supreme Judicial Court previously has passed upon the Commonwealth's existing tax foreclosure statutory scheme in *Kelly v. City of Boston*, 348 Mass. 385 (1965), holding that a former owner was not entitled to any payment representing the surplus fair market value of the property exceeding the tax liability.[3] The Land Court, as a trial court, is bound by that precedent unless it is changed.

Nonetheless, the bill pending before your committee, and its companions, come before the General Court at a critical time when tax foreclosure procedures around the country are being tested and changed. There are no doubt concerns that, regardless of the federal case outcomes, reforms to the existing system in Massachusetts may be necessary or advisable. While the Land Court of course cannot comment on litigation currently pending, and is constrained in its ability, as a court, to weigh in on pending legislation, we would like to offer some insights which we hope the Committee will find helpful as it addresses this important issue.

The Land Court, because it has exclusive jurisdiction over the foreclosure of rights of redemption under Chapter 60, plays a central role in the protection of landowners facing foreclosure of a tax title. In the Land Court proceedings, extensive efforts are undertaken to locate and serve notice to the homeowners and all parties with an interest in the property. In conducting the proceedings, the Land Court remains deeply committed to the preservation of home ownership and home equity. The court's notices spell out in plain language just how much is at stake.[4] The court always gives homeowners wide latitude and ample time so that they can:
- offer to redeem their title;
- work out a payment plan;
- explore options for forbearance or deferral;
- seek more time to obtain a loan or sell the property; and/or
- challenge the legal fees assessed.

---

[2] *See Tyler v. Hennepin County, Minnesota*, Docket No. 22-166 (argued Apr. 26, 2023), where the Supreme Court of the United States is currently considering a constitutional challenge to the tax lien foreclosure practices in Minnesota, where property acquired after a foreclosure is subsequently sold with all proceeds retained by the County. Current Massachusetts law does not require sale of the property after the foreclosure, but absolute title to the property vests in the foreclosing entity.

[3] The Supreme Judicial Court noted that a different outcome would "rest[] in the legislative domain." *Id.* at 389.

[4] See the Land Court's Supplemental Notice, which is sent with every court citation, available at: https://www.mass.gov/doc/supplemental-tax-lien-citation-notice-explaining-risks-of-foreclosure/download

Qualifying homeowners also may receive free legal advice and representation through the court's recently instituted partnership with the Lawyer's Clearinghouse and the Access to Justice Fellowship program.[5]

Here are some of the issues of concern we see with the current version of the legislation:

Under Senate Bill 921, the Land Court no longer would be able to facilitate redemption in the ways now available. Section 1 of the bill is highly problematic. Section 1 appears to call for a new proceeding before the Land Court, at the earliest stages of the tax collection process – a mere 28 days after the tax has become overdue – to authorize the municipality to exercise the power of taking.[6] When authorizing the taking, the Land Court then must "order a public sale of the foreclosed property and order distribution of proceeds." This, as the bill now is written, is an extraordinarily harsh result for homeowners who will now have their home ordered to sale as early as a month after failing to pay their property taxes. Failure to appear in such a proceeding might well doom any hope of retaining the home.

If the court orders a sale by public auction simultaneously with the municipality's taking, as Section 1 seems to mandate, then the homeowner has no opportunity to redeem their property – to pay the outstanding amount due; to negotiate a payment plan with the municipality; to arrange for the private sale of their home; to arrange for financing, refinancing, a private loan, a home equity loan, etc. – all of which options are available currently in the Land Court's tax lien foreclosure session. There is nothing left to redeem once the auction gavel has fallen. Not only would this new procedure and mandate of Section 1 cut off the homeowner's right of redemption, it would substantially increase the legal and court costs chargeable to the tax title account, further reducing the sum potentially recoverable by the homeowner following an ordered sale. Moreover, public auctions, particularly those which occur as distress sales under court directive, do not generally maximize the sale proceeds.

If Section 1 of this bill stands, then all the other provisions of the bill amending further sections of chapter 60 fail, as the proceedings to foreclose the right of redemption they outline and amend will not ever occur. The property already will have been ordered to public auction.

Even if section 1 were eliminated from the bill, the remaining sections contain other problems that would require substantial language revision:

---

[5] The Land Court offers a Tax Lien Foreclosure Legal Assistance Program, which provides referrals for free legal representation by experienced attorneys to homeowners who cannot afford an attorney.

[6] The bill fails to provide a grant of jurisdiction to the court for hearing such matters. *See* G.L. c. 185, § 1.

Section 3 requires the municipality to "withdraw possession of the property" if the tax debt is fulfilled through the collection of rents and other income from the property. But the only way to legally end a tax title foreclosure case pending before the Land Court would be through a motion to withdraw the complaint or a dismissal. Record title also must be cleared through a Certificate of Redemption or a Deed of Release. Failure to address the manner in which a tax foreclosure case is formally concluded will leave property titles under a cloud.

Section 4 purports to eliminate the vesting of absolute title upon foreclosure, but provides no clarity as to what title arises following the foreclosure or sale. If the title following disposition of the property by public auction is not absolute, and is subject to remaining rights, the title being conveyed at the court-ordered auction would be impaired. Impaired titles are not marketable, and consequently are devalued, further eroding any potential recovery of surplus proceeds to return to the foreclosed homeowner. If the title which passes when a property is sold at auction is subject to the rights of the homeowner or other interested parties to redeem in some fashion, no buyer at the auction will pay the full market value of the property or anything near it, because they will fear that redemption will take place after the auction sale, and strip the auction buyer (and its successors) of title to the property. This will limit auction bidding to those who are willing to put up only a fraction of the property's true worth. This will end up providing the homeowner with very little of the equity of the property out of the sale proceeds.

Section 5 requires the Land Court (again) to order sale by public auction upon foreclosing the right of redemption. This part of the bill points in a general way to sections of the General Laws that currently apply to mortgage foreclosures under the statutory power of sale.[7] The roadmap the court would have to direct be followed to sell the property is not laid out with any precision. But the learned experience with mortgage foreclosure sales is that public auctions under statutory power of sale seldom result in substantial returns of equity to foreclosed homeowners. They are distress sales, and do not often produce sale prices approaching those which might be seen if the property were fully exposed to the market in a conventional way.

Under current law, after extensive notice to homeowners and a full opportunity to redeem the title by paying off what is due, at the end of the case, if redemption is not made, the Land Court enters judgment foreclosing the taxpayer's right of redemption. In many cases, however, the property's title remains with the municipality, which often keeps the title, at least for some time longer. This allows the opportunity for the taxpayer, even after foreclosure, to work out an arrangement with the municipality to pay off what is then due and regain title. The chance to do that is greater within the first year after the foreclosure judgment, when the court has discretion to order vacation of the foreclosure judgment. But even after the year passes, the judgment can be vacated with the assent of the city or town if it still holds title. Most municipalities in many

---

[7] Section 5 omits reference to Chapter 183, but I presume reference was intended.

cases do not seek to take a home for municipal use, or to realize the full equity value of the property. Most cities and towns just want to recover the delinquent taxes and the costs of the foreclosure, and will be open to allowing the judgment of foreclosure to be vacated.

The current system certainly causes taxpayers to lose the equity they have built up in their homes if they do not redeem, and this can result in catastrophic loss when the owners are unable to raise the funds they need to redeem. But ordering a sale of the property may not help much with this, if the sale, because of its terms and the fact that it is a distress sale, yields a price well below the true market value of the property. The property will be liquidated and the actual value of the equity will end up in the hands of the buyer, who was able to acquire title at a below market price, rather than being returned to the taxpayer.

Sections 2, 6, and 7 each augment the notices required to be sent to homeowners facing foreclosure. The Land Court supports the need for sending clear notices to parties facing tax foreclosure. Indeed, the citations and notices sent by the court already incorporate extensive language warning recipients clearly of the severe consequences of failure to act on a foreclosure case (*see infra* note 4). But it is not feasible, as Section 6 mandates, to include "the amount necessary to redeem the property" in the court's citation and notice. That amount is not determined nor set until the court makes a "finding" after court proceedings, which include the plaintiff's proof of the amounts owed. G.L. c. 60, § 68. Those proceedings must necessarily include an opportunity for the homeowner to appear and be heard, which happens *after* the homeowner receives the citation and notice. And the amount needed to redeem increases as interest, costs, and fees continue to accrue while the case proceeds, making a firm redemption amount unavailable for inclusion in the notices.

Section 8 inserts a broad opportunity to file a petition to vacate a foreclosure, or to reverse or modify a decree after the date of the auction and distribution of proceeds. Requests of this sort could commence at any time "in the interest of justice." While the appeal of letting homeowners get a further chance to recover their property, even after a foreclosure sale, is palpable, there is a harsh down-side for the homeowner in leaving this right open-ended. This right to vacate, reverse, or modify the court's decree would drastically impair any title coming out of the foreclosure and sale, leaving all tax-foreclosed titles forever in limbo. If the chance to undo a foreclosure sale is unlimited – who would buy such a title? What price would such a title fetch at auction? What surplus proceeds could the homeowner expect to recover from an auction of such an impaired title? Granting the homeowner an open-ended right to apply to redeem, even after the property is sold at auction to a third party, is likely to depress the amount which will be bid at the auction – diminishing greatly any home equity surplus the taxpayer might garner from the auction. The court can and will offer a homeowner abundant opportunity to redeem the property by paying what is owed before ordering a foreclosure sale. The court offers that chance now in every case before entering a judgment of foreclosure. If the central goal of this legislation is to

return equity to a taxpayer (net of the tax arrearage and costs of the foreclosure), that goal will be compromised if the foreclosure sale takes place without the ability for a third-party buyer to purchase a clear title free of rights of redemption. Without the ability of a tax foreclosure sale to pass a clear title, the sale will generate greatly reduced auction sale prices. And the title coming out of the foreclosure sale will remain blighted, because it will in perpetuity be subject to the possibility of redemption.

While the need for tax lien foreclosure reform may be genuine and pressing, some of the provisions in this bill may cause more harm than good. Any significant changes in Massachusetts' foreclosure procedure ought to balance the compelling interests of homeowners facing foreclosure with the needs of municipalities, and provide benefit to taxpayers in a real sense.

Thank you for your consideration. We are available to discuss these concerns and to provide any further information you might want on the tax lien foreclosure process.

Very truly yours,

/s/ Gordon H. Piper

Gordon H. Piper
*Chief Justice of the Land Court*


Cc (by email): Hon. Jeffrey A. Locke, Chief Justice of the Trial Court
　　　　　　　Thomas G. Ambrosino, Court Administrator
　　　　　　　Deborah J. Patterson, Land Court Recorder